_____

| | |
|---|---|
| WESTCHESTER FITNESS, LLC, HOLLY WALLMAN, AND JASON WALLMAN<br><br>               Plaintiff,<br><br>      -against-<br><br>RETROFITNESS, LLC, ROBERT SPRECHMAN, BI COUNTY COMMONS LLC, MILBROOK PROPERTIES LTD., and JANE AND JOHN DOES 1-10,<br><br>               Defendants. | **AMENDED COMPLAINT**<br><br>Case No. 1:20-cv-00699<br><br>Plaintiff designates Suffolk County as the place of trial. Venue is based upon Plaintiff's place of business and given that a substantial part of the events or omissions giving rise to the claims occurred in Suffolk County, New York.  **Plaintiff demands a jury trial on all issues so triable**. |

_____

      Plaintiffs, Westchester Fitness, LLC ("Westchester Fitness"), Holly Wallman and Jason Wallman (jointly, the "Wallmans," together with Westchester Fitness, "Plaintiff") by its attorney, Holly S. Falkowitz,[1] as and for its complaint against Defendants, Retrofitness, LLC ("Retrofitness")[2] and Robert Sprechman ("Sprechman"), and Jane and John Does 1-10 ("Doe," together with Retrofitness and Sprechman, collectively, "Retro Defendants"), Bi County Commons LLC ("Bi County" or the "Landlord"), and Milbrook Properties LTD ("Milbrook," together with Bi County, "Landlord Defendants"), and respectfully alleges as follows.  The allegations of the Complaint are based on the knowledge of Plaintiff, and on information and belief, including the investigation of counsel and review of publicly available information.

---

[1] Holly Wallman, a Plaintiff in this action, is the married name of Holly Falkowitz.  Holly Falkowitz is licensed to practice law in the State of New York under her maiden name.

[2] All references shall include Retrofitness, LLC's predecessor entity, Retrofitness, Corp., as applicable.

## NATURE OF THE ACTION

1.      This action emanates from the failure of Retro Defendants to comply with their obligations under New York law, as a registered franchisor under the New York General Business Law, and a certain Franchise Agreement dated May 9, 2009 by and between Retrofitness and Westchester Fitness (the "Franchise Agreement").

2.      Instead of honoring their legal and contractual obligations to Westchester Fitness, Retro Defendants flagrantly have disregarded the law in an effort to strong arm Westchester Fitness and its members into executing a new franchise agreement and related documents under duress and in violation of multiple statutory and contractual obligations of Retro Defendants. Then, when Westchester and its members refused to execute the unlawful agreements, Retro Defendants used their unequal bargaining position and leverage to unlawfully attempt to take Westchester Fitness's business without providing any reasonable consideration in exchange, and to block Westchester Fitness and its members from mitigating the substantial damages caused by Retro Defendants.

3.      Retro Defendants were, or undoubtedly should have been, aware that they would be violating -- and continue to violate – Westchester Fitness and its members' rights given that Retrofitness drafted the Franchise Agreement and the relevant disclosure documents, and thus knew its obligations thereunder, and Retrofitness, as a registered franchisor under New York law, has been conducting business in New York for well over a decade and is required to comply with its laws.

4.      Retro Defendants wrongful conduct continued after the filing of the original complaint in this action through their continued tortious interference with Westchester Fitness's contracts with its billing provider, collection company and members, breach of the covenant and

good faith and fair dealing and breach of multiple settlement agreements. Plaintiff maintains that Retro Defendants delay tactics were designed to force Westchester Fitness to permanently shutter its business without enabling it to mitigate its damages resulting from Retro Defendants' wrongful conduct.

5.      Plaintiff now brings this action to enforce its legal and contractual rights against Retro Defendants, and to unwind Retro Defendants' fraudulent scheme so as to enable Plaintiff to be made whole in accordance with applicable law.

6.      This action also seeks rescission of a commercial property lease between Bi-County and Westchester Fitness, including all amendments and guarantees thereof, for the premises located at 1039 Route 109, East Farmingdale, New York (the "Lease"), and a declaration that the Lease is unenforceable as a result of the COVID-19 Pandemic and the related government-mandated shutdowns (including Governor Andrew Cuomo's "New York State on PAUSE Executive Order and related Executive Orders). In sum, the total standstill of business, commerce, and everyday life in New York for months, and the severe limitations placed on the operation of fitness centers in New York in particular, has completely and unforeseeably frustrated the purpose of the Lease, and has rendered performance impossible.

7.      In addition, Plaintiff seeks recovery for additional claims against the Landlord Defendants for breach of contract, the covenant of good faith and fair dealing and as further detailed herein.

## PARTIES

8.      Plaintiff, Westchester Fitness, LLC, is a New York limited liability company with an address at 14 Forest Drive, Centerport, New York 11721.

9.      Plaintiff, Holly Wallman, is an individual residing at 14 Forest Drive, Centerport,

New York 11721.

10.      Plaintiff, Jason Wallman, is an individual residing at 14 Forest Drive, Centerport, New York 11721.

11.      Upon information and belief, Defendant, Retrofitness, LLC, is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business and last known address of 1601 Belverdere Road, Suite E-500, West Palm Beach, FL 33406.

12.      Upon information and belief, Defendant, Sprechman, is a New Jersey resident.

13.      Defendants, Jane and John Does 1 – 10, are any and all persons and/or entities currently unknown to Plaintiff that, upon information and belief, assisted Retro Defendants in carrying out their fraudulent scheme, breach of contractual obligations and deceptive business practices, and are thus, proper defendants in this action.

14.      Defendant Bi County, is a limited liability company organized and existing under and by virtue of the laws of the State of New York, with a principal place of business and last known address of 42 Bayview Avenue, Manhasset, New York 11030.

15.      Defendant Milbrook, is a corporation organized and existing under and by virtue of the laws of the State of New York, with a principal place of business and last known address of 42 Bayview Avenue, Manhasset, New York 11030.

## JURISDICTION AND VENUE

16.      The Supreme Court of New York has jurisdiction over this matter under CPLR §§ 301 and 302.  Jurisdiction is proper because Defendant, Retrofitness, and Landlord Defendants transact business within New York, and Retro Defendants and Landlord Defendants have

committed acts within the State of New York and/or outside the State of New York causing injury within the State of New York.

17.     Venue is proper in Suffolk County pursuant to CPLR 503 and 509 as: (i) Plaintiff's place of business is in Suffolk County, New York; (ii) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Suffolk County, New York; and (iii) the place of trial of this action shall be in the county designated by Plaintiff.

## FACTUAL BACKGROUND

### I.     The Relationship and Dealings between Plaintiff and Retro Defendants

18.     In 2008, Jason Wallman ("Mr. Wallman") and Holly Wallman ("Ms. Wallman," together with Mr. Wallman, the "Wallmans"), began their journey with Retrofitness when they decided to invest in a Retrofitness franchise.  Mr. Wallman wanted to expand his practice as a physical therapist specializing in sports medicine, and an acupuncturist, and join his specialties with a gym concept.  Retrofitness was a relatively new franchise system that seemed like a good fit.

19.     At the time, Ms. Wallman was looking for a career change as well. She was pregnant and wanted to move away from her busy legal career and have more time to spend with their daughter as she grew up.  Ms. Wallman felt practicing as an attorney in New York City did not give her the quality of life and scheduling flexibility she needed.  The plan was for Mr. Wallman to handle the day to day operations of the new business and Ms. Wallman would focus on the business, financial, legal and most marketing duties.

20.     After conducting due diligence and speaking with many Retrofitness owners, and the management and employees of Retrofitness, the Wallmans decided to move forward with trying to raise the capital to open a Retrofitness franchise.  The Wallmans were successful in

their efforts to obtain that capital, and after Retrofitness agreed that only the Wallmans would need to guarantee the obligations under the Franchise Agreement, Westchester Fitness purchased the franchise at issue in this action.

21. It is important to note that Westchester Fitness and the Wallmans relied upon the provisions set forth in the Franchise Agreement and the July 2008 Disclosure (as defined below) when determining to invest in the Retrofitness franchise system. It was of particular import that only the Wallmans were to execute documents relating to the Franchise Agreement and that all other investors in Westchester Fitness (the "Investors") had no personal liability with respect to the business -- to which Retrofitness agreed. Without this agreement, Westchester Fitness, the Wallmans, and the Investors would not have agreed to purchase the franchise. It also was critical to Westchester Fitness that the renewal requirements were clearly identified in the Franchise Agreement as without such Westchester Fitness would not have agreed to enter into the Franchise Agreement.

22. The start-up costs and capitalization of the business were to be funded with, *inter alia*, SBA and equipment financing as well as significant investor funds that totaled in excess of one million eight hundred thousand dollars ($1,800,000). Both of the Wallmans' parents decided to take a substantial portion of their retirement funds to invest in the business in addition to an investor group contributing funds to obtain minority interests in the business. The parties anticipated that they would receive distributions from the business and ultimately would sell the business at some point during the franchise term to realize a significant return on their investment.

23. From the beginning, the model that looked so promising on paper was not coming to fruition on Long Island. Among the contributors to this lack of success was the inability to

charge a $99 enrollment fee that was included in the projections provided by Retrofitness to the Wallmans and the Investors at that time, and was relied upon by them in determining to invest in a Retrofitness franchise. Once Plaintiff opened its business, it quickly became apparent that it was not feasible to charge this enrollment fee given the fierce competition.

24. Moreover, the expenses on Long Island also were much more than as stated in the projections Retrofitness had provided to sell the franchise. This became a significant financial issue for Plaintiff, the Wallmans as well as the Investors who were counting on significant dividends and income based upon the projections Retrofitness provided to them.

25. Over the years, it also became readily apparent that Retrofitness did not care to provide the franchisor support and assistance, as required under the Franchise Agreement, to facilitate the success of Westchester Fitness as well as its other franchisees in the market place. Rather, it appeared that Retrofitness was more concerned with squeezing every last dollar out of its existing franchisees through not only the lucrative royalties and marketing fees, but also through significant kick-backs that it obtained from mandatory vendors and suppliers that Retrofitness required its franchisees to utilize and which kick-backs served to increase the cost of such products or services passed through to Westchester Fitness. Retrofitness also appeared more interested in selling more franchises through which it obtained a hefty initial franchise purchase fee as well as lucrative royalties, franchise fees and vendor kick-backs through the operations of the new franchises.

## II. The Attempted Sale of Westchester Fitness

26. In 2015, Westchester Fitness decided it was time to sell the franchise. Ms. Wallman thought a reasonable strategy was to put together a group of Retrofitness clubs -- with synergistic benefits that would serve to garner a higher price than selling on an individual basis –

which would be sold as a unit to a private equity group either already in the fitness space or looking to get into that sector. Mr. Wallman and the Investors agreed.

27. Thereafter, the Wallmans were successful in assembling a group of strategically located Retrofitness clubs that had logistical synergies to provide reduced operating costs and economies of scale to any new operator and thus would incentivize a private equity group to purchase. After about a year and a half of trying to put a sale together with dozens of private equity groups expressing initial interest in the purchase, the group began to unravel because none of the private equity groups were interested in purchasing the franchises for a variety of reasons.

28. For example, certain groups were not interested in purchasing individual franchises, but rather wanted to own and be the franchisor to have more control over the business model and strategy. Other groups were not impressed with the business model, growth results and strategy of Retrofitness's corporate leadership; while others thought the deal was too small or had no experience in the fitness industry and thus did not feel comfortable operating in this space. Still others were turned off by the negative stigma that Retrofitness had in the market place given the large number of Retrofitness's for sale at the time.

29. Once the sale group disbanded, Westchester Fitness brought in a business broker to sell its business. The broker advised Westchester Fitness that Retrofitness was not easy to deal with during the sale process and, at times, held up the sales.

30. Over nearly two years, Westchester Fitness continued its efforts to sell its business during which time it became increasingly difficult to sell as Retrofitness's public image continued to deteriorate due to the large number of Retrofitness that were up for sale or that continued to close. There were multiple offers, but for one reason or another, the deals did not get consummated.

## III. The Reinvestment in Westchester Fitness,
## New CEO of Retrofitness and August 2, 2019 Meeting

31.     In the spring of 2019, after substantial efforts to sell the business had failed, Westchester Fitness decided to renew the Franchise Agreement and contemplated a substantial capital investment into the business to replace the cardio equipment and renovate the facility. The plan was that the new equipment and renovations would serve to build up Westchester Fitness's membership base, and then once that was accomplished, to sell the business in about 2-3 years and reap the benefits of such investment through a higher sales price.  To that end, Retrofitness emailed Westchester Fitness a 271 page Franchise Disclosure Document on June 17, 2019 (the "6/17/19 Disclosure") for review while Westchester Fitness sought and was approved for financing to replace all of the cardio equipment and to conduct certain other capital improvements to its fitness facility.   A true and correct copy of the 6/17/19 Disclosure is attached hereto as Exhibit "A" and incorporated by reference in full.

32.     The decision to invest also was to be based upon whether the Wallmans had confidence in Retrofitness's new CEO, Andrew Alfano ("Alfano") -- who commenced his employment with Retrofitness in or about mid May 2019 -- to significantly improve the franchisor services and support provided to Westchester Fitness as well as the brand culture, marketing and business model to aid in Westchester Fitness's success.  Indeed, in addition to the lack of franchisor services and support, the Wallmans were concerned that Retrofitness failed to provide transparency on the use of the advertising fund royalties payments that it made over the years, which were significant comprising 2% of the gross sales of Westchester Fitness for 10 years.  Westchester Fitness believed that the funds were not being used for the proper purpose as set forth in the Franchise Agreement especially given that over the years the Wallmans and other

Franchisees neither had been provided any detailed reporting or support for the use of the funds nor had Westchester seen any significant results from the advertising purportedly provided by Retrofitness.

33.     To that end, at the inception of Alfano's employment with Retrofitness, by email dated May 20, 2019, he stated that we will continue to focus on the growth and development of the Retrofitness team so that we can deliver the highest quality product and support to Retrofitness franchisees. Alfano also stated that he is confident Retrofitness will emerge as a category leader and notified the franchisees that he was scheduled to meet with the Retrofitness franchisees and to visit the clubs as part of his onboarding process to get to know the club owners, and to better understand what was working and what was not, and to hear, in general, what was on franchisees' minds. Alfano also stated "I strongly recognize that in order for Retro Fitness to have success as a brand, our franchisees need to be successful. So count on a focus to improving tools, resources and engagement with each of you."

34.     The Wallmans were excited at the prospect of new leadership in Retrofitness to hopefully breathe new life into the Retrofitness brand thereby increasing the value and success of the brand on the whole as well as each Retrofitness franchise, including Westchester Fitness. First, however, they needed to meet with Alfano to hear directly from him as to his vision for the franchise, his commitment to increase support and services to the franchisees including Westchester Fitness, as well as to discuss certain concerns they had with the terms of the newly proposed franchise agreement that would be executed. Accordingly, by email dated July 24, 2019, Mr. Wallman requested that the meeting with Alfano be moved up from an original date scheduled on August 8, 2019 to allow the Wallmans to have a positive and constructive

conversation with Alfano about their relationship with the franchise in general as well as their particular situation.

35.     Specifically, Mr. Wallman stated:

> We are about to sign a new franchise agreement and spend upwards of $300,000 in renovating the Farmingdale club. Before we make such a strong and positive commitment to Retro Fitness for another 10 years, we both feel strongly about sitting down with Andrew. The issue right now is time is of the essence. We need to decide on our financing so we may commence the renovation in an orderly and precise manner. We also have some items to discuss in terms of the franchise agreement itself. Holly and I cannot move forward with financing until we have our conversation with Andrew and work through all of our issues.
>
> Is there a way we can have a meeting sooner rather than later? Even as soon as this weekend if possible. Our only constraint is Holly's schedule. She works from home on Monday and Wednesday, which are best for us. We can also meet on a weekend if that works. Please let us know when we can make this happen. Given the circumstances and time constraints, we would appreciate any help in scheduling a meeting within the next week.
>
> Thank you again.

36.     Initially, Alfano indicated by email dated July 27, 2019 that he was unable to have a face to face meeting given that his calendar was packed the following week with touring the markets and meeting franchisees. Alfano suggested that any urgent matters regarding Westchester Fitness be discussed with other members of the Retrofitness team and the renewal of the franchise agreement be discussed with Sprechman, or alternatively, he as well as his colleagues, could participate in a call.

37.     Ms. Wallman responded by email dated July 27, 2019, reiterated the time constraints with respect to the financing, and stated:

> It's great to meet you as well and we look forward to meeting you in person. As I assume you know, Jason and I are working through

some time constraints on our end with respect to financing a major renovation. As I am sure you can appreciate, before taking the major step of investing hundreds of thousands of dollars into our business, we need to meet with you in person.

We would like to discuss the franchise, the vision that you have for the franchise and your plans to execute upon it, the new franchise agreement that we will need to execute, and the support that Retro Fitness will be providing to us (both monetarily and through services) to grow our business if we decide to take on this new substantial investment in our club.

The renovation is a major business decision for Jason and I -- the financing for which we will need to personally guarantee. We therefore need to feel comfortable moving forward and that we have the support and cooperation of Retro Fitness if we decide to do so. We are big proponents of face to face meetings and therefore the only way to get us comfortable with our decision is to meet with you personally.

Originally, August 8th was proposed as a date to meet you in person, but I work in the City on that date and also that date is not as timely as we need given the timing of the financing, the need to order the equipment, which has a 6 to 8 week lead time, and the time necessary for the renovations. With that said, if you have no earlier time available than August 8th, then I will take off from work to meet you in person. Please let us know as soon as possible if there is any possibility of an earlier meeting -- we can meet with you on this weekend or next if that works for you given that we all live in Long Island. Otherwise, would you please confirm asap that August 8th is good for a meeting and let us know the time so that I can arrange my work schedule?

38.     Ultimately, the parties were able to arrange for an in person meeting on August 2, 2019 at the Westchester Fitness club and then a lunch meeting thereafter. Prior to visiting the club, Alfano, Sprechman, Greg Pfohl ("Pfohl") and possibly Russ Hermann visited a Blink, which was scheduled to open in September 2019 within about one mile of Westchester Fitness's club. The Wallmans discussed with Alfano, Sprechman, and Pfohl that the main reasons they were trying to expedite the financing and the ordering of the equipment was to combat the

attrition from the opening of that new competitor as well as to ensure that the equipment replacement and renovations were completed well in advance of the busy season.

39.     The meeting with Alfano went well and the Wallmans were impressed by Alfano's vision, prior experience and self-proclaimed success in creating substantial increased value in businesses including The Learning Centers and Starbucks.  In particular, during lunch Alfano indicated that he had achieved an approximate 16 times multiple of EBITDA for the sale of The Learning Centers although the private equity firm that invested in that business had only projected less than half of that return.  Alfano also admitted during that meeting that Retrofitness had not been providing sufficient support or services as the franchisor of the Retrofitness franchise system and thus committed to significant improvements and increased support to facilitate success for the franchisees and to properly fulfill Retrofitness's obligations as franchisor.

40.     The Wallmans further discussed with Alfano, Sprechman and Pfohl their various concerns with the new franchise agreement provided as part of the 6/17/19 Disclosure and Sprechman indicated that they could work through many of the issues, and have a revised franchise agreement drafted in a week (the "2019 Franchise Agreement").  The Wallmans were eager to move forward with their growth and renovation plan.  That eagerness, however, quickly vanished as it became apparent over the following 1 ½ months that there was no way they could proceed forward with the 2019 Franchise Agreement and related documents given the unreasonable obligations placed on Westchester Fitness, the Wallmans and the Investors.

**IV.    Retrofitness's Protracted Delays and Failure to Honor
         its Contractual Obligations and to Comply with Applicable Law**

41.     Unfortunately, the drafting of the 2019 Franchise Agreement and ensuing

discussions did not go as smoothly as the Wallmans had been led to believe. Rather, Retrofitness and Sprechman unreasonably required, *inter alia*, Westchester Fitness to execute an addendum to their lease of the business premises located at 1039 Route 109, East Farmingdale, New York (the "Lease") exposing Westchester Fitness and the Wallmans to significant additional liability (the "Lease Addendum") and, incredibly this liability was inflicted regardless of whether they still owned or operated the business, and even if Retrofitness took over the Lease and was operating the business. This requirement also was imposed although Retrofitness and Sprechman previously had approved the Lease and the conditions for renewal set forth in the Franchise Agreement did not require any amendment thereof – a critical point relied upon by Westchester Fitness and the Wallmans when determining to execute the Franchise Agreement.

42.     Retrofitness and Sprechman also unreasonably required that all of the members of Westchester Fitness execute the 2019 Franchise Agreement, a certain Addendum to the Franchise Agreement (the "2019 Franchise Agreement Addendum"), and a limited guaranty and subordination agreement (the "Limited Guaranty").   Once again, the Franchise Agreement renewal provisions did not require all members of Westchester Fitness to sign any renewal franchise agreement, guarantee or related documents and this also was a crucial provision that Westchester Fitness and Wallmans relied upon when determining to execute the Franchise Agreement.

43.     Further, Retrofitness and Sprechman did not agree to provide reciprocal general releases to Westchester Fitness, the Wallmans, and the Investors despite these releases being mandated under the New York General Business Law as well as Retrofitness's own disclosure documents as described below.   Finally, Retrofitness and Sprechman demanded Westchester Fitness, the Wallmans, and its Investors to execute additional onerous provisions that neither

were required under the Franchise Agreement or the Retrofitness's disclosure documents, nor were they in conformance with applicable law.

44.     Separate and apart from the unreasonable demands placed upon Westchester Fitness, the Wallmans, and the Investors, and the failure of Retrofitness to comply with New York law, Sprechman and Retrofitness took nearly one month to provide even a draft of the simple 3 ½ page 2019 Franchise Agreement Addendum and 1 ½ page Limited Guaranty, which were to encompass various comments raised by Westchester Fitness at the August 2, 2019 meeting as further detailed in an email from Ms. Wallman to Sprechman dated August 5, 2019.

45.     In fact, Ms. Wallman sent Sprechman numerous emails throughout August requesting the franchise documents only to be repeatedly told that Retrofitness's counsel is still working on the agreements or that the documents would be coming soon even though they did not. For example, in response to Ms. Wallman's email of Thursday, August 22, 2019, requesting the status of the franchise agreement, Sprechman stated "I've been waiting on Justin [counsel] for a while now. Sorry.. He's promised I'll have this Monday." Monday came and went and no documents were forthcoming, however.

46.     Ms. Wallman followed up on Wednesday, August 28, 2019, once again requesting the status and stating that we need to get this finished. Ms. Wallman received a harsh email response that same day from Sprechman stating: "I know!! I've been yelling at my attorney this entire time. He says it's in final edits. Hope to get you the docs tomorrow!!"

47.     Much to Westchester Fitness's disappointment, after the long awaited documents were finally provided to Westchester Fitness on August 29, 2019, it quickly became apparent that only a fraction of what had been requested at the August 2, 2019 meeting and in the August 5, 2019 email from Ms. Wallman to Sprechman was included, and therefore substantial revisions

were required, which only served to lead to further delays by Retrofitness. For example, although Retrofitness and Sprechman agreed that the Wallmans' parents and the other Investors would have no liability under the 2019 Franchise Agreement and related documents, the draft documents provided by Retrofitness and Sprechman sought to impose significant liability and indemnification obligations upon them.

48. Sprechman and Ms. Wallman discussed her concerns with the 2019 Franchise Agreement, the 2019 Franchise Agreement Addendum, and the Limited Guaranty on August 30, 2019 at which time Sprechman agreed that he would have his attorney draft a one paragraph agreement stating that the Investors have no confidential information and they will not compete with another franchise fitness facility. There was to be no indemnification or other provisions that were set forth in the Limited Guaranty submitted on August 29, 2019 as the Investors were not guaranteeing any of the obligations under the Franchise Agreement or indemnifying Retrofitness. Ms. Wallman reiterated her objection to the Investors executing the 2019 Franchise Agreement as the stand alone agreement would encompass all of the Investors' limited obligations as set forth above. Ms. Wallman also advised Sprechman that once the agreements were finalized they would be subject to the Investors' approval.

49. Ms. Wallman documented her comments discussed during that call as well as other concerns by email dated September 2, 2019, in addition to multiple emails throughout September 2019, but ultimately after several rounds of emails, much of her comments and concerns were outright rejected and dismissed by Retrofitness including, without limitation, the one paragraph agreement stating that the Investors have no confidential information and they will not compete with another franchise fitness facility as agreed to by Sprechman during the August 30, 2019 call.

50.     To add further insult to injury, while waiting on the drafts of the agreements from Retrofitness, and after having spent a significant amount of time reviewing the extensive 6/17/19 Disclosure, Retrofitness sent an updated nearly 300 page disclosure document and franchise agreement on August 15, 2019, which purportedly was amended July 30, 2019 as denoted at the bottom of the document (the "7/30/19 Disclosure") prior to the August 2, 2019 meeting, but was not provided to Westchester Fitness until August 16, 2019, over two weeks later. A true and correct copy of the 7/30/19 Disclosure is attached hereto as Exhibit "B" and incorporated by reference herein in full.

51.     On August 30, 2019, Ms. Wallman informed Sprechman that she had been working off of the 6/17/19 Disclosure and franchise agreement included therein and asked whether anything had changed. Rather than to highlight the changes to assist in her review of the hundreds of pages of disclosures that had been provided to her weeks after the 7/30/19 Disclosure was effective, however, Sprechman claimed that he did not have a redline.

52.     While the 2019 Franchise Agreement Addendum and Limited Guarantee were being drafted and reviewed as discussed above, the Lease Addendum also was being addressed. In particular, Sprechman originally claimed at the August 2, 2019 meeting that Retrofitness had not approved the Lease as a basis for requiring the Lease Addendum. Ms. Wallman explained at that meeting and in a subsequent email dated August 5, 2019, however, that:

> Our lease previously was approved by the Franchisor when we purchased the Farmingdale location. As I mentioned at the meeting, Prakash Datwani initially negotiated the lease, which was assigned to us. At the time, we retained Mitch Grayson as our attorney and he ensured that all of the necessary Retro Fitness required lease provisions were included in the assignment, which also was provided to Retro Fitness at the time. In any case, I am resending you the Lease, the Assignment and the two amendments to the Lease by separate email. In addition to the Lease previously

having been approved by Retro Fitness, our current Franchise Agreement states that with respect to renewal, we are only required to sign the then-current Franchise Agreement (except with respect to the renewal provisions thereof, which shall not supersede this Section 4.6.2). Section 4.6.2 of our current Franchise Agreement does not require a lease approval as a condition to renewal. We also ask that Section 4.6.2 of our current Franchise Agreement be included as part of the new Franchise Agreement in place of Section 4.6.2 in the new Franchise Agreement consistent with the contractual provisions of the current Franchise Agreement.

53.     Despite being presented with multiple emails reflecting Retrofitness and Sprechman's approval of the Lease documents, over a series of emails between Sprechman and Ms. Wallman from August 6, 2019 through August 8, 2019, Sprechman continued to unreasonably demand that the Lease Addendum be executed. Sprechman claimed that the Lease Addendum sought to provide further protections to the Landlord of Westchester Fitness and incredulously stated that the Lease Addendum had nothing to do with Westchester Fitness and the Wallmans, but rather was Retrofitness's, and presumably the Landlord's, issue.

54.     Indeed, Ms. Wallman attempted to explain to Sprechman multiple times including by email dated August 6, 2019 that:

The Lease was previously approved by Retro Fitness and our current Franchise Agreement does not require us to sign any additional rider to the Lease or to take on the additional obligations as set forth in the Rider as a condition for renewal as I previously stated. The current rider expands Jason, my and Westchester Fitness's obligations under our Lease, which was heavily negotiated with the Landlord prior to execution. Jason and I are not willing to expand our liability and obligations under the Lease and our current Franchise Agreement with respect to the Lease (which specifically does not require us to do so). This was, and still is, a critical point for us in determining to proceed with the Lease as well as the Franchise.

55.     Incredibly, in response to this email on that same day, Sprechman disingenuously and callously stated:

As I said, it's not an onerous ask in any way for the landlord. If anything it's an extra layer of protection. Please send it to him and ask him to have a call with Rich….

It's a demand we have of every lease. Early on back in 2009, I didn't even know what a rider was! But we grow and learn and of course many things change. No one could ever expect the same agreements, deals or documents from 10 years ago!

56.    Ms. Wallman further objected to the Lease Addendum in additional emails and

also stated by email dated August 8, 2019 that:

The rider takes away valuable rights that we negotiated with the Landlord and, without such, we would never have entered the Lease (for which we provided a personal guarantee) or purchased the Franchise in the first place. For example, we have an absolute right to the assignment of the Lease including to a franchisee. Your rider takes this right from us by providing the Landlord with the right to refuse a new tenant under various conditions. By that same token, the rider takes away rights of the Landlord and us that were heavily negotiated when we entered into the Lease.

I reviewed my emails again and see that I made great effort to obtain your approval of the Lease and based on this took comfort in the fact that the Lease would never be changed and the Franchisor would not impose additional obligations on us and the Landlord if and when we sought to renew our franchise.

To that end, if you review Section 4.6.2(c) of the original Franchise Agreement, you will see that it specifically states as a condition of renewal: "You and any Related Parties that have signed this Agreement shall have signed a copy of the then-current Franchise Agreement (except with respect to the renewal provisions thereof, which shall not supersede this Section 4.6.2)...." The requirements of section 4.6.2 of the original Franchise Agreement do not include a requirement that a new lease rider be signed.

It is basic contract law that this specific provision in the Franchise Agreement stating that Section 4.6.2 cannot be superseded trumps any general provision in the contract regarding modifications of the standard Franchise Agreement (including the provision you stated). It is also basic contract law that an agreement is to be construed against the drafter and any ambiguities are to be

interpreted in favor of the non-drafter. Finally, a contract is to be read as a whole and provisions are to be interpreted so that they are consistent with each other. Accordingly, even though I do not think the Franchise Agreement is ambiguous on this issue, assuming *arguendo* that it is, the Franchise Agreement would be interpreted in our favor. Based on your approval of the current Lease as well as the provision in the Franchise Agreement that protected our rights to renewal, I was satisfied that we were protected and agreed to proceed with the Lease and the Franchise. To now seek to impose significant obligations on us and also to provide the Landlord with additional benefits and detriments that were not initially negotiated is not only unfair but counter to the legal requirements of the contract.

Again, I ask that we discuss this matter today.

57.     In direct defiance of Retrofitness's contractual and legal obligations, Sprechman responded that same day:

… Nothing you've written below or the emails you've sent change the fact that you need to send us your landlord's contract information so we can negotiate our rider. That was then, this is now. If this becomes a deal breaker for you, I'm sorry. This is standard operation procedure for all Retros.

58.     That same day, Ms. Wallman further stated by email in response:

Robbie, we cannot sign that rider. In addition to Jason and me, we have other investors in our gym that approved the lease as is. This is extremely disappointing given that the current franchise agreement specifically does not require the rider and the franchisor is not honoring its contractual obligations. The fact that it is now standard procedure to provide the rider is not relevant to our agreement with the franchise.

59.     Ms. Wallman also requested that same day that Sprechman speak with Retrofitness's franchise lawyer about the dispute and offered to participate in a call with him as well. Sprechman failed to respond to this request.

60.     Even after being presented with extensive emails demonstrating that the Lease was approved by Retrofitness and the Franchise Agreement did not require a lease addendum as a condition for renewal, and over Westchester's Fitness's strong objection, Retrofitness and Sprechman still unreasonably and steadfastly demanded that the Lease Addendum be executed and Sprechman flatly rejected to even participate in any discussions with Ms. Wallman on the issue.

61.     At the time, upon information and belief, Retrofitness and Sprechman knew that Westchester Fitness would be forced to concede to their unreasonable demands in order to salvage their business and thus Retrofitness and Sprechman knew that they had leverage over Westchester Fitness and were operating from a position of power and undue influence. This was a significant concern of Westchester Fitness and the Wallmans as the Lease Addendum sought to detrimentally impact the rights of the Westchester Fitness and the Wallmans and to impose multiple restrictions and negative covenants upon them that were not included in the Lease – a lease that was extensively negotiated by Westchester Fitness, the Wallmans and the Landlord prior to Westchester Fitness and the Wallmans agreeing to its execution. Significantly, without the very provisions that Westchester Fitness and the Wallmans had negotiated with the Landlord to limit their liability under the Lease, which Retrofitness now sought to eviscerate with the Lease Addendum ten years after the Lease and Franchise Agreement were executed, Westchester Fitness and the Wallmans would not have agreed to execute the Lease or to pursue a franchise with Retrofitness.

62.     Left with no choice, Ms. Wallman was forced to reluctantly and under protest, provide the contact information of the Landlord to Retrofitness, and participated in a conference call with Charles Hirsch (a principal of the Landlord), Richard Roser of Retrofitness ("Roser"),

and Bartow Duncan (Retrofitness's real estate counsel) ("Duncan") to discuss the Lease Addendum on August 13, 2019. During that call, both the Landlord and Ms. Wallman expressed their concerns regarding various onerous provisions included in the Lease Addendum.

63. Although Roser and Duncan indicated that they would revise the Lease Addendum to incorporate the Landlord and Ms. Wallman's comments, the version of the Lease Addendum sent later that day failed to include the vast majority of such comments. Accordingly, by separate emails dated August 15, 2019, Ms. Wallman and the Landlord provided written comments to Roser and Duncan, without waiving any rights, and reiterating the comments discussed during the August 13, 2019 call.

64. In particular, Ms. Wallman sought to, *inter alia*, omit or modify the provisions of the Lease Addendum that: (i) allowed Retrofitness to unilaterally assume the Lease if the 2019 Franchise Agreement was terminated; (ii) held Westchester Fitness liable on the Lease for all obligations under the Lease even if the Lease was assigned to Retrofitness, or to a parent, subsidiary or affiliate of Retrofitness (the "Assuming Franchisor Party"); (iii) afforded the Assuming Franchisor Party the right to an unlimited recovery of any amounts it paid the Landlord to cure Westchester Fitness defaults under the Lease regardless of whether such amounts were determined to be due and owing under the Lease; (iv) failed to release Westchester Fitness from any liability as tenant under the Lease accruing after the effective date of any assumption by the Assuming Franchisor Party; (v) sought to limit Westchester Fitness and the Landlord's rights to negotiate additional lease amendments without obtaining Retrofitness's written approval; and (vi) required Westchester Fitness upon receipt of written demand to remove certain signage and other items from its location at 1039 Route 109, East Farmingdale, New York, 11735 (the "Premises").

65. Likewise, the Landlord's comments served to limit the increased exposure and liability imposed upon the Landlord designed for the betterment of Retrofitness and despite Retrofitness disingenuously claiming that the provisions were intended to protect the Landlord.

66. Moreover, although certain provisions of the Lease that were extensively negotiated by Westchester Fitness and the Landlord afforded Westchester Fitness an unfettered right to assign the Lease, Retrofitness's proposed amendments placed limitations on such right serving to make it more difficult to assign the Lease and thereby decreasing the value of the Lease to Westchester Fitness.

67. During the August 13, 2019 call, Roser agreed that the parties would have another group conference call after all comments were incorporated to finalize an agreement expeditiously. However, much to Ms. Wallman's disappointment, that call or any other call with Ms. Wallman and Roser never materialized. Rather, Roser and Duncan separately negotiated with the Landlord to reach an agreement that was beneficial to Retrofitness while being detrimental to Westchester Fitness and contrary to Westchester Fitness's rights under the Franchise Agreement and Lease.

68. Indeed, despite numerous follow ups and Ms. Wallman's constant reminder of the urgency of finalizing the 2019 Franchise Agreement and related documents through multiple emails dated August 19, 2019 through September 17, 2019, the final draft of the less than 4 page Lease Addendum (which failed to include the vast majority of Ms. Wallman's comments) was not tendered to Westchester Fitness until September 17, 2019 -- approximately 1 ½ months after the August 2, 2019 meeting and on a date that Retrofitness claimed at the time to be the expiration date of the Franchise Agreement.

69.     On September 17, 2019, just prior to receiving the Lease Addendum, Ms. Wallman emailed, *inter alia*, Roser and Duncan, reiterating the same issues that she had conveyed to Retrofitness for months, as follows:

> Rich, I know I expressed the time sensitivity of getting the new franchise agreement and lease addendum finalized many times, but the delays in getting this done are negatively impacting the gym. We announced renovations and new improvements to be done over the summer time in an effort to combat competition and maintain our membership base. We cannot commit to any financing to even order the equipment without finalizing the franchise agreement and lease addendum, which equipment takes 6 to 8 months to deliver. We have a new gym opening up in Farmingdale next week (Blink) and the entire purpose of the timing of the renovations and the new equipment was to combat the impact on our membership due to such new gym. We have now lost the advantage and are extremely frustrated that this has taken so long. To add to our frustration is that we legally are not even required to execute a franchise [sic] [lease] agreement addendum per our original franchise agreement, but have been forced to do so by the franchise. This is not right.

70.     On September 17, 2019, Sprechman also emailed what he purported to be the final version of the 2019 Franchise Agreement, but unbeknownst to Ms. Wallman at the time, the version of the 2019 Franchise Agreement was yet another version from the draft franchise agreements submitted to Westchester Fitness in the 6/17/19 Disclosure as well as the 7/30/19 Disclosure. In particular, the franchise agreement set forth in the 6/17/19 Disclosure and the 7/30/19 Disclosure included identifying footnotes of "F.A. 04 2019", and "F.A. 07/2019," respectively; whereas the final franchise agreement provided to Westchester Fitness for immediate execution on September 17, 2019, had a footnote stating "F.A. 04 2018, as amended 01 2019." Accordingly, contrary to the disclosure requirements under New York law, and in an apparent effort to deceive Westchester Fitness into executing an agreement that it had not reviewed, Sprechman switched the final version of the franchise agreement for execution.

71.     This same date, Sprechman provided what he purported to be the final versions of the 2019 Franchise Agreement Addendum and the Limited Guaranty.  These documents along with the 2019 Franchise Agreement sought to impose unreasonable restrictions and obligations on Westchester Fitness, the Wallmans and the Investors as further detailed herein.

72.     Retrofitness knew that Westchester Fitness needed to finalize and execute a new franchise agreement and related documents before it could proceed with finalizing the financing and ordering the equipment.  Retrofitness knew that Westchester Fitness was under significant time constraints given that a competitor gym was scheduled to open in September 2019 and Westchester Fitness needed to combat the attrition from that gym by renovating the club and replacing the equipment, which Retrofitness also knew took 6 to 8 weeks to be installed.

73.     Armed with this knowledge, Retrofitness used delay and strong-arm tactics in an effort to force Westchester Fitness, the Wallmans, and the Investors of the business to sign the 2019 Franchise Agreement out of pressure to get a deal done because the Franchise Agreement was set to expire in September 2019 and they needed to finalize their financing and order the equipment to combat the attrition from the opening of a new neighboring gym.  Retrofitness would not respond to Westchester Fitness and the Wallmans' good faith efforts to resolve various issues they had with the respect to the 2019 Franchise Agreement, the 2019 Franchise Agreement Addendum, the Lease Addendum, and the Limited Guaranty (collectively, the "2019 Franchise Documents").

74.     Indeed, on September 19, 2019, merely two days after Retrofitness presented the 2019 Franchise Documents to Westchester Fitness on September 17, 2019 (the date that Retrofitness claimed at the time the Franchise Agreement had expired as Retrofitness subsequently admitted that the Franchise Agreement expired on September 7, 2019), Sprechman

emphatically stated: "We are at a point where we need to sign docs and move forward!  Can I expect to get everything today?  Your old agreement is expired".

75.     Ms. Wallman responded on that same day to Alfano by forwarding Sprechman's email and stated:

> I am writing to follow up on our meeting earlier this summer during which we discussed the future of the Retro Gym franchise and your vision going forward.  We are unable to execute the updated franchise agreement as drafted, and communications such as the one attached pressuring us to sign without appropriate review of the agreement are not productive.  As I told Robbie, we need to discuss this agreement with all of our investors, and that takes some time.   We are continuing to honor our basic commitments under the existing agreement and do not believe that there is an emergency, especially given the delays caused by the Franchisor's attorney in the negotiation of this agreement as well as the delays in receiving a revised lease addendum.
>
> We would like to set a meeting with you to discuss moving forward.

76.     On that same day, in response to Retrofitness and Sprechman's pressure tactics, Ms. Wallman informed Sprechman that Westchester fitness is not moving forward with the 2019 Franchise Agreement as it is onerous and Westchester Fitness, the Wallmans, and the Investors cannot sign it.  Ms. Wallman further informed Sprechman that to mitigate their damages they would be willing to fire sale the gym to get someone in that would put up the money and invest in it.

77.     During that call, Sprechman claimed the refurbishment schedule of approximately $215,000 was for Westchester Fitness as a 10 year franchisee, but if someone new came in they may make them put in $350,000 or $400,000 in capital expenditures.  Ms. Wallman replied that the original refurbishment schedule was created for a new owner as Westchester Fitness intended

to sell the gym when that schedule was created and the amounts set forth therein were not at a discounted rate for Westchester Fitness. Sprechman claimed he would need to talk with the person that created the schedule and get back to Ms. Wallman.

78. Sprechman also claimed during that call that Ms. Wallman' proposed resolution only benefited Westchester Fitness and not Retrofitness. Ms. Wallman disagreed and stated that if Westchester Fitness can sell its club to another owner that is willing to invest this would be positive outcome for Retrofitness. Sprechman threatened that they have closed Retros before and this would not be the first one they closed. Ms. Wallman replied that is a losing position for Retrofitness and that if they can get another franchisee to purchase the business that would be the best result for all of them.

79. Ms. Wallman also asked if the franchisor would buy the club and Sprechman stated not at this point, but maybe in a few years they would. Ms. Wallman also asked Sprechman if Retrofitness had a prospective purchaser of the club and Sprechman stated he did not know, but would check. Sprechman further stated that Westchester Fitness would have to pay the new franchise fee, and Ms. Wallman responded that they would continue to pay the royalties under the Franchise Agreement (although under no obligation to do so) and the new owner coming in would pay the franchise fee. Sprechman, however, unreasonably demanded multiple fees and stated he would get back to Ms. Wallman the next day after he spoke with his team.

80. At that point, in an effort to mitigate its damages, Westchester Fitness pursued multiple avenues. Specifically, Westchester Fitness reached out to current and former owners of other Retrofitness clubs to see if they or purchasers of their clubs would be interested in purchasing another gym at an extremely reduced price. Westchester Fitness also contacted other

parties that previously were interested in purchasing the club to determine if they would purchase the club at a steeply discounted price. Unfortunately, none of these efforts were successful.

81. Simultaneously, Westchester Fitness contacted multiple business brokers to sell the club and promptly executed an agreement with one of those brokers, who had sold many other Retrofitness franchises and was Retrofitness primary business broker, to sell the club at a fire sale price to mitigate its damages.

82. In a further effort to mitigate damages, on September 20, 2019, the Wallmans provided the Landlord with their four month notice to vacate (the "Notice to Vacate") required under their limited good guy guaranty of the Lease (the "Good Guy Guaranty"). Ms. Wallman informed the Landlord that Westchester Fitness would continue to look for a purchaser of the business to take over the Lease, and, in fact, at the time, had a potential buyer considering the gym. Mr. Hirsch was aware that Westchester Fitness had engaged a business broker to sell the business and, in the event that Westchester Fitness was able to consummate a sale of the gym with a new franchisee or even Retrofitness, Westchester Fitness would revoke the Notice to Vacate.

83. Although Sprechman indicated that he would get back to Ms. Wallman the next day, another week went by before Retrofitness emailed on September 24, 2019 stating that Retrofitness would provide a limited extension to allow Westchester Fitness a short window to try and sell the club (the "Limited Extension"). Sprechman further stated that the document was "a read only doc, no changes. Please sign and send back asap, as you are out of term."

84. The Limited Extension, however, stripped Westchester Fitness, the Wallmans, and the Investors of valuable rights in exchange for nominal and illusory consideration in return. In particular, the Limited Extension provided Westchester Fitness with a little over two months

to close on the sale or transfer of the club under stringent conditions that served to ensure that no such sale or transfer would ever occur.  Not only was the timing for such transaction to occur too limited, but as a condition for approving any such transfer, the prospective franchisee was required to complete any required remodel, equipment purchases, and/or refurbishment in the first twelve (12) months following the transfer and that such required renovation or equipment purchase was presently estimated to be between $300,000 - $350,000, which amount was subject to increase at the discretion of Retrofitness.  These new costs ranged between approximately $86,000 to $136,000 or even higher than the original expenditures required when Retrofitness previously approved the $214,200 in upgrades.  Such improvements also were required to be consummated in one year despite Retrofitness previously approving the improvements over multiple years thereby allowing a prospective purchaser to spread out any investment over time. Retrofitness's exorbitant increase in the renovation expenses and equipment purchases as well as the significantly shortened time frame for such investment from what previously was approved by Retrofitness in contemplation of the sale of the fitness center, further demonstrate Retrofitness's bad faith.

85.     In exchange for this sham opportunity to transfer their business, Westchester Fitness and the Wallmans were required to remit substantial payments to Retrofitness during the extension period, such as:  (i) $1,500 per month in addition to the royalties and advertising fund fees charged under the Franchise Agreement prior to its expiration; (ii) a lease review fee of $2,000; and (iii) a technology fee of $499.99 per month.  In addition, Westchester Fitness was required to continue to spend $5,000 on approved advertising each month.

86.     In addition to the lucrative fees charged under the Limited Extension, Westchester Fitness and the Wallmans were required to sign a unilateral general release as part of the Limited

Extension and also an additional unilateral general release prior to any transfer of the business (which is contrary to the requirements of the New York General Business Law and the July 2008 Disclosure).

87.     Retrofitness imposed additional stringent requirements upon Westchester Fitness and the Wallmans under the Limited Extension.  In the event that the business was not transferred within the two month extension period, Westchester Fitness and the Wallmans were required to, *inter alia*:  (i) close the business; (ii) de-brand the outlet; (iii) be subject to a confidentiality agreement regarding the Limited Extension and all of Retrofitness's wrongful conduct that occurred prior to the execution of the Limited Extension; (v) extend the indemnification provisions that had expired under the Franchise Agreement; and (iv) indemnify Retrofitness and its officers, directors, shareholders, affiliates, successors, and assigns and hold them harmless for any and all costs, expenses, liabilities and damages arising out of or relating to the enforcement of Westchester Fitness and the Wallman's obligations under the Extension Agreement.

88.     The Limited Extension was nothing more than a feeble attempt to provide Retrofitness and Sprechman with some cover for their prior wrongful actions, which they seemingly knew were contrary to their contractual and legal obligations, and served to cause significant harm to Westchester Fitness, the Wallmans, and the Investors. Indeed, upon information and belief, Retrofitness knew that Westchester Fitness would not be able to sell its business with the excessive renovation and equipment purchasing costs Retrofitness strapped on to any sale over a greatly shortened period from what Retrofitness previously had agreed. Rather, by affording Westchester Fitness an illusory extension for a sale that was required to be consummated in slightly more than two months under the onerous conditions imposed by

Retrofitness, Retrofitness would be able to insulate itself from substantial liability by virtue of the unilateral general release required to be provided by Westchester Fitness and the Wallmans while collecting its lucrative and excessive fees.

89.     After reviewing the Extension Agreement and recognizing its fundamental unfairness, Ms. Wallman responded by email on September 26, 2019 to Sprechman and Alfano: "We are not comfortable signing the agreement as currently drafted. I will make comments and send them to you."

90.     Alfano, however, was not agreeable to any amendments, but rather sought to impose a contract of adhesion upon Westchester Fitness and the Wallmans, and stated shortly thereafter that same day: "We have been more than patient and accommodating. There will be no amendments to this agreement. Please make your decision on what you will be doing and let us know tomorrow."

91.     The next day, by email dated September 27, 2019, Ms. Wallman replied:

> The agreement has a number of objectionable provisions and the demand to sign the agreement immediately is not appropriate as there are no exigent circumstances. We will continue to operate in good faith and honor our financial commitments under the expired franchise agreement while we continue to discuss our relationship on a go forward basis. If you have a buyer or intent to operate the franchise, as I previously indicated to Robbie last week, we are open to any mutually beneficial arrangement. I have not heard back on this request other than for Robbie to indicate last week that he would look into a third party buyer and the franchise is not interested in buying the business.
>
> I would hope that all parties could work to a solution that will benefit all involved. Please let me know the status of my inquiry regarding a potential third party buyer.

92.     Incredibly, rather than to work in good faith to reach an acceptable resolution to all parties especially after Retrofitness's wrongful conduct served to place Westchester Fitness,

the Wallmans and the Investors in an untenable situation and caused them significant damage, Retrofitness's response to the September 27, 2019 email was to send a default notice dated October 1, 2019 (the "10/1/19 Default Notice").

93.     The 10/1/19 Default Notice stated, in pertinent part, that the Franchise Agreement expired on September 17, 2019, and provided notice that Retrofitness *may* exercise its option to purchase the physical assets, and the Lease, of Westchester Fitness.   Retrofitness requested certain documentation and information in the 10/1/19 Default Notice including:  (i) a complete list of all equipment, supplies, and inventory; (ii) a calculation of the cost and fair market value of the supplies and inventory; (iii) a calculation of the current value of all other tangible personal property based on the straight-line method over a five (5) year life; (iv) a list of all liens and/or encumbrances on the physical assets of Westchester Fitness; (v) copies of any leases for equipment used in Westchester Fitness's business as well as a list of all liens and/or encumbrances on those leases; and (vi) copies of the Lease for the Premises, any amendments or addendums thereto, and any applicable notices of default and/or documentation of any liens, encumbrances, or other circumstances which may be material to the assumption of the Lease (collectively, the "Discovery").  Retrofitness also demanded that Westchester Fitness allow it to inspect the leased equipment (the "Inspection").  Retrofitness further claimed that Westchester was prohibited from taking any action that infringes upon any of Retrofitness's rights including any action that may compromise the value of the assets, equipment and/or premises until Retrofitness notified Westchester Fitness as to its final determinations with regard to its purported contractual options.

94.     While seeking to hold Westchester Fitness in default, and although knowing that Westchester Fitness was not proceeding with the 2019 Franchise Agreement, Retrofitness

continued to negotiate directly with Westchester Fitness's Landlord in an effort to modify the Lease to the detriment of Westchester Fitness.

95.     Thereafter, on October 21, 2019, Ms. Wallman discussed with Sprechman various concerns that also were set forth in her email to Sprechman of that same date. In particular, Ms. Wallman stated during the course of reviewing the franchise documents for the renewal of the Franchise Agreement as well as in connection with communications with Retrofitness, serious concerns had been identified as to the manner in which Retrofitness was doing business in New York.

96.     During their call, Sprechman asked where is Westchester Fitness's lease assignment and equipment and Ms. Wallman replied that she was not sure of the purpose of the 10/1/19 Default Notice as it does not comply with the requirements of the expired Franchise Agreement.   Ms. Wallman further informed Sprechman that Retrofitness may not selectively seek to enforce a contract when they have breached that contract.

97.     In addition, Ms. Wallman stated that they are still working to sell the franchise, had a buyer interested in the purchase, and continued to maintain that this would be a positive result for Retrofitness as it would provide Retrofitness with another franchisee willing to invest in the business.  Ms. Wallman further stated that they would be selling the business for a fire sale price and therefore losing significant money on the proposed transaction.  Sprechman indicated that Retrofitness had offered Westchester Fitness an extension agreement and Ms. Wallman replied that it is a contract of adhesion and included unreasonable limitations that Retrofitness was unwilling to modify.

98.     Sprechman further indicated that it's out of his hands and that is why Retrofitness has attorneys and pays insurance.   Under a full reservation of rights, Ms. Wallman reiterated that

the best result for all would be to allow Westchester Fitness to sell its business and while doing so Westchester Fitness would continue to remit the royalties and other fees under the expired Franchise Agreement (although under no obligation to do so).

99.    The next day, on October 22, 2019, Sprechman offered $50,000 for Retrofitness to buy Westchester Fitness's equipment and take over the Lease. On October 24, 2019, Westchester Fitness responded that Retrofitness's offer failed to take into account the going concern value of the business, which includes, receivables, contracts, leasehold improvements, good will and other assets of the business (in addition to the equipment). Accordingly, Westchester Fitness countered with an offer of $500,000 indicating that this price represented a significant reduction of the going concern value of the business.

100.    On October 25, 2019, Sprechman once again reiterated Retrofitness's $50,000 offer and thereafter on October 28, 2019, Ms. Wallman replied:

> We do not believe the value of our business is only $500,000. Indeed, we believe it is well in excess of this number and we received offers much higher than that price in the past, but given the circumstances, we are left with no choice but to try to sell the gym at a significant discount.
>
> As I stated previously, it is well settled law that a party such as Retrofitness LLC may not selectively seek to enforce a contract after it has breached the very same contract that it seeks to enforce. Moreover, Retrofitness LLC's offer and request for information is not consistent with the terms of the Franchise Agreement even if we assumed solely for the sake of argument that the Franchisor is entitled to avail itself of the Franchise Agreement despite such breaches. Specifically, the Franchise Agreement provides that Retrofitness LLC has an option to purchase the equipment, but that option must be executed within 30 days after the Franchise Agreement terminated. Once the option is executed, then there is a mechanism in the Franchise Agreement to agree upon a price. Retrofitness LLC never executed the option within that time period.

Further, Retrofitness LLC's efforts to obtain our lease after it refused to comply with its contractual and legal requirements with respect to the Franchise Agreement, the extension of the Franchise Agreement and the lease addendum as well as New York law are without merit and would also result in Retro Fitness being unjustly enriched for its wrongful conduct. Indeed, I understand that Retrofitness LLC continued to negotiate with the Landlord for the take over of our lease even after our Franchise Agreement expired and we told Retrofitness LLC we were not renewing because of the various issues we had experienced with Retrofitness LLC with regard to its non-compliance with the terms of the original Franchise Agreement and applicable law.

With that said, if Retrofitness LLC is interested in purchasing our gym at an agreeable price as a going concern as I indicated in my email below, we welcome that offer. We would require the execution of a confidentiality agreement to move forward with the provision of any additional information as to the business, which I will forward to you if you wish to proceed.

We have been continuing our efforts to sell the business. We will continue to honor our financial obligations under the expired Franchise Agreement as we have been doing to date and although under no legal obligation to do so.

We continue to reserve all legal rights and remedies available at law and in equity and nothing herein shall constitute an admission or waiver of any such rights or remedies.

101.    Retrofitness responded to Westchester Fitness's good faith efforts to resolve their dispute, by sending a second default letter dated November 11, 2019 (the "11/11/19 Default Notice"). Recognizing the deficiencies in the 10/1/19 Default Notice, in an exercise in futility, Retrofitness attempted to remedy its improper notice by, for the first time, seemingly exercising certain options under the Franchise Agreement. In particular, Retrofitness exercised its option to: (i) assume the Lease for Westchester Fitness's Premises; (ii) purchase some or all of the physical assets located at the Premises; and (iii) assume the lease(s) for some or all of the leased

equipment used in connection with Westchester Fitness's club. Retrofitness also demanded that the Discovery be produced and that the Inspection of the leased equipment be allowed.

102.    While Retrofitness continued to send the above unreasonable default letters in an effort to strong arm Plaintiff into giving its business away to Retrofitness for nominal consideration, at best, and failed to identify any prospective purchaser of Westchester Fitness's business despite repeated requests, it was well aware of Westchester Fitness's ongoing good faith efforts to sell its business in an effort to mitigate the damages caused by Retrofitness.  In fact, Westchester Fitness was informed by its business broker that they had several discussions with Retrofitness about a prospective purchaser of the Westchester Fitness business and that Retrofitness claimed it would allow the sale to proceed.

103.    Because Westchester Fitness had been informed that Retrofitness would allow the sale to proceed, it held off from responding to the 11/11/19 Default Notice.  Unfortunately, the sale was not consummated and thus Ms. Wallman responded to Retrofitness's 11/11/19 Default Notice promptly thereafter by email dated December 16, 2019 to Sprechman (the "12/16/19 Email"), denying any breach of the Franchise Agreement, once again stating that the request for information was not consistent with the obligations set forth in the Franchise Agreement, and that Retrofitness's efforts to avail itself of the very same contract it breached are not supported by applicable law.

104.    Ms. Wallman further stated in the 12/16/19 Email that: (i) Westchester Fitness previously had produced certain of the information requested multiple times, and also supplied additional information in an effort to address Retrofitness's requests although under no obligation to do so; (ii) Retrofitness failed to exercise its option to effectuate the purchase of certain of the equipment until November 11, 2019, which was over two months after September

7, 2019, the date that Retrofitness now alleges that the Franchise Agreement expired. Such exercise, however, was required to be done within 30 days after the Franchise Agreement expired; (iii) given Retrofitness's breach of the Franchise Agreement, Retrofitness would not be entitled to avail itself of the option even if it had exercised the option timely; and (iv) assuming *arguendo* that the pricing guidelines were applicable (which they are not), Retrofitness failed to account for the remaining value of the assets of Westchester Fitness's business in its purchase offer.

105.   Ms. Wallman once again welcomed a reasonable offer more in line with the value of the business and even reduced the prior offer of $500,000 to $300,000 in a further good faith effort to resolve the dispute as set forth in the 12/16/19 Email. Ms. Wallman noted that given the delays caused by Retrofitness, Westchester Fitness's business continued to decline and to be damaged, but in an effort to mitigate damages, Westchester Fitness was willing to sell the business at a reduced price of $300,000.

106.   Ms. Wallman further noted in the 12/16/19 Email that:

> I have detailed on numerous occasions the conduct of RetroFitness that is in breach of the Franchise Agreement, and in contravention of RetroFitness's obligations under New York General Business Law and the Franchise Disclosure Documents. Indeed, I sent you numerous emails and we also discussed these issues.
>
> In summary and without limiting my previous communications with you on the matter, Section 4.6 of the Franchise Agreement governs the rights and obligations of the parties in connection with renewing the Franchise Agreement. To that end, Section 4.6.2.(c) states that the renewal provisions of the Franchise Agreement are not to be superseded irrespective of the parties' obligation to sign a new franchise agreement. There is no requirement in Section 4.6.2 of the Franchise Agreement for the provision of a rider to the lease between Westchester Fitness and its landlord (the "Lease"), which I indicated to you multiple times. Separate and apart from their being no legal obligation to execute a Lease rider, RetroFitness

37

approved the Lease at its inception without any Lease rider, but with language including the right to assign the lease to RetroFitness, which was deemed acceptable by RetroFitness. Accordingly, Westchester Fitness, as well as its principals, in reliance upon the contractual protections afforded under the Franchise Agreement, negotiated and executed the Lease as well as a good guy guarantee designed to limit the liability of Jason and I in the event that we could not continue the operation of our business.

Despite such and my detailed explanation of same, you insisted that a Lease rider be executed and stated that we cannot expect the new franchise agreement to remain the same after 10 years. I told you that the Franchise Agreement expressly provides for the terms of the renewal and that it not only was reasonable for us to expect the same provisions on renewal, but RetroFitness contractually was obligated to those terms, which do not require any Lease rider.

Over our strong objection, RetroFitness steadfastly demanded a Lease rider, which sought to detrimentally impact our rights under the Lease. Indeed, RetroFitness submitted a Lease rider to us and our Landlord that imposed multiple restrictions and negative covenants upon us that were not included in the Lease -- a lease that was extensively negotiated by us and the Landlord prior to our agreeing to its execution. Significantly, without the very provisions that we had negotiated with the Landlord, which RetroFitness now sought to eviscerate with the Lease rider, we would not have agreed to execute the Lease or to pursue a franchise at the present location.

Specifically, the Lease rider, *inter alia,* sought to turn our good guy guarantee into an absolute guarantee and to hold us responsible for the Lease even if an assuming Franchisor party took over the Lease. The Lease rider also imposed numerous other detrimental covenants upon us for the benefit of RetroFitness as it: (i) allowed the assuming Franchisor party to recover from us certain amounts it paid to the Landlord to cure any defaults under the Lease; (ii) sought to eviscerate our rights to transfer the lease by imposing many financial and other restrictions on a new tenant and/or us that were not otherwise included in the Lease and which were extensively negotiated by us and the Landlord when reaching agreement on the Lease; (iii) required us to remove certain signs, equipment, logos, etc. under a ten business day time constraint that was not included in the Lease; (iv) allowed the Franchisor to conduct such removal and sought to impose financial obligations

upon us for such removal if done by the Franchisor; (v) provided certain rights to the Franchisor to unilaterally assume the Lease -- all of which were not included in the Lease; (vi) required the Landlord to cooperate with the Franchisor to assist the assuming Franchisor party to gain possession of the Lease, and such would be the case even if we were not in default under the Lease; and (vii) limited our ability to contract with our Landlord without the Franchisor's written approval.

Of particular concern are the Franchisor's delays in presenting the Lease rider to us until the eleventh hour and despite numerous requests by us for the document over many weeks. Although I had a conference call with the RetroFitness and its counsel as well as the Landlord on August 13, 2019 in which I once again expressed my concerns with the Lease rider and also provided substantive comments to the Lease rider without waiving any rights, I was not provided with a revised Lease rider until September 17, 2019 -- the same day that you provided what you claimed to be final versions of the Franchise Agreement and related documents and also the same day that you claimed the Franchise Agreement expired. Much to my disappointment, none of the substantive comments that I repeatedly had raised and also which were provided in my comments emailed to RetroFitness thereafter on August 13, 2019, were addressed. Rather I was presented with the Lease rider with all of the above provisions detrimental to us included therein as the final version on the date the Franchise Agreement was set to expire.

This delay in providing the new franchise agreement and related documents as well as the Lease rider also was troublesome given that RetroFitness knew we were under time constraints given our need to finalize and execute these documents prior to our being able to finalize the financing for the purchase of new equipment and the ordering thereof. Indeed, we communicated the need to expeditiously execute the Franchise Agreement and related documents multiple times over the summer of 2019 and thereafter given that a Blink was set to open within a short distance of the gym in September 2019 and we needed to proceed with the purchase of new equipment expeditiously to combat the attrition from that new gym. In fact, you, Andrew, and Greg, even visited the Blink when you met with Jason and me on August 2, 2019 to discuss the renewal of the Franchise Agreement. At the time we met, you stated it would only take about a week to get a new franchise agreement finalized, but unfortunately we all know this

was not the case as documented by the extensive email communications regarding RetroFitness's delays.

In addition to the issues we raised with the Lease rider, I had extensive communications with you regarding the requirements for a mutual reciprocal release under the Franchise Disclosure Documents and New York General Business Law. In fact, you asked me to further clarify my concerns regarding the release (that previously had been documented) and therefore by email dated September 15, 2019, I provided an extensive additional analysis of the release requirements both under N.Y. Gen. Bus. Law Sections 680-695, but also under the Franchise Disclosure Documents. Rather, than to address the legitimate deficiencies in the release that was to be in our favor, the final version of the release submitted to us on September 17, 2019, was even less compliant with applicable law and the Franchise Disclosure Documents as it narrowed the release in our favor from what was previously agreed to by RetroFitness prior to my September 15, 2019 email.

Given the above, we do not believe RetroFitness operated in good faith during the negotiation of the renewal of the Franchise Agreement. Rather, we believe RetroFitness thought we would sign the new franchise agreement and related documents as well as the Lease rider out of desperation on the date the Franchise Agreement purportedly expired.

In addition to the concerns set forth above, over the course of reviewing the Franchise Agreement, Franchise Disclosure Documents and applicable law, I have been made aware of other significant deficiencies in the Franchise Agreement contrary to applicable law and the Franchise Disclosure Documents. We reserve the right to raise all of these issues should we not be able to reach an amicable resolution.

Further, it is our understanding that even after we told RetroFitness that we would not be renewing the Franchise Agreement that RetroFitness continued to negotiate with our landlord in an effort to take over our Lease and have the Landlord evict us. This interference with our landlord as well as the efforts to force us to modify our Lease with the Landlord constitutes tortious interference with our contractual relations.

**Alternative Purchasers and Sale:**

I asked you during our call on September 19, 2019, as well as in my email of September 27, 2019 to Andrew and you, whether the Franchisor had a buyer to purchase our business. You indicated during the call on September 19th that you would look into a third party buyer, but to date, I have not received a response to my inquiry. Please advise as to whether the Franchisor knows of a prospective buyer to purchase our business and, if so, provide us with the contact information.

Although we continue to actively seek a buyer for the business in an effort to mitigate our damages, to date, we have been unable to effectuate a sale of our business. In the event that the Franchisor is not interested in purchasing our business at a reasonable price, and does not have any other Retro Fitness Franchisee or prospective Franchisee to which we may sell the business, then we need to have the ability to sell our business to a non-Retro Fitness buyer in an effort to mitigate our damages. We propose under these circumstances that the Franchisor allow us to move forward with such a sale and while doing so we will continue to honor the financial obligations under the expired Franchise Agreement in a good faith effort to reach a resolution and despite not being contractually obligated to do so. Should you wish to discuss this matter further, we are available to do so.

Finally, I stated by email dated October 21, 2019 set forth below that all future correspondence regarding this matter is to be sent to my email or home address at 14 Forest Drive, Centerport, New York 11721. Contrary to this direction, you continued to send correspondence to the gym incorrectly alleging our default under the Franchise Agreement and RetroFitness's alleged exercise of its purchase option (i.e. the 11/11/19 Letter). To the extent that our employees and members are made aware of the above due to your failure to cease sending such correspondence to the gym, we reserve all rights and remedies. Once again, I reiterate that all correspondence is to be sent to my email or home address.

We continue to reserve all legal rights and remedies available at law and in equity and nothing herein shall constitute an admission or waiver of any such rights or remedies. This offer shall be valid until December 23, 2019 and is subject to the execution of a formal agreement.

107.     Unbeknownst to Westchester Fitness, while it was attempting to mitigate its damages, contrary to Retrofitness's claim that it would allow a sale to proceed, however, Retrofitness insidiously instituted litigation against Westchester Fitness and Ms. Wallman in New Jersey Superior Court (*Retrofitness LLC, et al. v. Westchester Fitness, LLC.*, Docket No. MON L 004140-19, (New Jersey Superior Court, November 21, 2019)) in November 2019 (the "New Jersey Action").  In the New Jersey Action, after having caused substantial damage to Westchester Fitness's business, Retrofitness filed a procedurally defective complaint, alleging various baseless claims.  Specifically, Retrofitness alleged breach of the Franchise Agreement, violation of the Lanham Act, trade dress infringement, declaratory judgment, and sought injunctive relief to which it was not entitled, whereby Retrofitness wrongfully sought to compel Westchester Fitness and Ms. Wallman to turn over their business and equipment to Retrofitness and attempted to preclude them from mitigating their damages under the Lease  -- all the while continuing to deduct all of its royalties and franchise fees and thus having suffered no damages.

108.     Consistent with its bad faith conduct, Retrofitness hid its lawsuit, as well as a motion by order to show cause (seeking the very documents that Retrofitness already had received and attempting to block Westchester Fitness from mitigating its damages caused by Retrofitness), from Plaintiff for nearly a month by claiming to have made efforts to serve Westchester Fitness and Ms. Wallman at a former address at which Retrofitness was well aware that Westchester Fitness and Ms. Wallman had not resided for over six years.  Indeed, not only was Retrofitness notified of the address change years ago, but it also was reminded as recently as a few weeks before filing the New Jersey Action that all communications were to go to Westchester Fitness and Ms. Wallman's address in Suffolk County, New York.

109.    Retrofitness's misconduct allegedly was designed to unjustly enrich itself to the detriment of Westchester Fitness, the Wallmans, and the Investors. Retrofitness and Sprechman knew: (i) that Westchester Fitness was under time constraints to combat attrition from a neighboring fitness center within approximately one mile of its Premises scheduled to open in September 2019; (ii) that in order to combat the attrition from this new competitor, Westchester Fitness needed to execute a financing agreement for the purchase of new equipment and certain renovations; and (iii) Westchester Fitness was unable to proceed with such financing, purchases or renovations without first executing the 2019 Franchise Documents.

110.    Rather than to negotiate in good faith, however, Retrofitness and Sprechman caused substantial delays in providing drafts of the 2019 Franchise Documents to run out the clock on the term of the Franchise Agreement, and refused to incorporate various provisions in the 2019 Franchise Documents as required under the Mandatory Disclosures (as defined herein), Franchise Agreement and applicable law.  Retrofitness used its position of power and influence as the franchisor in an effort to strong arm Westchester Fitness, the Wallmans, and the Investors into executing documents that were to their significant detriment, and contrary to Retrofitness's contractual and legal obligations.  And then when Westchester Fitness, the Wallmans and the Investors would not relent to Retofitness's demands, instituted frivolous litigation against Westchester Fitness and Wallman to cause further damage to them and the Investors.

111.    As a result of the aforementioned conduct, Westchester Fitness, the Wallmans, and the Investors were substantially damaged as (i) the gym membership (and corresponding revenue) continued to decline due to the inability of Westchester Fitness to make the capital improvements that it had planned to combat attrition and to grow its membership and business in response to the increased competition; (ii) they were forced to provide the Notice to Vacate to

mitigate their damages under the Lease; and (iii) they were forced to liquidate their business at a fire sale price to mitigate further damages.

**V.     The New Jersey and New York Litigation, and Retro Defendants'
         Continued Tortious and Bad Faith Conduct, Breach of the Settlement
         <u>Agreement and Breach of the Covenant of Good Faith and Fair Dealing</u>**

113.    Retrofitness purposefully availed itself of the Court system, and actively litigated, in the New Jersey Action, for over ten months before filing a voluntary dismissal when it knew the New Jersey Action was not proceeding in its favor given its continued bad faith conduct. And this is so, despite Retrofitness's claim (which Plaintiff disputes) that provisional injunctive relief is the only claim that would permit any action to be filed in Court, in accordance with Section 11.7.1 of the Franchise Agreement.

113.    The relief sought in the complaint filed in the New Jersey Action (the "New Jersey Complaint"), however, was not "provisional injunctive relief," which Retrofitness claims is an exception to the dispute resolution process set forth in the Franchise Agreement, and rather, sought final and declaratory relief as well as monetary damages from the New Jersey Court by way of an abuse of process and ignorance of the very terms of the Franchise Agreement upon which Retrofitness based its claims in the New Jersey Action.  Rather than go through the dispute resolution process including informal efforts to resolve the matter, mediation and then arbitration, which Retrofitness claims the Franchise Agreement requires in its alleged defense of this action (and the Plaintiff continues to dispute are applicable to this action), Retrofitness attempted to by-pass those portions of the Franchise Agreement that Retrofitness alleges require such disputes to be brought before a mediation and arbitration forum and cherry-pick those portions of the Franchise Agreement that they deemed relevant to bringing the New Jersey

Action. Retrofitness, however, cannot rely on one portion of the Franchise Agreement while completely disregarding its obligations in another.

114. By example, Retrofitness sought the following, final relief in both the New Jersey Complaint and by two motions seeking injunctive relief by way of Order to Show Cause filed in the New Jersey Action (the "Motion"):

a. A declaratory judgment order stating that Westchester Fitness and Ms. Wallman are in breach of the Franchise Agreement;

b. A declaratory judgment order stating that Retrofitness has the right to take ownership and control over the Retrofitness Outlet owned and operated by Westchester Fitness and Ms. Wallman;

c. An injunctive order compelling Westchester Fitness and Ms. Wallman to provide Retrofitness with the information and access necessary for Retrofitness to take ownership and control over the RetroFitness Outlet owned by Westchester Fitness and Ms. Wallman;

d. An injunctive order enjoining Westchester Fitness and Ms. Wallman from the continued use of Retrofitness's Marks (or marks confusingly similar thereto), as well as Retrofitness' trade dress and red and yellow color scheme);

e. An injunctive order enjoining Westchester Fitness and Ms. Wallman from continuing to operate a competitive business in violation of the Franchise Agreement;

f. An injunctive order enjoining Westchester Fitness and Ms. Wallman and all those acting in concert with them from taking any actions that further infringe upon any of Retrofitness's rights, including any action or actions that may compromise the value of the assets, equipment, and/or Premises;

g. An injunctive order enjoining Westchester Fitness and Ms. Wallman from taking any steps to prevent Retrofitness from exercising its rights under the terms of the Franchise Agreement to assume ownership over the Retrofitness Outlet owned by Westchester Fitness and Ms. Wallman; and

h. An award to Retrofitness of its reasonable costs and attorneys' fees for bringing the Order to Show Cause.

115.    All of the above relief seeking either a declaratory judgment, monetary damages, final relief, or some combination, in no way may be deemed "provisional injunctive relief" as contemplated under the Franchise Agreement, as Retrofitness contended in the New Jersey Action.  All of the pleadings and any other filings in the New Jersey Action are incorporated by reference herein in full.

116.    In furtherance of the affirmative relief it sought in the New Jersey Complaint, Retrofitness actively participated in the New Jersey Action by, *inter alia*: (i) filing the New Jersey Complaint as well as two procedurally defective Motions by way of Order to Show Cause seeking the final relief demanded in the New Jersey Complaint and discovery in November 2019 and/or January 2020 and seeking oral argument thereon; (ii) submitting multiple proposed orders in connection with its filings; (iii) participating in numerous case management conferences and communications with the New Jersey Court via letter, in person and through video conferencing over the ten months that the case was pending to address the New Jersey Action and settlement of both the New Jersey Action and this action; and (iv) agreeing to numerous consent orders as well as seeking multiple adjournments of the case proceedings.  Indeed, most significantly, Retrofitness engaged in a half day mediation with the New Jersey Court on February 7, 2020 as well as months of negotiations, with and without the New Jersey Court's participation, in an effort to reach a global settlement of the New Jersey Action and this action.

117.    Although Retrofitness constantly renegotiated the terms of its settlement proposals and often reneged on the agreements it reached causing extensive delays to gain tactical advantages, Retrofitness, Westchester Fitness and Ms. Wallman reached an agreement in principle during a half day mediation with the New Jersey Court on February 7, 2020 to resolve the claims in both the New Jersey Action and this action.  The principle terms of the settlement

46

were set forth in writing during the mediation at the request of Judge Marshall. Thereafter, the parties exchanged written email communications and then a draft settlement agreement that was extensively negotiated by the parties (the "First Settlement Agreement"). The First Settlement Agreement provided for Retrofitness to purchase Westchester Fitness's assets for a sum certain and assume certain of its obligations including, without limitation, either entering into a new lease with the Landlord or assuming the existing Lease. Retrofitness was to enter into a new lease or assume the Lease by no later than April 1, 2020. As part of this settlement, the Landlord agreed to waive any of the back rent owed by Westchester Fitness as further discussed below.

118.    Counsel for Retrofitness, Brent Davis, counsel for Westchester Fitness, Michael Korik, and Ms. Wallman, had a three hour conversation on March 11, 2020 to address the final language of the First Settlement Agreement. Mr. Davis was to get back to Mr. Korik promptly, but failed to do so. Although, Mr. Korik followed up with Mr. Davis several times, Mr. Davis did not respond until March 16, 2020. This date was significant as the Governor of the State of New York issued a mandatory shut down of fitness centers as of that date due to the COVID-19 pandemic. By emailed dated March 16, Mr. Davis stated "we have not received any guidance from our client regarding the agreement because Retrofitness has been solely focused on the current situation with Covid-19 … and its impact on the locations that already have been and/or will be shut down by government action. As I am sure you can appreciate, this has been a crisis situation. We will do our best to get you further information when we can."

119.    While acknowledging that the COVID-19 pandemic was a crisis situation and Retrofitness was focused solely on its impact on the individual locations, Retrofitness was quick to cut off communications between Westchester Fitness and its members through the Westchester Fitness Facebook account. Indeed, on March 20, 2020, Mr. Korik emailed Mr.

Davis "Can you have your client reinstate access to Ms. Wallman on Facebook so that she can interact with the Retro clients? In these times, it is necessary to advise members and without such access, it is impossible. Mr. Davis responded on March 23, 2020 that he will pass along the request to Retrofitness, but Retrofitness failed to respond further and the access to the Westchester Fitness Facebook account was never restored to Ms. Wallman.

120.    On March 25, 2020, Mr. Davis emailed Mr. Korik and requested that the parties agree to a stay of both the New Jersey Action and this action. The next day, Mr. Davis informed Mr. Korik that Retrofitness had not had time to finalize the First Settlement Agreement given the ongoing pandemic and would not address the settlement at all while the gym was shut down. Accordingly, while the parties had reached an agreement in principle and were close to executing their written agreement, they agreed to extend all deadlines in, and to seek a stay of, this action as well as the New Jersey Action. To that end, by letter submission dated March 27, 2020, Mr. Davis, counsel to Retro Defendants at that time, informed this Court that "the parties, while being close to resolving the matter, have had to pause negotiations as key components of the settlement cannot be completed because of the COVID-19 pandemic. As a result of the foregoing, the parties request that all deadlines in this case by stayed until twenty-eight (28) days after the New York Governor's Order shutting down all gyms is lifted." Mr. Korik sent a similar letter to the New Jersey Court mirroring the language set forth in Mr. Davis's letter.

121.    Westchester Fitness agreed upon the stay based on its understanding that Retrofitness would consummate the First Settlement Agreement. Retrofitness clearly knew that Westchester Fitness would continue to incur liabilities the longer it stayed at the Premises, but Westchester Fitness did so given that Retrofitness had led Westchester Fitness to believe that a settlement in principle had been reached and that Retrofitness would consummate the First

48

Settlement Agreement and the Landlord had agreed to abate the back rent given that Westchester Fitness was providing it with a new tenant.

122.    Consistent with Westchester Fitness's understanding, Mr. Korik contacted Mr. Davis the last week of May to finalize the Settlement Agreement given at the time the State of New York was in the process of opening up businesses.  Mr. Davis informed Mr. Korik that he would confer with his client as to the settlement and get back to Mr. Korik early the week of June 1, 2020.  Mr. Davis finally got back to Mr. Korik on June 4, 2020 and for the first time claimed that his client was no longer interested in purchasing the fitness center and wanted to now enforce the terms of the Franchise Agreement.  Mr. Davis claimed that the world had changed since COVID-19; yet he failed to inform Westchester Fitness of his clients' decision to renege on the First Settlement Agreement in the over 2 ½ months that the fitness facility had been shut down due to the COVID-19 Pandemic – all the while Retro Defendants led Westchester Fitness to believe that a settlement in principle had been reached and allowed Westchester Fitness to incur additional liability.  In fact, the only reason that Westchester Fitness was informed of Retro Defendants change in position was because Westchester Fitness pressed a response from them as to executing the First Settlement Agreement when businesses were starting to open up in New York.  Unfortunately, this was not the first time nor the last time that Retro Defendants would renege on their agreement.

123.    Indeed, Retro Defendants' bad faith conduct did not end there.  Rather, Mr. Davis claimed during communications with Korik on June 4, 2020 that the entire agreement in principal was premised upon Retrofitness's ability to enter into an acceptable deal with the Landlord, but that was no longer possible.  Ms. Wallman, however, spoke with Charles Hirsch, the representative of the Landlord, on multiple occasions both before and after the June 4th

communications between Messrs. Korik and Davis and Mr. Hirsch confirmed that the Landlord had no discussions with Retrofitness during the COVID-19 shut down, but the Landlord remained ready and willing to negotiate new lease terms with Retrofitness.

124.    That same day, Retrofitness filed a letter with the Court attaching a new order for its pending Motion in the New Jersey Action in which it no longer sought to retain the Premises for its use, and in a juxtapose of position, now claimed that the parties had failed to reach an agreement of settlement.  Although during the June 4th call, Mr. Davis agreed to discuss with his client an alternative resolution of debranding the fitness center and to continue its operations under a different name to settle the matter and was to get back to Mr. Korik, Westchester Fitness was once again met with more delays.

125.    By email dated June 9th, Mr. Korik followed up with Mr. Davis as to a proposed resolution from Retrofitness, which prompted a phone call in which Mr. Davis after having agreed to obtain a proposal from his client now asked that Westchester Fitness provide the proposal once again creating further delays.  Mr. Korik responded that Westchester Fitness would first need to determine if the Landlord was willing to re-negotiate the lease with Westchester Fitness to facilitate a resolution of the matter and a call with Mr. Hirsch, a principal of the Landlord, was scheduled at Mr. Hirsch's earliest opportunity later that week on June 12th. Mr. Hirsch indicated during that call, *inter alia,* that the Landlord has always been willing to re-negotiate the lease to retain a tenant in the space and this has never changed.  The Landlord specifically stated that Retrofitness had not reached out to him at all since fitness centers were shut down and remained willing to work out a deal.

126.    While Westchester Fitness made efforts to negotiate new lease terms with the Landlord, in the interest of moving the matter forward and given the time constraints

Westchester Fitness was faced with in light of Retrofitness's delays, on June 14th Westchester Fitness provided a detailed settlement proposal to Retrofitness addressing all of the key points of an agreement. Once again Westchester Fitness was met with more delays. Mr. Korik followed up on June 19th asking for a response to the proposal. It was not until June 23rd that Mr. Davis sent an email stating: "We were able to discuss your proposal with our client. Our client is not interested in the terms, nor is there anything that appears to be worth attempting to negotiate. Accordingly, we are advising the Court that we would like to proceed with the Motion Hearing scheduled for 7/10/20 in front of Judge Marshall."

127. On that same date, Mr. Korik emailed Mr. Davis that "[w]e object to you contacting the Court to set the matter down for oral argument on 7/10/20 when both parties explicitly agreed and notified the Court that these cases (EDNY and NJ) were stayed until 28 days after Cuomo's Emergency Order affecting gyms was lifted. This was communicated by both parties via letters in both matters (NJ & EDNY). Therefore, given the prior representation to the Court – the stay remains in effect until such time as 28 days have passed from the expiration of Cuomo's Emergency Order."

128. Mr. Davis never responded to Mr. Korik's email. Rather, Mr. Davis's firm contacted the Court ex-parte requesting a hearing on the pending motion contrary to the parties' agreement and over counsel's objection. On July 7, 2020, Mr. Davis also submitted an unauthorized post briefing filing in connection with the his client's pending Motion, which not only was irrelevant as it addressed a consent order based on a settlement agreement in another action in which Mr. Davis's firm sought similar relief as opposed to an adjudication on the merits, but also was wholly inappropriate. The New Jersey Court admonished Mr. Davis for the inappropriate filing and Mr. Davis's efforts to mislead the Court. Moreover, this is particularly

troublesome given that Mr. Davis threatened Ms. Wallman with Rule 11 sanctions in his June 4, 2020 email when Mr. Korik indicated that the EDNY requested a status update and that Ms. Wallman was to provide such. Mr. Davis wrote in his June 4th email that he "would advise that any status update to the EDNY be done jointly. Should Ms. Wallman file one unilaterally, she should be guided by FRCP 11." In fact, Mr. Davis was clearly not guided by his own threats having provided a status update to this Court ex-parte on August 20, 2020 without conferring with counsel for Plaintiff.

129. Given this bad faith conduct, Westchester Fitness was placed in an untenable position of having to scramble to debrand the gym during the midst of a pandemic and after incurring months of additional liabilities due to Retrofitness's false representations. Retrofitness's intentional delays, bad faith conduct and misrepresentations that the parties had an agreement in principle caused substantial additional harm to Westchester Fitness.

130. At the July 8, 2020, the New Jersey Court case management conference, Mr. Davis represented that Retofitness no longer wanted to take over the Westchester Fitness facility claiming that Retrofitness could not reach a deal with the Landlord. Judge Marshall indicated that there is a difference between not being able to work out a deal with the Landlord and not wanting to work out a deal with the Landlord and that she was inclined to enforce the settlement agreed upon at the February mediation. Although counsel for Retrofitness tried to side step the issue by claiming that he would confirm with Sprechman as to how the negotiations went with the Landlord, Westchester Fitness was informed by the Landlord that Retro Defendants made no effort to contact the Landlord to reach a deal during the entire COVID shut down although the Landlord remained ready and willing to make a deal with Retrofitness.

131.    Judge Marshall also indicated during the case management conference that Retrofitness was not to couch the Motion brought by order to show cause as a dispositive motion and that the Court would not provide injunctive relief on the claims in the New Jersey Complaint.  The parties discussed yet another settlement of both the New Jersey Action and this action due to Retrofitness's refusal to honor the First Settlement Agreement.  Under the terms of this settlement agreement the parties would agree to a mutual walk away from their obligations under the Franchise Agreement, a settlement of all claims alleged in the New Jersey Action and this action, reciprocal releases, Westchester Fitness would be able to sell its fitness facility to a third party and various other components of the agreement (the "Second Settlement Agreement").  The New Jersey Court encouraged the parties to reach a resolution in line with the principals of a mutual walk away and as addressed during the conference.

132.    In furtherance of the July 8th conference and consistent with the directives provided by the New Jersey Court, Mr. Korik provided a proposal of the key points of the Second Settlement Agreement via email dated July 13, 2020.  In an effort to avoid protracted litigation and to settle the claims, the proposal included the following, in pertinent part:  (i) the parties would agree to a walk away from their obligations under the Franchise Agreement (although Westchester Fitness avers that it has no such obligations given that the Franchise Agreement is void for the reasons set forth herein) with reciprocal general releases of all claims that they may assert against each other and their affiliates; (ii) the New Jersey Action and this action would be dismissed with prejudice; (iii) the non-compete in the Franchise Agreement would be modified (although once again Westchester does not believe it is enforceable because the Franchise Agreement is void as set forth herein); (iv) Westchester Fitness would be able to sell, transfer or assign the Westchester Fitness, LLC membership interests and/or any of the

debranded assets of Westchester Fitness to any other party, including, without limitation, the good will of Westchester Fitness derived from the contracts with its members and receivables; (v) indemnification provisions; (vi) mutual general releases; and (vii) confidentiality and non-disparagement provisions.

133.    In response to the proposal, on July 13, 2020, Mr. Davis emailed Mr. Korik that they were discussing the proposal with their client and hoped to provide a draft agreement shortly.

134.    By email dated July 14, 2020, Mr. Davis provided a counter proposal on behalf of Retrofitness in the form of a draft settlement agreement seeking to grossly expand the concept of a mutual walk away and distorting the framework discussed with the New Jersey Court at the July 8th conference.  In particular, Retrofitness sought to turn a simple settlement that was to be a mutual walk away into an expansive agreement to their benefit.  Most significantly, is that Retrofitness incorporated an order in the Second Settlement Agreement providing Retrofitness the final relief sought in the New Jersey Complaint (rather than a walk away from all claims and a settlement of the litigation), while simultaneously requiring Westchester Fitness and Ms. Wallman to release all claims in this action.  Further, Retrofitness did not allow Westchester Fitness to sell its membership agreements as part of its assets and limited the releases provided to Westchester Fitness, Ms. Wallman and their affiliates while affording Retrofitness and its affiliates broad non-reciprocal releases.  Incredibly, Retrofitness even sought:  (i) a carve out of the releases omitting the owners of Westchester Fitness, and any affiliates thereof, while ensuring that Retrofitness's ownership interests and all related parties were fully released; and (ii) to expand its rights under the Franchise Agreement by seeking to run the non-compete for two years from September 7, 2020 instead of two years from September 7, 2019 – the date the

Franchise Agreement terminated. Indeed, it was apparent from the agreement provided by Retrofitness that it once again was not operating in good faith, but rather reflected another bad faith attempt by Retrofitness to obtain all of the relief they sought in the New Jersey Action while requiring Westchester Fitness, Ms. Wallman and all related entities and persons to waive their claims in a one sided settlement proposal.

135.    Despite such, Westchester Fitness and Ms. Wallman provided a revised draft agreement more in line with the spirit and intent of the New Jersey Court's recommendation as set forth in its July 15, 2020 email.

136.    Retrofitness provided a counterproposal that same day outlining eight remaining issues in dispute and was to speak with its client prior to the conference scheduled with the New Jersey Court for the next day, but failed to do so. Rather, the parties attended yet another case management conference with the New Jersey Court on July 16, 2020 during which the New Jersey Court once again attempted to facilitate a resolution of the claims in the New Jersey Action and this action.

137.    Thereafter, the parties continued to discuss a macro resolution and exchanged draft proposed language. To that end, Westchester Fitness and Ms. Wallman provided proposed language to address various outstanding issues on July 16, 2020 consistent with the Court's directives during the case management conference earlier that day. Retofitness provided a response on July 21, 2020, which highlighted the few remaining areas in dispute.

138.    On July 23, 2020, in advance of another case management conference that was adjourned by the New Jersey Court, Westchester Fitness and Ms. Wallman provided a response to Retrofitness's latest proposal accepting Retrofitness's proposed language for multiple provisions with the exception of only three remaining issues -- the proposed indemnification

language as it sought to expand Retrofitness's rights under the expired Franchise Agreement, the dispute resolution provision, and the limitations Retrofitness sought to impose on Westchester Fitness's ability to sell its membership interests and assets including, without limitation Westchester Fitness's membership agreements.

139.     With respect to the sale of the membership agreements, Westchester Fitness and Ms. Wallman stressed that Retrofitness was expanding rights to the membership contracts that were not included in the expired Franchise Agreement.   Indeed, Westchester Fitness and Ms. Wallman pointed out that this issue already was litigated in a pending class action lawsuit filed in New Jersey against Retrofitness (*Ardino, et. al. v. Retrofitness LLC, et. al.*, Docket No. MID-L-362-14 (N.J. Super. Ct)) (the "Pending Class Action"); and prior related cases (*Ardino, et al. v. Retrofitness, LLC et. al.*, Civil Action No. 3:14-cv-01567-JAP-LHG (D.N.J.) (the "District Court Case"), and *Ardino et al. v. Retrofitness, LLC, et al.*, Docket No. ESX-L-3429-13 (N.J. Super. Ct. April 30, 2013) (the "2013 Superior Court Case," together with the District Court Case and the Pending Class Action, the "Class Actions")).

140.     Specifically, the issue was addressed in lengthy briefings of counsel to Retrofitness (which counsel was the same in the New Jersey Action and, at the time, was the same counsel representing Retro Defendants in this action), as well as in oral argument of such counsel in which Retrofitness admitted that it does not own the assets of its franchisee's fitness center, it does not provide fitness center services or products, it has no interest in the membership contracts and the membership contracts specifically provide that they are between the franchisee and the member.   In fact, this was and remains one of Retrofitness's primary defenses to the Class Actions and in Retrofitness's pleadings it admits that Judge Nelson previously determined in the 2013 Superior Court Case that Retrofitness has no contractual relationship with members

through the membership contracts between Retrofitness franchisees and their members. *See* Retrofitness, LLC's Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint or, Alternatively, Strike Plaintiff's Class Allegations, filed in the District Court Case ("3/19/14 Motion to Dismiss") at pp. 2-4, p. 7 fn. 4, pp. 8-12; Transcript of Motion to Dismiss dated September 12, 2013 in connection with *Ardino, et al., v. Retrofitness, et. al.*, Docket No. L-3429-13 submitted with 3/19/14 Motion to Dismiss, T26:8-T27:16 and T28:2-12; Defendant Retrofitness, LLC's Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint or, Alternatively, Strike Plaintiff's Class Allegation dated January 23, 2015 ("7/23/15 Motion to Dismiss") at pp 1-2, 4, p. 7 fn. 7, p. 8-10. A true and correct copy of the 3/19/14 Motion to Dismiss and the 7/23/15 Motion Dismiss are attached hereto as Exhibits "I" and "J," respectively, and are incorporated by reference herein in full.

141.     Therefore, Retrofitness's settlement position that Westchester Fitness may not retain its rights to its membership contracts to provide in a third party sale to salvage any recovery due to the destruction of its business by Retrofitness's misconduct alleged herein is inconsistent with its admissions in the Class Action and once again demonstrates Retro Defendants's breach of the covenant of good faith and fair dealing and bad faith in connection with its settlement efforts in the New Jersey Action and this action.

142.     Although counsel for Westchester Fitness followed up as to a response to its latest settlement proposal, it was not until August 7, 2020 (over two weeks after Westchester Fitness submitted its July 23rd proposal) that Brent Davis, counsel for Retro Defendants, had a call with Michael Korik, counsel to Westchester Fitness, to discuss the few remaining issues. During that call, the parties agreed to all outstanding issues with the exception of the indemnification language and the sale of the membership agreements.

143.    Mr. Korik provided a revised and believed to be final draft of the resolved outstanding issues on August 11, 2020 to address Retrofitness's remaining concerns regarding the indemnification and the membership agreements and reflecting the parties' agreement on all remaining items as discussed during the August 7th call.  In particular, Westchester Fitness expanded its indemnification of Retrofitness although under no obligation to do so in the Franchise Agreement and this was inconsistent with the spirit and intent of the settlement to be a walk away as originally proposed by the New Jersey Court, and Westchester Fitness agreed not to assign the membership agreements to any Big Box Gym (as previously defined by Retrofitness), but rather only to assign the membership agreements to another health club located on the same Premises consistent with applicable law.  In addition, Westchester Fitness agreed not to sell any of the membership agreements executed on December 31, 2019 and thereafter given that Retrofitness had unilaterally, and without Westchester Fitness's knowledge or authorization, changed Westchester Fitness's membership agreements as of that date to, *inter alia*, provide that a Westchester Fitness member may use any other Retrofitness facility.  Although Westchester Fitness had the absolute right to sell its membership agreements and Retrofitness not only admitted in the Class Actions that it had no interest in such agreements, but it relied, and continues to rely, upon this argument as its primary defense to the Class Actions including the Pending Class Action, Retrofitness sought to impose unreasonable limitations upon such sale in bad faith.  Westchester Fitness and Ms. Wallman, in a good faith effort to reach a settlement at the time and due to the untenable position that Retrofitness had put them in reneging on the First Settlement Agreement, were willing to concede to Retrofitness's unfair demands.

144.    Much to Westchester Fitness and Ms. Wallman's surprise, however, shortly after Mr. Korik sent the August 11th final language, Mr. Davis emailed:

I think that we are not going to reach an agreement. The bottom line is that the proposed language regarding the indemnification and the sale of the member AGREEMENTS does not address the outstanding issues we discussed. It appears your client is unwilling to make any real movement at all in resolving these issues.

145. Westchester Fitness and Ms. Wallman believed that the parties had in fact reached an agreement and thus Mr. Korik responded that he disagreed and suggested that the parties get on a call to go over the point for the sake of efficiency. Accordingly, Mr. Korik, Mr. Davis and Ms. Wallman had a call on August 11, 2020 in which they agreed upon the scope of the indemnification language. Further, Ms. Wallman explained how the proposed language regarding the membership agreements addressed Retrofitness's concerns. Mr. Davis agreed with the proposed language and was to take this back to his client.

146. The next day, the parties had another status conference with the Court in which Mr. Davis stated that the parties made progress, but they are down to one issue relating to the sale of the membership agreements. Mr. Davis, however, quickly devolved into raising other issues that previously were resolved such as the indemnification provision and allowing Westchester Fitness to sell its assets and agreements to a purchaser that would operate a fitness facility at the Premises. None of the later issues were outstanding prior to the status conference; yet Retrofitness sought to re-open the terms upon which the parties previously had agreed and also to impose obligations on Retrofitness without any contractual right to do so. The New Jersey Court indicated that it was more than reasonable to allow Westchester Fitness and Ms. Wallman to sell the business to a new fitness facility that would operate at the Premises to enable them to recoup as much of the business losses as they could and that Westchester Fitness was trying to work with the Landlord to get another gym to lease the Premises as well. By the end of

the status conference, all of the issues had been addressed and the New Jersey Court was to set a holding date of the week of the August 31st for a follow up conference only if it was necessary, but encouraged the parties to contact the New Jersey Court sooner if any issues arose.

147.    By email dated August 17, 2020, Mr. Korik provided revised language based on the discussions between Mr. Davis, Mr. Korik, and Ms. Wallman on August 11, 2020 and during the August 12, 2020 case management conference with the New Jersey Court.  Within minutes, Mr. Davis responded with yet another new issue that "Retro will not agree to allow the member contracts or info to be sold to someone who would operate a gym at the same location.  This is non-negotiable if your client will not accept this, there is no point in continuing discussions."

148.    Mr. Korik promptly responded:  "Has Retro's position changed here because this was NOT where we were as recently as Friday."

149.    Mr. Davis replied:  "No.  Retro's position never changed.  I said I would discuss the proposed changes with Retro.  They did not agree to the changes."

150.    Retrofitness once again reneged on its agreement prompting counsel to Westchester Fitness to contact the New Jersey Court for assistance on August 17, 2020.  The timing of Retrofitness's change in position was significant as Governor Cuomo had issued a press release that day indicating that all gyms in New York were able to reopen by September 2, 2020.  Retrofitness provided ABC Financial Services, LLC ("ABC"), the billing services and software provider, a list of all New York Retrofitness franchise fitness centers to prepare for reopening, but did not include Westchester Fitness on that list.  Rather, Westchester Fitness maintains that Retrofitness continued to capitalize on its delay tactics by forcing Westchester Fitness to permanently close its doors.

151.     In the meantime, in an effort to mitigate its damages, on August 28, 2020, Westchester Fitness permanently closed its facility and terminated the membership agreements that Retrofitness wrongfully claimed Westchester Fitness had no authority to sell.

152.     On August 31, 2020, the New Jersey Court held another status conference during which the Court indicated that it did not see how Retrofitness had the ability to preclude Westchester Fitness from selling its business and memberships and that by obtaining another tenant at the Premises this helped Westchester Fitness with its landlord. The New Jersey Court clearly expressed its displeasure of Retrofitness's behavior multiple times stating that the Court was extremely unhappy with Retrofitness's bad faith conduct, Retrofitness was not being reasonable and was not offering a lot in exchange for a settlement.  Indeed, the New Jersey Court indicated that Westchester Fitness and Ms. Wallman could file a motion to enforce the settlement.  Mr. Davis stated that he would share this information with his client.

153.     Counsel to Westchester Fitness suggested that the parties have another conference with the New Jersey Court in which each of the parties could participate telephonically ex-parte with Judge Marshall to discuss their concerns and then the Court could bring all parties together. The New Jersey Court was willing to do so, but indicated that you need two willing parties to settle and Retrofitness was not willing to resolve the case.  The New Jersey Court also suggested that counsel have their clients on the call.  Mr. Davis was to report back to the Court within a day or two.

154.     That same day, Westchester Fitness discovered that it had been cut off from any access to its billing records with ABC Financial.  Ms. Wallman contacted ABC Financial and was informed that Robbie Sprechman of Retrofitness, a co-defendant in this action, instructed ABC Financial to remove Westchester Fitness and the Wallmans access to Data Track and CRS -

- the business billing records.  Ms. Wallman immediately contacted Mr. Davis via email and stated:

> Your client improperly has instructed ABC Financial to remove Westchester Fitness's access to its own billing records.  As I am sure you know, we need this information to address any outstanding issues with the business (including, without limitation, membership issues, tax preparation and filings, and any other information needed in connection with Westchester Fitness's business and/or legal required filings).  By cutting off our access to the membership information, Retrofitness Corp. not only is tortiously interfering with Westchester Fitness's contractual relations with, *among others*, its members and its billing servicer, ABC Financial, but it also is precluding Westchester Fitness from obtaining the information required to prepare the necessary tax filings to comport with applicable law.  We hereby demand that Retrofitness Corp. immediately:  (i) instruct ABC Financial to reinstate full access to Westchester Fitness's billing accounts on Data Track and CRS (with all ownership functionality); (ii) cease any interference with Westchester Fitness's contractual relations with its billing servicer, ABC Financial, its members and any other third parties; and (iii) cease its interference with Westchester Fitness's access to its business data in an effort to prevent Westchester Fitness… from filing any legally required tax filings or the like.

> We reserve all rights and remedies in connection with Retrofitness Corp.'s wrongful termination of Westchester Fitness's access to its billing records, tortious interference with Westchester Fitness's contractual relationship with ABC Financial, its members and any other third parties, and wrongful efforts to preclude Westchester Fitness from gaining access to its billing records to obtain the information necessary to prepare the tax filings and any other required legal filing.

155. Ms. Wallman followed up with ABC Financial the same day forwarding them the email she sent to counsel to Retrofitness, stating that Westchester Fitness needs access to its accounts and Retrofitness has no right to interfere with such access, and asking that ABC Financial reinstate such access asap, but such reinstatement was not forthcoming.

156.     Having received no response from Mr. Davis, on September 1, 2020, Ms. Wallman followed up stating:

> I am following up on my email below. We are unable to process any refund requests for members as we continue to have no access to Westchester Fitness's membership accounts. As stated below, Robbie Sprechman directed that our access to Westchester Fitness's billing records on the ABC Financial Billing system be shut down as of yesterday. If Retofitness Corp. does not immediately reinstate full access to CRS and Data Track records of Westchester Fitness so that we can properly address member inquiries and requests for refunds as well as obtain the necessary information for governmental filings such as tax filings and the like, we will be forced to seek Court intervention and also report Retrofitness Corp. to the appropriate governmental authorities.
>
> Retrofitness Corp.'s wrongful conduct has damaged and continues to damage Westchester Fitness. We continue to reserve all rights and remedies in connection with Retro Fitness Corp.'s wrongful conduct including without limitation all damages due to Retrofitness Corp's tortious conduct.

157.     The evening of September 1, 2020, Mr. Davis finally responded claiming the action taken by Retrofitness is standard procedure taken when any Retrofitness franchisee shuts down and that ABC Financial will provide reports and process refunds as long as Westchester Fitness has the funds in its bank account. Mr. Davis also claimed that this process is not unique and has been used by every other franchisee who has sold or closed their business. Mr. Davis further stated that Westchester Fitness's "agreement with Retrofitness expired of its own terms on September 7, 2019 and you did not renew. It was your choice not to renew and your advising ABC Financial of your location's closure and the termination of the member agreement that triggered Retrofitness to take this standard action."

158.    On September 2, 2020, Retrofitness withdrew the Motion seemingly in response to the New Jersey Court's prior admonition on the propriety of the Motion, to wit, seeking final relief on the allegations alleged in the New Jersey Complaint through an order to show cause.

159.    Ms. Wallman replied to Mr. Davis's September 1st email on September 3, 2020 stating:

> This is not standard procedure and was not done when we closed the Yonkers location.  In fact, after closure of that fitness center, we were told that we could have access to all of our accounts through the ABC Billing System as long as we needed and, in fact, were granted that access.   This is just another example of Retrofitness Corp.'s wrongful and tortious conduct, which adds to our significant claims against Retrofitness Corp.
>
> Your reference to the expiration of the Retrofitness Franchise Agreement below is irrelevant as Retrofitness Corp. is not a party to Westchester Fitness's direct agreement with ABC Financial. Moreover, Retrofitness Corp. also is not a party to the Westchester Fitness membership agreements.  Accordingly, Retrofitness has no right to tortiously interfere with Westchester Fitness's contracts with ABC Financial, its members or any other third parties.
>
> We intend to pursue all rights and remedies – all of which are expressly reserved.

160.    Mr. Davis failed to respond to Ms. Wallman's September 3rd email and Retrofitness has continued to wrongfully block Westchester Fitness's access to its electronic billing records and to tortiously interfere with both Westchester Fitness and ABC Financial's contractual and business relations as well as Westchester Fitness and its members contractual and business relations.

161.    Shortly after Ms. Wallman sent her September 3rd email, Mr. Korik emailed Mr. Davis inquiring as to whether Mr. Davis had a chance to reach out to his client as per his representation to the Court during the last status conference that he would do so by September 1,

at the latest, regarding what the Judge said and to confirm availability of his client for another call.

162.     Mr. Davis responded to such email by filing a letter with the New Jersey Court claiming that the parties reached a stalemate in their settlement, that any further settlement conferences would just be a waste of the time and resources of both the Court and the parties and further advising the Court that it would be filing a dismissal of the action.  Retrofitness filed a notice of dismissal of the New Jersey Action shortly thereafter.

163.     Unfortunately, Retrofitness's tortious conduct did not stop there.  By email dated August 29, 2020, Westchester Fitness informed First Credit Services, Inc. ("First Credit") that it closed its gym and it wanted to make sure that the handling of the collection accounts were coordinated.  Westchester Fitness further stated that given First Credit's handling of accounts with past due amounts owed prior to the Governor's shut down of gyms in New York and prior to the gym closure, First Credit should continue to collect on the pending accounts.

164.     First Credit responded on September 2, 2020, "[w]e're under instructions by Corporate to cease our efforts on all accounts once a location is no longer in business, and any exceptions to this requirement would have to be approved by Corporate before we'd be able to continue any efforts."  On September 3, 2020, Westchester Fitness replied "Westchester Fitness has a contract directly with FCS and we would ask that FCS continue to proceed with our contractual agreement to collect on the Westchester Fitness accounts.  I will pull the contract, but ask that you also send it to me asap as based on my recollection, Retrofitness Corp. is not a party to that contract."  Later that day, First Credit provided the contract and stated:  "I understand your point related to parties to the contract, however must suggest that you reach out to

Corporate for any exceptions to their policies and/or processes related to continuing collection efforts on accounts assigned as "Retro Fitness" when the club is no longer in business."

165.    Thereafter, on September 13, 2020, Westchester Fitness forwarded the email communications with First Credit as well as the Westchester Fitness contract with First Credit to Mr. Davis and stated:

> You will see that the attached contract is between Westchester Fitness, LLC and First Credit, and Retrofitness, LLC is not a party to the contract. Therefore, Retrofitness, LLC has no right to interfere with Westchester Fitness's contractual relations with First Credit or the collection of Westchester Fitness's past due receivables. Accordingly, we request that your client inform First Credit of such so that we [may] proceed with the collection of Westchester Fitness's receivables.

166.    On September 15, 2020, First Credit sent Westchester Fitness a personal training account reconciliation. Westchester Fitness responded:

> Given our prior emails, I did not think FCS was continuing its collection efforts on behalf of Westchester Fitness, LLC. Would you please let me know if FCS is continuing to collect on the Westchester Fitness personal training and membership accounts and whether FCS has had any communications with Retro Fitness corporate regarding such?

167.    First Credit replied on September 16, 2020 "[w] have not received approval from Corporate to continue our efforts. I'm following up on the closure request that was submitted to ensure that all accounts have been closed in our system."

168.    Westchester Fitness responded that same day "Client Services, has Retro Fitness, LLC directed FCS to discontinue all collections of Westchester Fitness LLC accounts?"

169.    On September 17, 2020, First Credit responded:

> When reaching out to Corporate to inquire about possibly continuing collections, we were instructed to treat closed clubs as we have always have and to stop all collections. At this time, if

you'd like collections to continue, we ask that you reach out to Corporate for any exceptions to their policies and/or processes related to continuing efforts on accounts assigned as "Retro Fitness" when the club is no longer in business.

170. Having received no response from Retrofitness's counsel to Westchester Fitness's September 3rd email to Mr. Davis, on September 16, 2020, Westchester sent a follow up email to Mr. Davis stating "Brent, I am following up on my email below. FCS has stated that they are under the continued instruction to close all accounts. We will be pursuing all claims against RetroFitness, LLC for its ongoing tortious interference with Westchester Fitness, LLC's contractual relations." Mr. Davis never responded to this email.

171. That same day, John-Michael Genco, the Member Experience Specialist of Retrofitness, emailed the Wallmans an email string between him and Patrick Drummond, a member that purchased a membership at Westchester Fitness through the Retrofitness corporate website, on August 21, 2020. As set forth in such email string, on August 27, 2020, Mr. Drummond emailed Retrofitness and asked that his membership be cancelled given that the club had not opened and had not made any announcements on reopening. Mr. Genco replied over two weeks later, on September 12, 2020, asking if the member would prefer to transfer his account to a nearby facility. Mr. Drummond responded that he wanted a full refund and did not want to transfer.

172. Meanwhile, while knowing full well that the Westchester Fitness facility had been permanently closed weeks prior and even when faced with addressing a refund from a member due to the club's closure, Retrofitness continued to sell memberships through its website. In particular, on September 12, 2020, yet another member, Dillon Thorp, purchased a membership to the Westchester Fitness facility through the Retrofitness website.

173. Four days later, on September 16, 2020, Mr. Genco responded: "Since we are a franchise, each Retro Fitness is individually owned. As a corporate employee, I am not directly affiliated to any facility. I will forward your email to the previous owner of Farmingdale for further assistance. I hope you hear from them soon."

174. Retrofitness finally emailed the Wallmans the request for cancellation on September 16, 2020, which was the first time Westchester Fitness was apprised that Retrofitness continued to sell memberships to the shuttered facility though the Franchisor's website. Ms. Wallman promptly forwarded the email to Mr. Davis along with a screen shot of the Retrofitness's website actively selling memberships to the long since closed Westchester Fitness facility, and stated:

> Brent, per the email below and as reflected by the attached image of the Retro Fitness, LLC's website of the Farmingdale facility as of today, RetroFitness, LLC continues to sell memberships at the former Retro Fitness of Farmingdale facility without any authority to do so and although knowing that the facility has been closed since March 16th and never reopened….
>
> Further, it appears that RetroFitness LLC is marketing our former now closed business as a means to capture members for other Retro Fitness facilities as Retro Fitness LLC offers a transfer to another club. We demand that Retrofitness, LLC immediately cease and desist all marketing of our former facility as such marketing by Retrofitness, LLC represents, inter alia, fraudulent marketing practices in violation of the New York Consumer Fraud Statutes. Further, to the extent any membership fees have been collected by Retro Fitness, LLC or ABC since the facility shut down on March 16, 2020, we demand that RetroFitness, LLC immediately return all such fees to any such members and provide us an accounting of such as we have not received any such fees nor did we authorize that such fees be charged. Given that RetroFitness, LLC has tortiously interfered with our contract with ABC, we are unable to access Westchester Fitness's billing records to determine whether any additional billings have been wrongly charged to member accounts and continue to reserve all rights with

respect to this wrongful interference with our business and
contractual relations.

175. That same day, Westchester Fitness also informed ABC Financial that Retrofitness continued to sell memberships its closed facility on the Retrofitness corporate website and requested that ABC Financial ensure that no further memberships may be charged through the ABC Financial billing system given that the facility has closed.

176. On October 7, 2020, weeks after First Credit closed all of the collection accounts placed with it by Westchester Fitness based on the direction of Retrofitness, counsel for Retro Defendants finally responded to Ms. Wallman's September 16, 2020 email regarding Retrofitness's tortious interference with Westchester Fitness's relations with First Credit. Counsel claimed that Retrofitness had not given any instructions to First Credit to prevent Westchester Fitness from pursuing its receivables if it choose to do so. Counsel further indicated that "[i]t is our understanding that First Credit generally stops collection activities in the event of a gym closure as it typically invites adverse claims and Retro generally agrees with that policy. Perhaps that is the source of the miscommunication. You are of course free to decide how you wish to proceed here."

177. In that same email, counsel responded to Westchester Fitness's September 16th email to Mr. Davis regarding Retrofitness's continued wrongful sale of memberships for the Westchester Fitness club despite its closed status. Counsel claimed that there are no ongoing advertisements or marketing efforts from Retro as to the former Farmingdale location and that any reference to the Farmingdale location was terminated in conjunction with the dismissal of the New Jersey litigation.

178. Westchester Fitness responded later that day:

I must respectfully disagree with your email. First Credit specifically informed me that Retrofitness, LLC previously instructed First Credit to cease all collections on Westchester Fitness accounts and not that it was a First Credit policy to do so. Indeed, First Credit was willing to continue collections, but for Retrofitness, LLC's refusal to allow them to do so. As a result, First Credit ceased all collections weeks ago. Is Retrofitness, LLC now changing its position and claiming that it is authorizing the collection by Westchester Fitness, LLC of its own accounts? Has this position been communicated to First Credit and, if so, when?

Further, I am unaware of any legal impediment to collecting on balances due and owing pursuant to a contract regardless of whether the business maintains operations. Indeed, I often address this issue with respect to the collection of receivables in the multitude of bankruptcy cases for which I provide legal counsel. Please advise as to the basis for Retrofitness, LLC's claim that adverse consequences may occur if First Credit were to continue to collect on Westchester Fitness's accounts.

With respect to the Retrofitness, LLC website, I disagree as the marketing efforts by Retro Fitness, LLC continued until I notified counsel of Retrofitness LLC of its clients' illegal business practices and demanded that they cease such marketing as it is a violation of, inter alia, the consumer protection statutes. Indeed, the former business of Westchester Fitness was wrongfully marketed by Retrofitness, LLC as open and Retrofitness, LLC continued to sell memberships for weeks after the New Jersey litigation had been dismissed, and months after Retro Fitness, LLC refused to allow Westchester Fitness to sell the facility and after we informed Retrofitness, LLC to cease all billings on all accounts and our gym was closed by government mandate. RetroFitness, LLC also indicated to members seeking a refund after they wrongfully sold memberships to them that they could transfer to another Retrofitness facility.

In addition, as per my prior emails with counsel to Retrofitness, LLC, their client continues to block our access to our business records with ABC Financial as it directed ABC Financial to shut down our access to our online records, which has and continues to cause significant issues with our ability to process multiple refunds to our members and to wind down the affairs of our business.

Retrofitness, LLC has actively and tortiously interfered with our contractual relations with our vendors and members and has and

continues to cause us substantial harm. Unfortunately, this is just an another and ongoing example of Retrofitness, LLC's illegal conduct and bad faith.

179. No response to such email has been forthcoming.

180. In addition, to the above acts of misconduct, in January 2020, in an effort to "price fix," Retrofitness uniformly set the membership pricing and packages for Westchester Fitness and its other franchisees' services and would not allow its franchisees to deviate therefrom. Retrofitness also wrongfully interfered with Westchester Fitness's business by locking down its POS system so that the Westchester Fitness management could no longer do simple tasks such as cancelling pending POS charges or change any membership pricing necessary to operate the business.

181. Retrofitness also callously and in disregard of Westchester Fitness relations with its employees advertised in January 2020 for a General Manager of the Westchester Fitness facility on Monster.com and Indeed.com. These advertisements were noticed by Retrofitness employees causing them concern that the business was being taken over by Retrofitness and leading them to look for and accept new employment at competing facilities. Due to such tortious interference, Retrofitness lost personal training clients that joined the other fitness facilities.

182. In the winter of 2020, Retrofitness also wrongly deducted additional fees to which it was not entitled and withdrew its royalty payment in advance of the date set forth in the expired Franchise Agreement causing Westchester Fitness to over draft on its back account and bounce its payroll. This caused Westchester Fitness employees increased concern that the business was closing and was yet another act of tortious interference of Westchester Fitness's relations with its employees committed by Retrofitness to the detriment of Westchester Fitness.

183.    Indeed, even after the parties had reached an agreement in principal, Retrofitness continued its tortious interference with Westchester Fitness's business relations with its members by cutting off Westchester Fitness's access to its Facebook account as detailed above, and also continued to promote membership sales through the Westchester Fitness Facebook account through September 2020 – 6 months after Westchester Fitness closed down its facility due to the government mandated shut down.

184.    The aforementioned conduct of Retro Defendants is vindictive and constitutes a systematic effort to destroy Westchester Fitness's business and to preclude Westchester Fitness from mitigating any of its damages.    Upon information and belief, when Retro Defendants realized that their efforts to strong arm Westchester Fitness would not be countenanced by the New Jersey Court, they quickly dismissed the New Jersey Action and now seek to have this Court dismiss the instant Action to compel arbitration and to shield their misconduct from the public purview.

185.    Retro Defendants, however, have purposely availed themselves of the New York Court system since the filing of the Complaint in this action on January 2, 2020 in the New York Supreme Court (the "NYS Action").    Indeed, rather than to make a motion to dismiss and compel arbitration in the NYS Action, over 9 months ago, Retro Defendants actively participated in the litigation by removing the case to this Court.    Thereafter, Retro Defendants sought multiple extensions, on consent, to extend the time to file a response to the Complaint, filed multiple status reports, had two law firms represent it in this action, jointly drafted the Rule 26(f) report and provided its initial disclosures in accordance with the Court's directives.    In fact, it was not until September 22, 2020 – that Retro Defendants first sought leave to move to compel arbitration.    And this is after Retrofitness actively litigated in the New Jersey Action for

approximately 10 months without any regard to the dispute resolution procedures it now seeks to enforce to preclude Plaintiff's day in Court. Although Westchester Fitness disputes the enforceability of the Franchise Agreement, Retro Defendants may not selectively seek to enforce the Franchise Agreement only when it benefits them while ignoring the Franchise Agreement when the provisions are to its detriment.

**VI.**     **The Disclosures, Applicable Agreements and Relevant Statutes**

186.    Initially, the Wallmans purchased a franchise from Retrofitness Corp., a predecessor of Retrofitness, under JHB Wallman LLC ("JHB"). To that end, on or about July 28, 2008, Retrofitness Corp., provided JHB Wallman LLC ("JHB") and the Wallmans with a certain Franchise Disclosure Document with an issuance date of July 1, 2008 (the "July 2008 Disclosure"). A true and correct copy of the July 2008 Disclosure is attached hereto as Exhibit "C" and is incorporated by reference herein in full.

187.    The July 2008 Disclosure as well as the other disclosures discussed herein were required to be provided to JHB, Westchester Fitness, and the Wallmans by the Federal Trade Commission (the "FTC") and under New York Law to aid in their determination to invest in the Retrofitness franchise.

188.    Exhibit H of the July 2008 Disclosure contained certain disclosures required under New York law. The New York Amendment (as defined below) was not included in the July 2008 Disclosure.

189.    Around the time the July 2008 Disclosure was provided to JHB and the Wallmans, Retrofitness Corp. was informed that although the Wallmans collectively were to represent a majority ownership in the company that was to purchase the franchise, there would be minority members of the company, including Wallmans's parents, and the other Investors.

73

Retrofitness Corp. was further informed that only the Wallmans would and could execute a guarantee of any franchise agreement, and that if the other minority owners were required to do so and/or to execute any other contracts with Retrofitness Corp., then JHB and the Wallmans would not be able to proceed with the purchase of a Retrofitness franchise.

190.    Retrofitness Corp. agreed that only the Wallmans would have to personally guarantee any franchise agreement with Retrofitness Corp. and that the Investors would not have to be party to any franchise agreement.  This was significant to the Wallmans as without such agreement, JHB and the Wallmans would not be able to proceed with the purchase of a Retrofitness franchise as the partners of the business would not agree to personally guarantee any business obligations and it also was critical that the Wallmans' parents (who were investing their retirement funds) not have any personal liability for the business obligations.

191.    Retrofitness Corp. would not agree to any changes to the proposed Retrofitness franchise agreement despite being requested by JHB and the Wallmans.  Retrofitness told JHB and the Wallmans that the terms of their franchise agreement were non-negotiable.

192.    Consistent with the parties' agreement to not require the Wallman's parents or the other Investors to be party to any agreements, only JHB, the Wallmans and Retrofitness Corp. executed a certain Retrofitness Franchise Agreement dated August 18, 2008 (the "8/18/08 Franchise Agreement") for the purchase of a New York franchise with the location of the franchise to be determined.  A true and correct copy of the 8/18/08 Franchise Agreement is attached hereto as Exhibit "D" and is incorporated by reference herein in full.

193.    The 8/18/08 Franchise Agreement did not include the New York Amendment required by applicable law.

194.    Subsequently, Wallman decided to open the Retrofitness franchise at its current location of 1039 Route 109, East Farmingdale, New York, 11735, with a newly formed entity, Westchester Fitness, to operate the Retrofitness franchise, with the same investor participation as discussed above.

195.    Now that the location of the facility was defined and a new entity was to own and operate the Retrofitness franchise, Retrofitness required the parties to terminate the 8/18/08 Franchise Agreement and to transfer the license to operate the Retrofitness outlet to a new franchise agreement.

196.    As part of such termination and transfer process, Retrofitness was required to once again provide Westchester Fitness and the Wallmans its disclosure documents mandated by applicable law.    Accordingly, Retrofitness delivered to Plaintiff the Franchise Disclosure Document dated September 30, 2008 with an effective date of November 10, 2008 (the "Disclosure").  A true and correct copy of the Disclosure is attached hereto as Exhibit "E" and is incorporated by reference herein in full.

197.    The Disclosure includes, as Exhibit H, certain State Addenda to Disclosure Document and State-Specific Agreement Amendments as required by various states among which include New York State.  The State-Specific Agreement Amendments are required to be executed by Retrofitness and the franchisee simultaneously with the execution of a Retrofitness franchise agreement.

198.    The New York Disclosure, as part of Exhibit H of the Disclosure, provides, in pertinent part, "IF YOU LEARN THAT ANYTHING IN THE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE

DEPARTMENT OF LAW, BUREAU OF INVESTOR POTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK 10271."

199. The New York Disclosure further provides "THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE PROSPECTUS. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS PROSPECTUS."

200. The New York Disclosure also states:

> In recognition of the requirements of the New York General Business Law, Article 33, Sections 680 through 695, and of the regulations promulgated thereunder (N.Y. Comp. Code R. & Regs, tit. 13, §§ 200.1 through 201.16), the Franchise Disclosure Document for Retrofitness, LLC for use in the State of New York shall be amended as follows: … 'Renewal, Termination, Transfer and Dispute Resolution,' shall be amended by deleting 'd', … 'w', and the following new 'd', … 'w', shall be substituted in lieu thereof:

| Provision | Section in Franchise or other agreement | Summary |
| --- | --- | --- |
| d. Termination by franchisee | Section 10.3 | Material default by us and compliance with post termination obligations. Pursuant to New York General Business Law, the franchisee may terminate the Agreement upon any |

| | | grounds available by law…. |
|---|---|---|
| w. Choice of law | 11.2.1 | New Jersey law applies. The foregoing choice of law should not be considered as a waiver of any right conferred upon the franchisor or the franchisee by the General Business Law of the State of New York, Article 33. |

201.    The New York Disclosure expressly states that "an offer or sale is deemed made in New York if the franchisee is domiciled in or the franchisee will be opened in New York.  We are required to furnish a New York prospectus to every prospective franchisee who is protected under New York General Business Law, Article 33."

202.    In bold and prominent type Exhibit H of the Disclosure represents:

**STATEMENT OF DISCLOSURE DOCUMENT ACCURACY**

**THE FRANCHISOR REPRESENTS THAT THIS DISCLOSURE STATEMENT DOES NOT KNOWINGLY OMIT ANY MATERIAL FACT OR CONTAIN ANY UNTRUE STATEMENT OF MATERIAL FACT.**

203.    Exhibit H of the Disclosure also includes the New York Franchise Agreement Amendment (the "New York Amendment"), which is to be executed contemporaneously by

RetroFitness and the franchisee with any New York franchise agreements offered by Retrofitness, and states:

New York Franchise Agreement Amendment

In recognition of the requirements of the New York General Business Law, Article 33, Sections 680 through 695, and of the regulations promulgated thereunder (NY Comp. Code R. & Regs., tit. 13, §§ 200.1 through 201.16), the parties to the attached Retrofitness, LLC Franchise Agreement (the "Agreement") agree as follows:

1.      Under Section 4.5 [sic] of the Agreement, under the heading "Term and Renewal," the subsection 4.5.2.(f) [sic] shall be deleted in its entirety and shall have no force and effect, and the following shall be substituted in lieu thereof:

> 4.5.2(f) [sic] You and any Related Parties that are parties to this Agreement have signed a mutual general release of claims in a form satisfactory to Retrofitness, LLC with respect to past dealings with Retrofitness, LLC and its Related Parties; provided however, that all rights enjoyed by you and any causes of action arising in its favor from the provisions of New York General Business Law Sections 680-695 and the regulations issued thereunder, shall remain in force, it being the intent of this provision that the non-waiver provisions of N.Y. Gen. Bus. Law Sections 687.4 and 687.5 be satisfied; and

2.      Under Section 9 of the Agreement, under the heading "Resale of Franchise," the subsection 9.3.1(h) shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> 9.3.1(h)        You and your Related Parties' signing if [sic] a mutual general claims with Retrofitness LLC and its Related Parties; provided, however, that all rights enjoyed by the you/transferor and any causes of action arising in its favor from the provisions of New York General Business Law Sections 680-695 and the regulations issued thereunder, shall remain in force, it being the intent of this provision that the non-waiver provisions of N.Y. Gen. Bus. Law Sections 687.4 and 687.5 be satisfied:

3.     Section 11 of the Agreement, under the heading "Miscellaneous Provisions," shall be supplemented by the addition of the following new subsection 11.23:

11.23  Nothing in this Agreement should be considered a waiver of any right conferred upon you by New York General Business Law, Sections 680-695.

4.     There are circumstances in which an offering made by Retrofitness LLC would not fall within the scope of the New York General Business Law, Article 33, such as when the offer and acceptance occurred outside the state of New York.  However an offer or sale is deemed made in New York if you are domiciled in or the Outlet will be opening in New York.  Retrofitness LLC is required to furnish a New York prospectus to every prospective franchisee who is protected under the New York General Business Law, Article 33.

In Witness Whereof, the parties hereto have duly executed and delivered this New York amendment to the [Franchise/License/Development] Agreement on the same date as the [Franchise/License/Development] Agreement was executed.

204.     The New York Amendment is substantially similar to version of the New York Amendment included in the 6/17/19 Disclosure and the 7/30/19 Disclosure.

205.     In connection with the transfer of the franchise license discussed above, Retrofitness (the successor to Retrofitness, Corp.), JMB and the Wallmans executed the Voluntary Cancellation and Release Agreement dated May 5, 2019 terminating the 8/18/08 Franchise Agreement.

206.     Plaintiff and Retrofitness executed the Franchise Agreement pursuant to which Plaintiff purchased a Retrofitness franchise to be located at the Premises in New York.  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit "F" and is incorporated by reference herein in full.

207.     Retrofitness did not provide, much less execute, the requisite New York Amendment as required under applicable law.  Accordingly, the Franchise Agreement is not in compliance with the applicable statutory requirements and also is inconsistent with the Disclosure mandated by applicable law.

208.     Only the Wallmans were required to execute a guarantee of the Franchise Agreement in accordance with their agreement with Retrofitness.

209.     The Franchise Agreement has a term of ten years commencing on or about September 7, 2009 through September 7, 2019.

210.     The terms for renewal of the Franchise Agreement are specified in Section 4.6.2. (the "Renewal Provisions"), which were required under New York law as well as the Disclosure to be supplemented by the New York Amendment. As a condition to renewing the Franchise Agreement, Westchester Fitness

> **and any Related Parties that have signed this Agreement shall have signed a copy of the then-current Franchise Agreement (except with respect to the renewal provisions thereof, which shall not supersede this Section 4.6.2) not less than thirty (30) days before the expiration of this Agreement, or thirty (30) days after You receive a signature-ready copy of the then-current Franchise Agreement from Retrofitness, whichever is later.**

*See* Franchise Agreement Section 4.6.2 (c) (emphasis added).

211.     The term "Related Parties" is defined in the Franchise Agreement to mean, pertinent part:

> persons and companies affiliated with Retrofitness or [Westchester Fitness] …, as the context indicates, including, but not limited to, owners (as defined herein), general partners, limited partners, shareholders or members, owing a Substantial Interest in: (i) Retrofitness or [Westchester Fitness] …; (iv) officers, directors, members or agents of Retrofitness or of [Westchester Fitness] …. As used in this paragraph, the phrase ***"Substantial Interest" means***

> **the right to twenty percent (20%) or more of the capital earnings**
> **of a partnership or limited liability company….**

*See* Franchise Agreement Section 3.11. (emphasis added).

212.    Other than the Wallmans, none of the members of Westchester Fitness have an interest greater than 20% or more in Westchester Fitness.  Accordingly, consistent with the requirement that only the Wallmans guarantee the Franchise Agreement, none of the other members of Westchester Fitness constitute Related Parties and thus were not contractually required to execute  the Franchise Agreement or any guarantee thereof as a condition for renewal, as stated above.

213.    Moreover, the Renewal Provisions expressly state that only "Related Parties" *that signed the Franchise Agreement* would be required to execute the then-current Franchise Agreement.  Thus, in accordance therewith, if Westchester Fitness determined to renew the Franchise Agreement, then only Westchester Fitness was contractually required to execute a renewal of the Franchise Agreement given that the Investors and the Wallmans did not execute the Franchise Agreement, but, rather the Wallmans merely guaranteed the Franchise Agreement.

214.    The Renewal Provisions also expressly state that they are to supersede any of the terms of the then current franchise agreement required to be signed to renew the Franchise Agreement.  The Renewal Provisions do not require a lease addendum to be executed.

215.    Pursuant to the Renewal Provisions, any renewal franchise agreement was required to be executed the later of:  not less than thirty (30) days before expiration of the Franchise Agreement, or thirty (30) days after Westchester Fitness received a signature-ready copy of the then-current franchise agreement from Retrofitness.

216.    In accordance with the Disclosure, the Renewal Provisions also were to be supplemented by Section 4.5.2(f) [sic][3] of the New York Amendment (as quoted above).  The New York Amendment requires that all parties to the Franchise Agreement are to sign mutual general releases with respect to past dealings with Retrofitness and its Related Parties; provided all rights enjoyed by Westchester Fitness and all causes of action arising in Westchester Fitness's favor from the provisions of the New York General Business Law Sections 680-695 and the regulations thereunder are to remain in force such that the non-waiver provisions of New York General Business Law Sections 687.4 and 687.5 are satisfied.

217.    Pursuant to the Disclosure, and in accordance with the New York Amendment set forth therein, the Renewal Provisions also were required to include protective language for Westchester Fitness that nothing in the Franchise Agreement should be considered a waiver of any right conferred upon Westchester Fitness by New York General Business Law, Sections 680-695.

218.    The New York legislature enacted certain provisions under General Business Law Sections 680-695 to protect against the substantial losses where the franchisor or its representative have not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between the franchisor and the franchisee, and other factors relevant to the franchise offered for sale.  *See* N.Y. Gen. Bus. Law, Article 33, § 680, Section 1.

219.    In accordance with the General Business Law, the New York legislature determined that:

---

[3] The Disclosure inadvertently refers to Section 4.5.2(f) instead of 4.6.2(f) as the relevant provision of the Franchise Agreement.

the offer and sale of franchises … is a matter affected with a public interest and subject to supervision of the state, for the purpose of providing prospective franchisees and potential franchise investors with material details of the franchise offering so that they may participate in the franchise system in a manner that may avoid detriment to the public interest and benefit the commerce and industry of the state.  Further, it is the intent of this law to prohibit the sale of transactions where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled.

*See* N.Y. Gen. Bus. Law, Article 33, § 680, Section 2.

220.    The disclosure requirements mandated by the General Business Law

apply to all written or oral arrangements between a franchisor and franchisee in connection with the offer or sale of a franchisee, including, but not limited to, the franchise offering, the franchise agreement, sales of goods or services, leases … of real or personal property, promises to pay, security interests, … advertising, construction or installation contracts, servicing contracts, and all other arrangements in which the franchisor … has an interest.

*See* N.Y. Gen. Bus. Law, Article 33, § 682.

221.    The New York General Business Law further requires franchisors to register with the department of law prior to offering or selling a franchise in New York and obtaining the approval of their "offering prospectus."  In the instant case, the "offering prospectuses" were the July 2008 Disclosure, the Disclosure, the 6/17/19 Disclosure and the 7/30/19 Disclosure (collectively, the "Mandatory Disclosures").  *See* N.Y. Gen. Bus. Law, Article 33, § 683, Section 1.

222.    The Mandatory Disclosures must include a detailed list of information as set forth in Section 683 of the General Business Law.  Among the information required are:  (i) "[a] statement of the conditions under which the franchise agreement may be terminated or renewal refused or repurchased at the option of the franchisor"; and (ii) "[a] representation that the

registered prospectus does not knowingly omit any material fact or contain any untrue statement

of material fact." *See* N.Y. Gen. Bus. Law, Article 33, § 683, Sections 2 (j) and (s).

223.     Further, the General Business Law provides that

> [a] franchise which is subject to registration under this article shall
> not be sold without first providing to the prospective franchisee, a
> copy of the offering prospectus, together with a copy of all
> proposed agreements relating to the sale of the franchisee at the
> earlier of (a) the first personal meeting between the franchisor or
> its agent and the prospective franchisees, (b) at least ten business
> days prior to the execution of a binding franchise or other
> agreement, or (c) at least ten days prior to the receipt of any
> consideration in connection with the sale or proposed sale of a
> franchise.  For the purposes of this chapter, the words:  (i) 'first
> personal meeting' shall mean the first face to face meeting between
> a franchisor or franchisor's agent or any representative or
> employee thereof and a prospective franchisee which is held for
> the purpose of discussing the sale or possible sale of a franchise.

*See* N.Y. Gen. Bus. Law, Article 33, § 683, Section 8.

224.     Pursuant to General Business Law Section 687:

> 1.  It is unlawful for any person to make any untrue statement of a
>     material fact in any application, notice, statement, prospectus
>     or report filed with the department under this article, or
>     willfully to omit to state in any such application, notice,
>     statement, prospectus or report any material fact which is
>     required to be stated therein, or to fail to notify the department
>     of any material change as required by this article.
>
> 2.  It is unlawful for a person, in connection with the offer, sale or
>     purchase of any franchise, to directly or indirectly:
>
>     (a) Employ any device, scheme, or artifice to defraud.
>
>     (b) Make any untrue statement of a material fact or omit to
>         state a material fact necessary in order to make the
>         statements made, in light of the circumstances under which
>         they were made, not misleading….

    (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

    3. It is unlawful for any person to violate any provision of this article, or any rule of the department promulgated hereunder, or any condition to the effectiveness of the registration of an offering prospectus or of an exemption from the registration provisions of this article.

    4. Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void.

    5. It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article.

*See* N.Y. Gen. Bus. Law, Article 33, § 687.

    225.   In addition to criminal remedies for violation of the General Business Law, Section 691 of the General Business Law provides civil remedies for violations, but notes that liability is not limited and may exist by virtue of any other statute or under common law if the article was not in effect. In particular,

    1. [a] person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred and eighty-seven of this article is liable to the person purchasing the franchise for damages and, if such violation is willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs….

    3. A person who directly or indirectly controls a person liable under this article, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, and an employee of a person so liable, who materially aids in the act of transaction constituting the violation, is also liable jointly and severally with and to the same extent as the controlled person, partnership, corporation or employer.

*See* N.Y. Gen. Bus. Law, Article 33, § 691.

226. Finally, the New York legislature noted that the article shall be liberally construed to effect the purposes thereof. *See* N.Y. Gen. Bus. Law, Article 33, § 695.

227. Retrofitness, having failed to provide and execute the New York Amendment along with the Franchise Agreement consistent with its obligations under the New York General Business Law, and also having failed to comply with its contractual obligations under the Disclosure and Franchise Agreement, further failed to remedy these deficiencies when drafting the 2019 Franchise Documents. And this is so, even after the unlawful conduct was pointed out to Retrofitness and Sprechman. Rather, Retrofitness and Sprechman continued their wrongful conduct and stridently refused to include the required provisions in the 2019 Franchise Documents contrary to the Mandatory Disclosures. Indeed, Retrofitness refused to abide by its own contract and the Mandatory Disclosures to include the requisite renewal provisions or other language mandated by applicable law.

228. Instead, Retrofitness and Sprechman initially failed to provide any release to Westchester Fitness in the proposed renewal documents while ensuring that they received a release. Only after Westchester Fitness raised this deficiency and violation of the General Business Law, did Retrofitness ultimately opt to provide itself a broader release while offering a more limited release to Westchester Fitness (without the necessary carve outs as mandated under New York law) contrary to applicable law and the Mandatory Disclosures.

229. In particular, in response to Sprechman's request for a further explanation as to Westchester Fitness's concerns with the general release, Ms. Wallman provided by email dated September 15, 2019 a detailed analysis as to why the releases being offered were not consistent

with the Mandatory Disclosures, General Business Law and New York Amendment (as defined below), which require mutual general releases of claims with respect to past dealings with Retrofitness to be exchanged by the parties with a carve out for the protections afforded to the franchisee under applicable law.

230.     Retrofitness and Sprechman also refused to renew the Franchise Agreement unless Westchester Fitness executed the onerous Lease Addendum stripping Westchester Fitness and the Wallmans of valuable rights that they had negotiated under the Lease and imposing unreasonable obligations upon them to the benefit of Retrofitness.  Again, such conduct was in contravention of the Mandatory Disclosures, the Franchise Agreement as well as the General Business Law.

231.     Moreover, contrary to the conditions for renewal set forth in the Franchise Agreement, the Disclosure, and as mandated under applicable law, Retrofitness demanded that all members of Westchester Fitness execute the 2019 Franchise Agreement, 2019 Addendum and Limited Guarantee.

232.     Incredibly, Retrofitness and Sprechman also attempted to bait and switch the 2019 Franchise Agreement presented to Westchester Fitness for signature without disclosing that the document was yet a different version from the franchise agreement included in the 6/17/19 Disclosure and the 7/30/19 Disclosure submitted to Westchester Fitness as mandatory disclosures under the General Business Law and without providing 30 days to review as required under the Franchise Agreement.  Attached hereto as Exhibit G, and incorporated by reference herein in full, is Sprechman's email dated September 17, 2019 transmitting the 2019 Franchise Agreement, the 2019 Addendum and the Limited Guarantee.  Attached hereto as Exhibit H, and

incorporated by reference herein in full, is Sprechman's email dated September 17, 2019 transmitting the Lease Addendum.

233.     Plaintiff contends that Retrofitness and Sprechman's actions are further evidence of its intent to fraudulently induce Westchester Fitness, the Wallmans, and the Investors to execute the Franchise Agreement by providing false and misleading disclosure documents and agreeing to a contract that Retrofitness never intended to honor.  Upon information and belief, it was Retrofitness and Sprechman's intent to lure Retrofitness into executing the Franchise Agreement with their false representations in the July 2008 Disclosure, and then once Westchester Fitness invested in the franchise, to force Westchester Fitness, the Wallmans and the Investors to concede to the unreasonable demands of Retrofitness and Sprechman if they wanted to renew the franchise and maintain their business.

234.     However, Westchester Fitness determined that it could not submit to Retrofitness and Sprechman's unreasonable demands to execute the onerous 2019 Franchise Documents and conveyed such to Retrofitness as discussed above.  At that point, Retrofitness and Sprechman ratcheted up their efforts to damage Westchester Fitness in an effort to take its business without providing any reasonable compensation and to obtain an unlawful windfall by virtue of their misconduct.

235.     As discussed previously, although Retrofitness originally declined to purchase the assets of Westchester Fitness, after the time period prescribed under the Franchise Agreement expired, Retrofitness attempted to invoke certain options under the Franchise Agreement.

236.     The operative provisions provide:

10.3     **Rights and Obligations After Termination and Expiration**

Upon termination of this Agreement for any reason, the parties have the following rights and obligations: …

(f)     Retrofitness has an option to purchase any or all of the physical assets of the RETROFITNESS Outlet, including its equipment, supplies and inventory, during a period of sixty (60) days following the effective date of termination, valued as follows:

1.     The lower cost of fair market value of the supplies and inventory;

2.     Depreciated value of other tangible personal property calculated on the straight-line method over a five (5) year life, less any liens or encumbrances.

Retrofitness must send written notice to You within thirty (30) days after termination of this Agreement of its election to exercise the option to purchase.  If the parties do not agree on a price within the option period, the option period may be extended for up to fifteen (15) business days to permit appraisal by an independent appraiser who is mutually satisfactory to the parties.  If the parties fail to agree upon an appraiser within the specified period, each will appoint an appraiser and the two appraisers thus appointed must agree on a third appraiser within ninety (90) days after termination who must determine the price for the physical assets of the RETROFITNESS Outlet in accordance with the standards specified above.  This determination will be final and binding upon both Retrofitness and You.

(g)     Retrofitness has an option to replace You as lessee under any equipment lease or note for equipment that is used in connection with the RETROFITNESS Outlet. Upon request by Retrofitness, You shall give Retrofitness copies of the leases for all equipment used in the RETROFITNESS Outlet immediately upon termination.  Upon request by Retrofitness, You shall allow Retrofitness the opportunity, at a mutually satisfactory time, to inspect the leased equipment.  Retrofitness must request the information and access described in this paragraph within fifteen (15) days after termination; it must advise You of its intention to exercise the option within fifteen (15) days after it has received the information and/or inspected the equipment.

Retrofitness may assume any equipment lease in consideration of its assumption of future obligations under the lease. Upon exercise of this option by Retrofitness, You shall be fully released and discharged from future rents and other future liabilities under the lease if the terms of the lease permit it, but not from any debts to the lessor that already exists on the date when the option is exercised.

(h)    If Retrofitness declines to purchase or assume the lease on Your equipment, You may sell it to either another franchisee or a non-franchisee.

(j)    If the premises are leased from a third party, and if the Retrofitness elects, the Franchisee shall immediately assign its interest in the lease to the Franchisor and immediately surrender possession of the premises to the Franchisor. The Franchisee is and remains liable for all of its obligations accruing up to the effective date of the lease assignment.

237. As stated previously, Retrofitness failed to exercise any option under the Franchise Agreement until November 11, 2019 – which was more than two months after the Franchise Agreement expired. Accordingly, Retrofitness was not entitled to purchase the assets of Westchester Fitness, which it sought to do through the Motion, but then changed its position in June 2020 when it backed out of the First Settlement Agreement as set forth above. Moreover, due to Retrofitness's breach of the Franchise Agreement, unclean hands, misconduct and fraud as alleged herein, Retrofitness may not attempt to avail itself of the benefits of the Franchise Agreement by assuming the Lease or exercising any options under the Franchise Agreement without providing reasonable consideration to Westchester Fitness in return and to compensate Westchester Fitness for the substantial damages caused by Retrofitness. This wrongful conduct was raised by Westchester Fitness in response to the claims brought by Retrofitness in the New Jersey Action before Retrofitness voluntarily dismissed that action when it seemingly was not going its way.

**VII.** **The Landlord Breached the Covenant of Good Faith and Fair Dealing and Contract and the Lease is Void due to Frustration of Purpose and Impossibility of Performance**

238.     Given Retrofitness's misconduct as alleged above, in an effort to mitigate damages, the Wallmans provided notice to vacate the premises in accordance with the good guy guarantees of the Lease on September 20, 2019.  Ms. Wallman, however, informed Charles Hirsch, the Landlord's representative, during a call that same day prior to sending the notice that Westchester Fitness was actively seeking to reach an agreement with Retrofitness to purchase the business and lease the Premises or to find a new tenant to do so.  To that end, Ms. Wallman  kept the Landlord Defendants (through Mr. Hirsch and Angela Tullo- Murphy (at times)) informed of their efforts, as well as the status of the pending litigation and settlements with Retrofitness, through multiple emails and phone calls commencing in September 2019 through the summer of 2020.  During those communications the Landlord Defendants (through Mr. Hirsch and Ms. Murphy) never once indicated that they had a new tenant for the Premises.

239.     As Westchester Fitness's business continued to decline as detailed above, Westchester Fitness was unable to pay all of the rent as it came due.  However, Mr. Hirsch agreed during multiple discussions with Ms. Wallman during the period of in or about January 2020 through the summer of 2020 that the Landlord would waive all back rent if Westchester Fitness found a new tenant.  Mr. Hirsch also indicated that he would prefer to maintain a fitness facility to avoid having to pay for additional tenant improvements should the Premises need to be modified for another type of business, and that he did not have another tenant for the space.. Indeed, Ms. Wallman called Mr. Hirsch before entering the Court for the mediation conducted on February 7, 2019 to confirm that the Landlord would agree to waive any back rent as part of a settlement with Retrofitness.  Mr. Hirsch agreed to do so and authorized Ms. Wallman to

represent such to the New Jersey Court to facilitate a settlement that would provide the Landlord with a new tenant.  In reliance upon Mr. Hirsch's representation Ms. Wallman, in fact, informed Judge Marshall of such and Westchester Fitness continued to try to reach a deal with Retrofitness and/or to locate a new tenant to purchase the business and take over the lease.  The Landlord was well aware of Westchester Fitness efforts to do so and reliance upon Mr. Hirsch's agreement to waive any back rent if a replacement tenant was provided.

240.    Thereafter, on February 26, 2020, through a series of emails that date, Mr. Hirsch and Ms. Wallman discussed, *inter alia*, the status of the settlement with Retrofitness. Specifically, Mr. Hirsch emailed the Wallmans claiming that Rich Rosner of Retrofitness told him that he believes a court decision in the New Jersey Litigation is about a week or so away, asking where everything stood and when the Landlord could receive more money.  Ms. Wallman replied that she did not think Mr. Rosner was in the loop and that the parties were working on a settlement, and that she would call the Landlord later.  Mr. Hirsch responded that he was tied up in closings and asked that Ms. Wallman email an update.  Ms. Wallman explained:

> [a]ny settlement I reach with Retro is conditioned upon your agreeing to waive the rent as we discussed.  This is especially true given that I would be settling for a fraction of what the gym is worth to get a deal done and to maintain a tenant for your company.  I know that we discussed this in the past and you are willing to waive the rent if Retro or another tenant took over the lease, but I need to have a definitive agreement with you prior to being able to reach an agreement with Retro.

241.    Mr. Hirsh replied "Yes-but that was in January … what about the current rent and the upcoming March rent?  Ms. Wallman replied:

> [w]e need to discuss all of this and reach a final resolution as to all rent and the date of vacating.  This is a critical component to determining whether we can finalize a settlement with Retrofitness LLC.  Also, the last time we discussed this was as of the date of the last hearing on February 7.  We spoke before I met the Judge

on the settlement conference. In any case, please let me know when you are free to discuss.

242. Mr. Hirsch responded:

We cannot speak/have a sit down until next Thursday since we are out of state working on closing 2 deals. The agreement we had was through 1/20/20 and we never addressed February (or March) rent since we expected this to be done by then and you not be in possession still. If we had a lease transfer before 2/1/2020 to either Retro corporate or an assignment to one of your potential purchasers, this wouldn't be a discussion. But it is now 2/26/2020 and we don't have anything from either of those scenarios, so you must pay February rent since you are operating and receiving income.

243. Ms. Wallman replied:

When we spoke on February 7th just before I went into Court for the settlement conference you stated that you would waive the rent if we reached a settlement. I agree that we never discussed the end date at that time. However, as of that date, it was my understanding that we had an agreement and you knew that I was representing such to the Judge and agreed that I could do so. Based on our discussion, I, in fact, represented such to the Judge, and we have been attempting to resolve the litigation as quickly as possible since that conference.

As I repeatedly have said, this is not just about our business. I am trying to get you another tenant and in doing so will be agreeing to compromise significant claims and to take a substantial reduction in the sale price to get this done. If we can't reach an agreement with you, then we will need to consider pursuing other options asap given the financial condition of the business, which continues to deteriorate.

I don't want to get into a debate over email about this, which is why I asked to speak. I am always available to speak if you have 10/15 minutes to discuss.

244. Mr. Hirsch failed to respond to this email and Ms. Wallman followed up by email

dated March 5, 2020 indicating that she called Mr. Hirsch's office that day, but they were unable

to locate him. On or about March 5, 2020, Mr. Hirsch and Ms. Wallman discussed the matter

and he once again agreed that the Landlord would waive the rent if Westchester Fitness was able to provide the Landlord with a replacement tenant. Westchester Fitness continued to rely upon this representation when seeking to execute the settlement with Retrofitness.

245. Thereafter, all of New York went dark. Governor Cuomo issued an Executive Order declaring a State disaster emergency for the entire State of New York. The COVID-19 pandemic unprecedented in scope and destruction, spawned a massive and severe government response that completely shuttered Westchester Fitness's business from March 16, 2020; and, in fact, Governor Cuomo ultimately prohibited any fitness centers from re-opening in New York until August 24, 2020, but allowed local authorities to delay openings until September 2, 2020 or to a date beyond – nearly 6 months after the initial shut down.

246. Under the sweeping government restrictions, the Premises, being used as fitness center, were required by law to shutter indefinitely. Any conduct of Westchester Fitness's business at the location would violate the State's orders, and could potentially have led to criminal violations and penalties.

247. This shut down has, thus utterly and irreversibly frustrated the purpose of the Landlord and Westchester Fitness's agreements, and indeed rendered both parties' performance impossible. The COVID-19 shutdown is unlike anything ever before experienced in America in terms of severity and duration, and could not have been foreseen.

248. The shut down has hit the fitness industry particularly hard in New York as all fitness centers were not allowed to re-open until nearly two months after the final phase 4 re-openings of non-essential businesses occurred on July 8, 2020, and were not even provided a date for re-opening until a press release was issued by Governor Cuomo on August 17, 2020 (the "Press Release"). Even when fitness centers were permitted to reopen, there were severe

restrictions placed on their operations and facilities were required to operate at 33 percent capacity and follow rigorous health and safety protocols as detailed in the Press Release, including, without limitation: (i), the wearing of masks at all times; (ii) contact tracing and health screening; (iii) social distancing of 6 feet at all times; (iv) shared equipment cleaned after every use and staff available to clean and disinfect all equipment in between use by members; (v) capping of fitness class participation; (vi) individual showers to be cleaned in between each use; (vii) a heating, ventilation and air conditioning system ("HVAC") that must operate at MERV-13 or greater or, if unable to do so, a professional HVAC company must document such and adopt additional ventilation and mitigation protocols from the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) and the Centers for Disease Control and Prevention; and (viii) inspections by the local health department.

249. It is readily apparent that the New York business landscape, and particularly the brick and mortar fitness industry has been shattered, and is forever altered. Nobody can predict if or when the brick and mortar fitness industry will return to its pre-COVID form, or how social distancing and strict health and safety protocols will impact the brick and mortar fitness industry in the long run. COVID-19 remains virulent, and fitness facilities have been advised of extensive and mandatory guidelines to offer at least some measure of protection. Despite those restrictions, the experience of working out in a fitness center has been altered forever and has negatively impacted on the membership of health clubs. And, it appears that it will be years before fitness centers have a chance of returning to New York in its pre-COVID form, which was the foundation for the material assumptions and fundamental bases upon which the Landlord and Westchester Fitness relied in entering their agreements.

250. In other words, the purpose of tendering a monthly rent to operate Westchester Fitness's fitness facility is completely frustrated when the facility cannot open. That purpose is also frustrated when the facility can only open at a marginal capacity and under strict health and safety guidelines that are impracticable, or when members are too fearful of profound illness and potential death to use and/or continue their membership to the facility. Accordingly, for the reasons detailed herein, this Court should declare that the Lease (including all guarantees thereof) is rescinded as a result of the COVID-19 Pandemic and/or Executive Orders which prohibit Westchester Fitness from operating its business at the Premises.

251. In addition, there are multiple provisions of the Lease that support the rescission and termination of the Lease as detailed below. First, the Lease mandates strict limitations on the use of the Premises only to include:

> PERMITTED USE: Health club and related services and accessories including, but not limited to physical therapy, acupuncture, massage therapy, nutritional counseling, vitamins and nutritional supplements, juice bar, chiropractic services, tanning, fitness/strength training, personal training chiropractic and spa services, circuit training facilities of any kind, cardio classes, karate, aerobics and boxing.

See Rider to Assignment and Assumption of Lease By and Between BiCounty Commons, LLC, as Landlord, and Westchester Fitness, LLC, as Tenant dated May 2, 2009 (the "Lease Rider") at p. 2, § 5.

252. The Lease prohibits Westchester Fitness from using the Premises for any other purpose than as specifically allowed and provides that "[a]ny variation or deviation by Tenant from the specific use expressly set forth herein shall be deemed a default under the Lease." See Lease Agreement between BiCounty Commons, LLC Landlord and Retro-Fitness of

Farmingdale, NY LLC dated September 18, 2008 (the "Original Lease") at p. 2 § 1.D. (A true and correct copy of the Lease is attached hereto as Exhibit "K" and incorporated by reference in full.) Accordingly, given the near 6 month shut down of all New York fitness facilities (including Westchester Fitness's facility) along with the strict limitations on the operation of its business, and the decline in fitness club memberships due to such limitations and members' fear for their health and safety, the purpose of the Lease has been frustrated and therefore should be rescinded.

253. Second, the Lease provides that "there will be no violation of the terms of the lease or damages or penalty if the business is unable to operate due to situations that are beyond the Tenant's control (i.e.) action instituted by the local health department, as long as the Tenant is diligently acting to correct the condition." See Original Lease at p. 8, §17.C. Accordingly, the Lease clearly provides that Westchester Fitness is not in violation of the Lease or obligated to pay any penalty, and the Landlord is not entitled to any damages, during the period that the facility was shut down and restrictions continue to be placed on use, occupancy and operations due to the COVID-19 Pandemic.

254. Third, the Lease provides a full abatement of rent if the Premises are damaged by fire, the elements, accident or casualty ("Casualty"). In particular, if the Premises are rendered wholly untenable, the Landlord is required to abate all rent and other charges for the period from the date of the Casualty until the Premises have been rendered tenantable. If, as a result of the Casualty, the Premises are rendered untenantable, in part, the rent shall be abated as to the portion of the Premises rendered untenable from the date of such Casualty until the Premises are rendered tenantable. See Original Lease at p. 16, § 33(A).

255. The Lease also provides in an addendum to the Casualty section:

> a. If the Premises are damaged and cannot be restored within two hundred forty (240) days following the date of any use casualty … either party shall have the right upon notice to the other to terminate the Lease.
>
> b. Should the Tenant, under the Lease, be entitled to an abatement of Rent such abatement shall continue until the sooner of (i) Tenant reopening for business or (ii) ninety (90) days following the Delivery of Possession of the Premises back to Tenant with all damage to the Premises repaired as per the Lease.

See Lease Rider at p. 13, § 25.

256.    The Premises were rendered untenantable by virtue of the Governor's Executive Orders prohibiting the operation of the fitness facility and the ongoing restrictions that continue to limit the use, occupancy, and operations of the facility.  Moreover, there is no end in sight as to when such restrictions will be lifted and the Premises will be restored to its pre-COVID shut down level of use, occupancy and operations free from any of the strict health and safety mandates.  Accordingly, the Premises cannot be restored within 240 days following the COVID-19 March 16, 2020 shut down and Westchester has a right to terminate the lease in accordance with its notice to the Landlord.

257.    Fourth, the Lease further requires the Landlord to afford Westchester Fitness the peaceful and quiet use and possession of the Premises.  See Lease Rider at p. 3, 2.B.  Clearly, Westchester Fitness has been unable to use the Premises for the purposes for which it leased the Premises and under the same occupancy and operations guidelines as discussed above.

258.    As a result of its total inability to operate its business by government order, Westchester Fitness's performance under the Lease was excused by, *inter alia*, the doctrines of frustration of purpose and impossibility of performance as well as pursuant to the Lease provisions as detailed above.  Moreover, the Landlord's previous agreement to abate the back

rent if Westchester Fitness could provide a replacement tenant also precluded any recovery of rent.

259. Although in the midst of a global pandemic, Westchester Fitness and the Wallmans continued to work diligently and in good faith to find a replacement tenant for the facility. To that end, the Wallmans kept the Landlord apprised of their efforts. The Wallmans, Mr. Hirsch and Angela Tullo-Murphy (another representative of the Landlord) participated in a call on April 24, 2020 during which Ms. Wallman updated everyone as to the status of their efforts and informed the Landlord that they had not heard from Retrofitness as to the settlement. Mr. Hirsch indicated that he also had not heard from Retrofitness, but would keep Ms. Wallman apprised if he did so. In addition, Mr. Hirsch did not request that any rent be paid.

260. Thereafter, on June 10, 2020, Ms. Wallman emailed Mr. Hirsch and Ms. Murphy informing them that they were finally able to get a response from Retrofitness and requested a call. Mr. Hirsch and the Wallmans participated in a call on June 12, 2020 during which Mr. Hirsch confirmed that he had not spoken to Retrofitness during the entire COVID-19 shut down and since Rich Rosner left the employ of Retrofitness. Ms. Wallman restated (what the Landlord already knew) that prior to the COVID-19 shut down, the parties had a deal in principle and, in fact, counsel to Retrofitness sent a letter to this Court informing the Court of such status. Ms. Wallman stated that once Westchester Fitness attempted to execute on the agreement, Retrofitness claimed that they did not want the fitness facility as a Retro Fitness, but, rather, wanted Westchester Fitness to clean everything out and they also claimed that they had no deal with the Landlord. Ms. Wallman indicated that Retrofitness has not been operating in good faith during any of the negotiations. Ms. Wallman asked Mr. Hirsch if they can achieve a walkway settlement with Retrofitness whereby the facility would be de-branded and a new tenant would

be provided, would this be of interest to the Landlord.  Mr. Hirsch stated that this would be acceptable to the Landlord and that he is not looking for the Wallmans to hand over the keys to the space and that he did not have another tenant.  Mr. Hirsch once again agreed that if a new tenant was provided, the Landlord would waive the rent and, to that end, Mr. Hirsch did not ask the Wallmans to remit any rent at that time.  Mr. Hirsch asked the Wallmans to make a proposal as a debranded Retrofitness fitness center and explained that he has been working with all of his tenants to get back to full rent within several years recognizing the financial impact of the COVID-19 shut down on tenants' businesses and therefore providing financial concessions.  Ms. Wallman stated that there is a lot of uncertainty given the ongoing pandemic as to what will happen with the business, and the Landlord would likely have to renegotiate the lease if they found a new tenant. Mr. Hirsch responded that the Wallmans know their business and if they make a proposal that they believe would be financially viable for the business, then it would likely be acceptable to a new tenant, but he also was willing to negotiate with a new tenant as he had done in the past when the Wallmans presented him with prospective purchasers.  Mr. Hirsch provided a frame work for the proposal stating that the Wallmans should propose a ramp up to full rent over several years.  Mr. Hirsch stated that the situation is fluid and that he would work with the Wallmans and also let them know if Retrofitness contacts him.  Ms. Wallman stated that they would do their best to provide proposal given the uncertainties.  Mr. Hirsch further stated that if the Wallmans got him a proposal that day (which was a Friday), he could have a response to any proposal over the weekend.  The Wallmans and Mr. Hirsch also discussed the debranding of the gym and, in particular, the signage on the Shopping Center pylon that had been blown off, in part, by a recent storm.  When Ms. Wallman stated that the signage needed to be removed, Mr. Hirsch commented that the Retrofitness sign on the pylon was mostly down already.

261.     Based on Mr. Hirsch's continued agreement to waive the Westchester Fitness rent and to work with the Wallmans on a new lease structure to address the financial impact of the COVID-19 shut down on the business, the Wallmans continued to actively work with Retrofitness to obtain a walk away settlement and also to locate a new tenant for the Landlord. Indeed, the Landlord's agreement to accept a replacement tenant is consistent with its obligations under the Lease to do so.  In particular, Section 14 of the Lease Rider provides the Tenant with the absolute discretion to assign or otherwise transfer it interest in the Lease to various third parties.

262.     In addition, the Wallmans reviewed the business financials and provided a proposal to the Landlord via email on June 14, 2020.  On June 15, 2020, Mr. Hirsch stated he would review the proposal and get back to the Wallmans sometime that week.  On June 20, 2020, Ms. Wallman emailed Mr. Hirsch as a follow up and he responded that the proposal was stilling being reviewed.  Ms. Wallman asked when Mr. Hirsch when he would have a response and Mr. Hirsch indicated by early next week.  On June 23 2020, Ms. Wallman emailed Mr. Hirsch as further follow up on the proposal and informed Mr. Hirsch that they are continuing to work with their broker as to possible purchasers.  Mr. Hirsch failed to respond.

263.     Ms. Wallman continued to follow up on June 25, 2020, and then again after receiving no response, on June 28, 2020 and stated:

> Charles, when we spoke on June 12th, you asked us to provide a lease proposal based on what we believed our business could sustain.  We indicated to you that there is significant uncertainty as to what will happen with our business, but would do our best to provide a proposal.  This uncertainty continues given the disparate treatment of fitness centers by the governor and the removal of fitness centers from the fourth phase of re-openings.

In any case, you indicated that you could have a response to our lease proposal over the weekend if we sent you the proposal that day, which was a Friday. We sent you the proposal below on June 14th. You stated that you would have a response the week of June 15th and then subsequently you indicated that you would respond the beginning of the week of June 22nd. We have not heard from you despite our follow ups. If our proposal is unacceptable, then please provide a counter proposal so that we can continue our dialogue.

264.     Mr. Hirsch failed to respond once again prompting another email on July 5, 2020

as follows:

I am following up again on my emails below. We are uncertain as to why you have not responded at this point. You asked us to provide a rent proposal with the understanding that you would need to work with us on the rent given the current circumstances, and we did so recognizing the uncertainty of our business and the fitness industry in general.

When we were negotiating to have Retrofitness LLC take over the space, you agreed that you would waive all back rent. Although we were close to reaching an agreement, due to the COVID 19 shut down, we were unable to consummate our settlement with Retrofitness LLC prior to the March 16, 2020 required shut down of our business. In fact, Retrofitness LLC represented this to the Court on March 27, 2020 as per the attached letter. Moreover, given your past agreement to waive the rent and that we have been shut down and unable to operate our business, it was never our understanding that we would be required to pay rent while we have been unable to utilize the space for the purposes for which we leased it (i.e. a fitness center), and obviously object to any rent due and owing during the period of the shut down.

Prior to the shut down, our business was significantly damaged and lost substantial revenues due to Retrofitness LLC's conduct as we previously discussed. This damage coupled with the inability to operate our business since March 16, 2020 as a result of the Governor's mandates, has put our business in further financial peril from which we do not even know if our business can ever recover. Accordingly, in light of the above, based on our best efforts and recognizing the uncertainty of the fluid situation, we provided you with a rent proposal of what we believed we would need with the

hope that it would be sufficient to maintain the operations of the
business. Since we provided our proposal, we continue to have no
guidance from the Governor as to when he will allow fitness
centers to reopen. In fact, the Governor recently removed fitness
centers from the fourth phase of reopening claiming it was too
dangerous to open fitness centers and that he may not allow fitness
centers to reopen unless there is a vaccine. This information is
detrimental to our business and continues to place a negative
stigma on fitness centers in general.

If appears from your lack of response, that you are not interested in
negotiating any lease amendment at this point. If that is the case
and you would like to attempt to settle the matter so that you may
relet the premises to a business that is authorized to operate in
these unprecedented times, we are open to such a discussion.
Please advise asap so that we may attempt to resolve this matter.

265. Once again, Mr. Hirsch failed to respond prompting yet another email on July 13,

2020 in which Ms. Wallman stated "I am following up again on my emails below. We remain

willing to resolve the matter. In addition, if you desire to show the gym to a prospective tenant,

we can make arrangements for you to do so. Please advise."

266. Mr. Hirsch responded that day: "I am in the Hospital dealing with Covid-19

issues and Angela is battling her own health issues. We will get back to you when we can." Ms.

Wallman responded "we had no idea and are very sorry to hear that. We hope that you both are

okay and get well soon. Please let us know if there is anything that we can do. Thereafter, Mr.

Hirsch never responded to the proposal.

267. Rather, on July 21, 2020, Mr. Wallman emailed Mr. Hirsch:

I hope you, your family, and Angela are doing better with the
COVID and health situations you have been dealing with. I hate to
bother you, but I have a very serious candidate who wants to buy
the gym from us and convert it into an independent gym. They
own and operate a large scale fitness equipment company that buys
and sells both commercial and home fitness equipment. They
refurbish and restore equipment and sell it back out in the both the
commercial and home markets. They have been in business 10

103

years and have three locations in the Northeast. They have requested to sit down with you to discuss taking over our lease with amended rent terms if you are available to do so. Please let me know so I can help set this up. Thank you.

268.  Mr. Hirsch responded that same day requesting that the prospective tenant fill out an application so that they can run credit, and agreeing to a conference call thereafter, which never materialized. Jason introduced the prospective tenant, Alex Gorgowicz and Amit Persaud, to Mr. Hirsch via email that same day.

269.  On July 22, 2020, Mr. Gorgowicz emailed Mr. Hirsch:

I'd like to introduce myself and my business partner Amit Persaud. We were in talks with Jason to possibly take over the facility and open a new gym in there in the coming months. Obviously you know the situation with Covid and how it has essentially devastated the entire fitness industry, especially in NY. We have our reservations about investing money in opening a gym at a time like this. We are looking at the long term and do expect the gym industry to bounce back again hopefully sooner than later.

I'm sure you've incurred tremendous losses as well with some tenants not being able to pay their lease and obviously Retro Fitness has been shut down for some time. I'd like to know what your thoughts are and what you're looking to do with the space in the near term and long term. If we were to consider buying out Retro, doing a full reno in the space and opening a newly branded fitness center what do you have in mind? I don't want to be presumptive and just throw out an offer before we had a chance for you to come to the table with some realistic suggestions.

270.  On July 23, 2020, Mr. Hirsch responded on July 23, 2020:

It is nice to meet you as well. However, what you are asking me to do is negotiate against myself for a space that I already have a lease on. We are long term owners and are willing to work with reasonable people on a long term solution that makes sense for everyone. Since I must assume that you have run projections/numbers in an effort to analyze this purchase, please present to me an idea of where you see the rent now, 6 months from now and in the future to be able to support your business model.

271.     On July 27, 2020, Mr. Gorgowicz replied:

I've been thinking about how to approach this subject and honestly I don't have a black and white answer for you. The truth of the matter is that gyms are still closed and if and when they reopen they will likely have a capacity limit. With those types of restrictions in place I cannot see making any money at all. But since Amit and I are looking long term we wanted to see if you were interested in negotiating a lease agreement that would both secure you a tenant but would also foster an environment for a new fitness center to succeed there. We believe your location is good and the neighborhood can definitely support a fitness center there; with the only competing gym being Blink Fitness on Main Street.

The reality is that we would have to buyout all the equipment and assets of the existing Retro Fitness. Then we would have to order all new equipment and do a renovation to "debrand" from Retro Fitness. With no guarantees that gyms are going to open and stay open into the fall/winter "flu" season I have no way to know whether the gym will even be able to operate and make any money.

So to be quite blunt I would need to get several months no rent or significantly discounted rent to even begin to consider that kind of investment into that location. Then we would need to negotiate a discounted rent for the first year proceeded by nominal rent increases year after year. I'm sorry I don't have a more direct answer or specific numbers for you. I cannot know what the future holds for the fitness industry but as long as gyms remain closed in NY for the foreseeable future and possibly closing again during the "flu" season, I'm equal parts hesitant and optimistic. The one major component to deciding whether to reopen a gym in that location is being able to negotiate a favorable lease conducive to future success.

272.     Mr. Hirsch responded the next day:

You really need to give me an actual amount on a month by month basis of what you think you can afford to pay. I have no idea what your investment is and I see that you own your own equipment company; so I am sure that this helps you to determine that part of your investment.

In order to move forward, I really need you to tell me <u>precisely</u> what you are looking for rent wise; for the next few months, the next year, and then going forward.

273. Messers.Gorgowicz and Persuad worked on a proposal to provide to the Landlord, which was remitted to Mr. Hirsch on July 31, 2020 as follows:

After speaking with Amit here is what we propose:

2-Months Guaranteed No Rent During Build-out/Reno

If gyms in NYS are open by the time month 3 rolls around, we are willing to pay $8500 per month until the end of the year December 2020.

January 2021 – March 2021          $12,000/month rent (includes CAM as capped in current lease and taxes)

April 2021 – August 2021          $15,000/month rent (includes CAM as capped in current lease and taxes)

September 2021- December 2021     $18,000/month rent (includes CAM as capped in current lease and taxes)

January 2022 – December 2022      $22,000/month rent (includes CAM as capped in current lease and taxes)

January 2023 – December 2023      $24,000/month rent (includes CAM as capped in current lease and taxes)

January 2024 – December 2024      $26,000/month rent (includes CAM as capped in current lease and taxes)

January 2025 – December 2025       $27,000/month rent (includes CAM as capped in current lease and taxes)

January 2026 - December 2029      $29,000/month rent (includes CAM as capped in current lease and taxes)

Option 1 (that may be exercised by tenant):

January 2030 to December 2034     $30,000/month rent (includes CAM and taxes)

Option 2 (that may be exercised by tenant):

January 2035 to December 2039     $31,000/month rent (includes CAM and taxes)

Stipulation is that if the gyms are required to close during the winter months of 2021 – we remain Rent Free for first 2 months and Reduced Rent of $5000 per month until gyms are permitted to open again.

The lease of Westchester Fitness would be assigned to us provided that the financial terms would be revised as set forth above.

274.    Mr. Gorgowicz followed up with Mr. Hirsch on August 4, 2020 asking whether he had any comments to the proposal.

275.    On August 5, 2020, Mr. Hirsch responded:

I have received your email, but I think we are pretty far apart in the first few years.  Please note that with the reduced CAM that exists, the total CAM & RE Taxes equal $11,271.22 based on the 2019 CAM & RE Tax numbers.  Locking ourselves in to anything less that this (in particular with a gross number that is capped) even for a short time makes no sense for us.  As you probably know, the current gross rent is $28,275.29/month; while for settlement purposes only, we can accept less than that for a period of time, we cannot accept a schedule that doesn't get there for nine (9) years.

We can only do a deal which is NNN; which means that the base rent ($17,004) is the only thing that we can negotiate.  For settlement purpose only, we can agree to cut this number by $10K through the end of the year and can agree to 2 months of free rent after reviewing your renovation plans.

If you think the above is something that you can work with, then we can discuss a long term lease.

276.    In response, on August 7, 2020, Mr. Gorgowicz increased his offer as follows:

Thank you for considering our proposal and giving us a counter proposal.  We understand your concerns regarding our original proposal in not reaching current rent structure, which was for approximately 5 ½ years as opposed to 9 years as set forth in your email.  We have amended our proposal to reflect a much faster

approach to help address those concerns keeping in mind the current economic conditions for both landlords and tenants.

Amit and I believe that gyms will open in New York with limitations on capacity and operations for some time. We believe that even with these restrictions as well as providing members with the comfort that we are taking every precaution possible so members feel that the gym is safe, it will still take time to be able to ramp up to sustain the expenses that the gym had prior to COVID 19. With that said, we are still willing to take on this business and invest in all new equipment and renovations to show we are in this for the long term. We are simply asking you to work with us over the rest of 2020 and 2021 to be able to address the COVID 19 apprehension and restrictions so by 2022 we are very close to the current rent structure and 2023 we are at the current rent structure.

Here is the new proposed structure:

1.  2 months no rent for renovation

2.  Until end of 2020 - $11,271.22/month after renovation (covers current CAM and Taxes)

3.  January – March '21 - Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $4k for base rent (this is approximately $15,271/month based on current capped CAM and taxes).

4.  April – August '21 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $7k for base rent (this is approximately $18,271/month based on current capped CAM and taxes).

5.  September -Dec '21 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus 10k for base rent (this is approximately $21,271/month based on current capped CAM and taxes).

6.  Jan-June '22 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $15k for base rent (this is approximately $26,271/month based on current capped CAM and taxes).

7. July – Dec '22 – Payment of CAM and Taxes with cap on CAM as set forth in the Lease Amendment plus $16k for base rent (this is approximately $27,271/month based on current capped CAM and taxes).

8. Jan '23 – Dec '24 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $17k for base rent (this is approximately $28,271/month based on current capped CAM and taxes).

9. Jan '25 – Dec 29 – Payment of CAM and Taxes with cap on CAM as set forth in the Lease Amendment plus $18k for base rent (this is approximately $29,271/month based on current capped CAM and taxes).

Option 1: (That may be exercised by tenant):

January 2030 to December 2034: Payment of CAM and Taxes plus $19k for base rent (this is approximately $30,271/month based on current capped CAM and taxes).

Option 2: (That may be exercised by tenant):

January 2035 to December 2039: Payment of CAM and Taxes plus $20k for base rent (this is approximately $31,271/month based on current capped CAM and taxes).

Should gyms be shut down again by the State during the winter of 2021, we ask for free rent during the shut down up to three months, and then reduced rent of $11,271.22 per month until gyms reopen.

The lease of Westchester Fitness will be assigned to us provided that the financial terms will be revised as set forth above.

277. Mr. Hirsch, however, failed to respond to this offer despite repeated follow ups by

Mr. Gorgowicz on August 11, 13 and 16, 2020.

278. Ms. Wallman also emailed Mr. Hirsch on August 13, 2020 as follows:

We wanted to follow up on Alex's email below. I know that when we first discussed modifying the lease payment terms several months ago in light of the shut down due to COVID 19, you indicated that it would only take a day or so to get back to us on any proposal. Given this, we are unsure as to your delay in

responding to Alex's revised proposal from last Friday morning. Are you not interested in agreeing to an assumption of the lease by Alex and Amit? They are qualified tenants that have been in business for over ten years and are willing to significantly invest in the gym and assume our lease. Their most recent offer is closely aligned with the current lease and is only seeking financial concessions for the first two years with the most significant of the reductions in the first year. We believe these terms are more than reasonable in light of the current uncertainty and financial conditions. If you are not interested in executing an assignment of the lease with Alex and Amit, please let us and them know asap so as to not waste anyone's time on this matter. With that said, Alex and Amit are very interested in the space and would like to reach an agreement as soon as possible so as to commence the renovations.

Further, as you know, we have made significant efforts to find a suitable tenant for the space and continued to seek a new tenant for the space given that Retro Fitness Corp. reneged on their deal to take over the space. Please advise as to whether you have another tenant or have other plans in mind for this space as Jason and I do not want to continue to pursue this route if the Landlord is not interested in making a deal. Further, Jason and I need to understand your position in order to know how to proceed (i.e. whether we need to vacate the space or find you a new tenant). In all of our prior discussions, you have indicated that you were always willing to accept a new tenant and that you preferred to keep the space as a gym so as to avoid having to pay additional TI money. If this has now changed, please let us know.

279.     Mr. Hirsch also failed to respond to Ms. Wallman's August 13, 2020 email or an August 17, 2020 email requesting that the Wallmans have a call with Mr. Hirsch to discuss the matter.

280.     At this point, Mr. Gorgowicz sent yet another proposal effectively bidding against himself given Mr. Persaud and his strong desire to lease the space as a fitness center stating:

We have reworked the numbers again. Please review them below and let us know if you have any questions.

Here is the new proposed structure:

1. 2 months no rent for renovation (September & October '20)
2. November & December '20 Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $2k for base rent (this is approximately $13,271/month based on current capped CAM and taxes).
3. January – March '21 - Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $4k for base rent (this is approximately $15,271/month based on current capped CAM and taxes).
4. April – August '21 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $9k for base rent (this is approximately $20,271/month based on current capped CAM and taxes).
5. September -Dec '21 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus 14k for base rent (this is approximately $25,271/month based on current capped CAM and taxes).
6. Jan '22-Dec '24 – Payment of CAM and Taxes with cap on CAM as set forth in Lease Amendment plus $17k for base rent (this is approximately $28,271/month based on current capped CAM and taxes).
7. Jan '25 – Dec 29 – Payment of CAM and Taxes with cap on CAM as set forth in the Lease Amendment plus $18k for base rent (this is approximately $29,271/month based on current capped CAM and taxes).

Option 1: (That may be exercised by tenant):
January 2030 to December 2034: Payment of CAM and Taxes plus $19k for base rent (this is approximately $30,271/month based on current capped CAM and taxes).

Option 2: (That may be exercised by tenant):
January 2035 to December 2039: Payment of CAM and Taxes plus $20k for base rent (this is approximately $31,271/month based on current capped CAM and taxes).

Should gyms be shut down again by the State during the winter of 2021, we ask for free rent during the shut down up to two months, and then reduced rent of $11,271.22 per month until gyms reopen.

The lease of Westchester Fitness will be assigned to us provided that the financial terms will be revised as set forth above.

281.     Once again, Mr. Hirsch did not respond, prompting yet another email from Ms.

Wallman on August 18, 2020 stating:

> Jason and I are at a loss as to why you have chosen to not engage either us or Alex and Amit in response to more than reasonable lease proposals. Westchester Fitness, LLC ("WF") has been a tenant in your property for over 10 years and we have had a solid working relationship with you during that time. During the term of the lease, WF paid the Landlord millions of dollars in rent. We have bent over backwards to try and find a viable tenant for the space to provide the Landlord rent merely with a bit of help from the Landlord for a fraction of the period of time on the new Lease to address the economic uncertainty and issues faced as a result of COVID-19.
>
> As you know, we worked months attempting to find a new tenant for you and were close to a deal with Retro Fitness Corp. taking over the Lease and space when the pandemic forced the closure of our gym. As you also know, although Retro led us and the Court to believe that a deal was imminent, Retro reneged on its deal in July. We, however, continued to work tirelessly to find you a new tenant and based on your encouragement that you would accept a new tenant to assume the Lease. Indeed, you stated that you preferred to have another fitness center lease the space given that the space already was built out for such. As you also know, we actually found a qualified tenant that is ready, willing and able to spend substantial renovation money, and execute a long term lease, and who has made multiple reasonable offers during this pandemic. The prospective tenant continues to be willing to lease the space despite limitations on gyms ordered by the Governor and yet you have not provided them or us even the courtesy of a response.
>
> The only logical explanation at this point is that you have another tenant. We believe it is likely Retro Fitness, which is why you fixed the sign over a month ago despite the fact that we discussed that the sign needed to be taken down if the space was no longer going to be a Retro Fitness during our last call. You led us to believe for months that you would do a deal with us and waive all back rent if we were able to find you a viable tenant. Indeed, you asked us during our last call to provide you with proposed concessions on the payment schedule under the Lease, and when we indicated that we would need to do this again, if and when, we found a prospective tenant, you stated that if the payment proposal

worked for us, it would likely work for a new tenant, and thus asked us to submit a modified payment schedule. We spent a significant amount of time and effort in providing you a revised lease payment schedule, which you initially indicated that you would respond to over the weekend if we submitted it to you on a Friday, but instead spent weeks stalling and, in fact, never provided any substantive response. When we found a qualified tenant to assume the lease, you again stalled on any response to Alex and Amit's proposal for a new rent structure that was closely aligned to the WF lease.

At the same time, Retro Fitness led us to believe that we were very close to finalizing a new settlement after they reneged on their prior settlement agreements, but stalled in our negotiations for a global walk away settlement.

Multiple times over several months after the business was shut down due to COVID 19, you specifically told us the Landlord had no tenant for the space, was not working with Retro on leasing the space, had no communications with Retro since prior to the shut down, and that the Landlord was open to a new tenant to lease the space if we could find one. We worked for months to find you a new tenant while at the same time offered the Landlord access to the space to be shown to new potential tenants. In response, we were met with radio silence to any of our proposals after you said it would take at most a few days to get back to us with a response. In addition, you provided one counter offer to the prospective tenant that was extremely inflexible and failed to provide much relief at all despite the ongoing pandemic and knowing there would be restrictions placed on the business. All Alex and Amit were asking for was some relief until the end of the year and to work with them on a gradual increase in rent every 4 months through 2021. You would have been back to full rent by 2022 according to their revised proposal.

We believe that your efforts to induce us to find a new tenant to rent the space while agreeing to waiving the rent, coupled with your lack of any response to the prospective tenant's proposals, were not in good faith. We are both highly disappointed and surprised by your lack of response after an over 10-year relationship.

If you are interested in having a call to discuss and resolve the matter, we have been and continue to remain available to do so.

282.	However, Mr. Hirsch still failed to respond prompting Ms. Wallman to send yet another email on August 22, 2020:

> Charles, it is obvious from your continued lack of response that you now don't want to do a deal after leading us to believe for months otherwise while we worked to get you a tenant, and, in fact, have one. At this point, we are working to clear out the space and remove all equipment. Given the large amount of organization and logistics in light of the size and amount all equipment and assets this will take us several weeks. We will be removing all of our assets and trade fixtures and are agreeable to coordinating this with you.
>
> We continue to dispute the rent given the prior agreement, but remain open to resolving the matter. Please advise if you would like to have a call to discuss.

283.	Thereafter, Westchester Fitness proceeded expeditiously to liquidate its equipment and assets and Ms. Wallman sent Mr. Hirsch an email on August 29, 2020 regarding the Landlord's removal of the pylon signage and stating:

> Charles, as I mentioned in my email of August 18, 2020, although the Landlord fixed the Retrofitness pylon sign in July without informing us that it was doing so, we request that the Landlord remove the sign asap. Please let me know when the Landlord intends to remove the sign so that I can inform the Court and counsel to Retrofitness Corp. We are in the process of arranging to have the other Retrofitness signage removed from the premises as well.
>
> In addition, I have not heard back from you as to coordinating our removal of our assets and trade fixtures as set forth in my August 22, 2020 email. We are in the process of removing such and, again, remain available to coordinate this with the Landlord.

284.	Once again, Mr. Hirsch failed to respond to the email. On Wednesday, September, 2, 2020, and Thursday, September 3, 2020, the purchaser of the fitness equipment removed all equipment from the Premises.

285.    On Monday, September 7, 2020, 16 days after Ms. Wallman sent the August 22nd

email, Mr. Hirsch finally responded:

> While gyms remained closed and you paid ZERO money towards
> CAM, RET or base rent, and planned on either discounting your
> space or leaving, we have focused our energies on the other 850+
> retail Tenants that we have who are working with us by paying
> some rent (even if just RET & CAM) while they are closed or
> struggle with limited openings.  You are actually the ONLY gym
> (Retro, Planet, or independent) who paid nothing.  In fact, your last
> payment was February 7, 2020; well before any closure was
> recommended or forced.
>
> Since you have already removed your equipment, please let me
> know when we shall receive the keys so that we can attempt to
> mitigate our damages; which is obviously not required in NY.
>
> As for the prior and current rent, your threat to dispute at this point
> does not phase or worry me; we will let the courts decide how it
> plays out.
>
> Attached is your current rent statement.

286.    Ms. Wallman responded to Mr. Hirsch's email that same day:

> The timing of your email is quite obvious and disappointing given
> that Jason and I spent months working in good faith in an effort to
> provide the Landlord a new tenant to rent the space while you
> conveniently chose to ignore our and the prospective tenant's
> communications and multiple offers during COVID 19 shut down
> of fitness centers until after we removed our equipment.  Indeed, as
> the many emails reflect, after Retro Fitness Corporate informed us
> that they were reneging on their agreement to purchase our
> business, we found you a tenant to assume the lease during the
> pandemic and even before fitness centers were allowed to reopen
> in New York. Yet you intentionally refused to engage in good faith
> negotiations consistent with your obligations and our agreement
> that the Landlord would waive all rent if we found a replacement
> tenant to assume the lease.
>
> As I stated many times, we have and continue to dispute the rent.
> Not only did we find you a tenant that was ready, willing and able
> to take over the lease, but as a landlord you failed to provide us
> with a usable space for the permitted use as set forth in the lease

for nearly six months. Accordingly, we have and continue to object to the payment of any rent and reserve all claims, rights, remedies and legal arguments that support our position, and this communication and all other communications are written without waiver thereof.

Further, during discussions prior to and after the COVID 19 shut down, we updated you of our progress with reaching a deal with Retro Fitness Corporate and/or finding you a new tenant. You repeated on multiple occasions that you would waive the rent if we found you a new tenant. Consistent with this agreement, you did not ask us during these discussions to remit any rent during the COVID 19 shut down. Thus, your claim below that we are the only gym that has not paid rent during the COVID 19 shut down further reflects our agreement.

With that said, we reached out to you on multiple occasions in an effort to discuss the prospective new tenant and a resolution over many months; yet you ignored each of our efforts. Therefore, your email below attempting to make a belated effort to mitigate the Landlord's damages after the fact and to rewrite history is disingenuous, at best.

In addition to disputing the rent on the whole, the Landlord also has added many charges to the rent statement that are not consistent with the Lease (assuming *arguendo* that it is enforceable, which we dispute) to which we further object. This email shall constitute a continuing objection to any invoices that the Landlord has and may continue to issue.

Although we are confident that a Court will find in our favor that the Lease is unenforceable, we have been, and continue to remain, available to discuss a potential resolution as we have indicated to you for many months.

We are in the process of removing the remainder of our assets this week and should have the keys to you in the next few days. Please advise of the address to which you would like us to send the keys.

287. That same day, Ms. Wallman also followed up as to the removal of the pylon

signage stating:

Charles, as a follow up to my email below, the pylon sign still needs to be taken down. Retro Fitness Corporate's counsel expressed their concerns about the pylon sign not being taken

116

down at a prior hearing with the Court. They indicated that this is a violation of their trade mark. I explained to the Court and Retro Fitness Corporate's counsel that I have no control over the pylon sign as it is the landlord's signage, but that I would request the landlord to take it down as I have done.

288.    Mr. Hirsch responded the next day, September 8, 2002:

I am not an attorney, so I will not try to argue lease points. You have a lease, have not paid anything, and offered a replacement Tenant at a significantly reduced rent. I explained when they first made their offer that we were worlds apart, but they came back with a slightly modified rent. If I was going to basically be at ½ rent in 5 years from your already reduced and scheduled lease, why on earth would I do it with a no-name gym? I tried to negotiate in good faith, but repeatedly offering a significantly reduced rate for an extended period of time is NOT good faith. As I stated in my last email, you have not paid a penny in rent since February 7, 2020; that is NOT ACTING IN GOOD FAITH. Every Tenant (other than you) has paid something; even the dance studio who was equally shut-down has paid and continues to pay.

Please let me know when you will be returning the key so I can begin showing the space; and please don't ask for a release in return for the key, that will not happen.

As for the sign, I do not have an agreement with Retro, and had to replace your sign panel since you failed to replace your broken panel in order to mitigate further damage to the shared pylon. You must call a licensed and insured sign company to either remove your branding and put in a blank sign, or reverse the existing panel. The pylon is no more "the Landlord's" then the façade of the building where you have your other sign(s).

289.    Ms. Wallman promptly responded that same day:

As you know and as reflected in the multiple emails, the prospective tenant's last offer was back to full rent within one year (with substantial increases over that one year period) and not close to five years as you state below. Moreover, after you claimed that the prospective tenant and you were world's apart on their offer, they attempted to continue to negotiate with you and provided not one, but two offers effectively negotiating against themselves. You chose not to respond to either of their offers or the multiple emails from the prospective tenant, Jason and me following up and

asking you to engage in negotiations over weeks. Indeed, you were silent until yesterday when you knew we had moved the equipment out of the space, which clearly is not good faith. Moreover, the prospective tenant was more than willing to negotiate with you to increase their offer as they were extremely motivated to get a deal done even when fitness centers were shut down. As they told you, they planned to renovate the space and put in all new equipment and assume a 10 year lease.

When Jason and I spoke with you over the summer about providing a replacement fitness tenant and you encouraged us to do so, you agreed that you were providing rent concessions to all tenants for several years. Thus, the prospective tenant's offer reaching full rent within one year (with substantial increases during that year) was even better than the guidelines you provided. Moreover, the prospective tenant would have negotiated for further increases had you made a good faith effort to engage in meaningful negotiations.

As for showing the space, I indicated to you in multiple emails over months that you were welcome to do so. Again, you chose not to do so. Further, I continue to extend that offer as we finish removing our assets from the space, which should be completed in the next day or so as I indicated to you yesterday.

As for the broken pylon panel, we also discussed this over the summer and you never once asked us to replace the panel. This is because it is neither our responsibility as a tenant nor were we authorized to do so given that it is not part of our lease. Moreover, I told you that we were liquidating over multiple emails and asked you to take down the pylon sign weeks ago, but again you failed to respond to any of my emails. Rather, you waited until after our signs were taken down to first claim that we should take down the pylon sign or reverse it. As you know, the landlord has provided for all signage on the pylon during the over 10 years we have been a tenant. This is because it is the landlord's responsibility to do so. You knew that we were in litigation with Retro Fitness Corporate and that Retro Fitness Corporate reneged on their agreement to purchase the gym yet in July you chose to put up another Retro Fitness sign. We question why you would put up another Retro Fitness sign if you knew there was no deal with Retro Fitness Corporate to take over the space. If you felt the need to change the sign, why wouldn't you just add a blank panel or take down the sign on the pylon, which is the Landlord's responsibility? Did you have a deal with Retro Fitness Corporate for them to take over the space?

118

As I am sure you know, we took down all of our signage yesterday and could have easily had our sign guy reverse the pylon sign if you had asked and authorized us to do so when he was at the premises. We will see if we can get him back to the property to address the pylon sign even though it is not our responsibility to do so.

As you also know, we had an agreement with you that if we found a replacement tenant you would waive the rent. Accordingly, we spent months attempting to negotiate with Retro Fitness Corporate to take over the space while simultaneously trying to find you a non-Retro Fitness (mom and pop) to take over the space. Consistent with that arrangement, we did not pay any rent since February. In fact, you encouraged us to find a fitness center to take over the lease as you preferred this given that you would not have to provide TI money for a new buildout or do the buildout yourself. For you to now claim that we have not paid any rent since February after we found you a qualified tenant (that owns a substantial business for over 10 years) and you refused to engage in any good faith negotiations is simply wrong. If we knew that you never had any intention of allowing a replacement tenant to take over the space despite your representations to the contrary, we would have vacated the space long ago. Your efforts to encourage us to provide you a new tenant when you never had any intention of accepting one are extremely disappointing.

As I requested in my prior email, please let us know where you would like us to send the key.

290.  Mr. Hirsch responded immediately:

I'm not going to argue any lease terms or lease definitions with you, that will be for a court to decide. As an FYI - attached is their last "final" offer as they stated – how are they at full rent within a year?

Send the key to the office in Manhasset at the address below as soon as possible.

291.  Ms. Wallman promptly replied:

Yes, I stand corrected. The prospective tenant would have been back to full rent within 16 months with substantial rent increments over that time and after investing hundreds of thousands in

renovations of your property and new equipment to essentially create a new fitness center with an assumption of a long term lease. This deal was still well within the parameters that you described to Jason and I as acceptable during the COVID shut down. In fact, you indicated to us that you were providing concessions for several years to your tenants.

292.    Mr. Hirsch neither addressed nor disputed Ms. Wallman's statements as he had done with past email exchanges and simply asked when the keys would be sent in an email later that day.

293.    The next day, Ms. Wallman responded:

Charles, we are finishing up clearing out the space and leaving it broom clean for the Landlord and will be sending the keys tomorrow via overnight mail. Please let us know if someone will be at Milbrook Properties to sign for the keys on Saturday. If not, please provide us with an address at which someone will be able to sign for the keys on Saturday.

Also, in speaking with Jason, he reminded me that the prospective tenant was agreeable to increasing the rent to full rent sooner than the last proposal if the Government restrictions on health clubs were lifted sooner. The prospective tenant also indicated multiple times that they were willing to negotiate with you, which was evident by the multiple emails and offers they submitted bidding against themselves when you failed to respond to them. They were extremely eager to lease the space and had the business experience and financial wherewithal to do so.

294.    Mr. Hirsch merely responded that same day asking that the keys be sent via overnight delivery for either later Friday or Monday delivery since no one would be at the office on Saturday.

295.    After clearing out the space and leaving it broom clean for the Landlord, on September 11, 2020, Westchester Fitness sent the keys to the Premises via overnight mail for Monday delivery in accordance with Mr. Hirsch's request.

296.     Accordingly, Westchester Fitness has faithfully performed all obligations under the Lease and the agreement with the Landlord to waive all back rent if Westchester Fitness provided the Landlord with a replacement tenant (the "Landlord Agreement").  The Landlord, however, has breached the Landlord Agreement and the covenant of good faith and fair dealing, and also fraudulently induced Westchester Fitness to remain at the Premises, to its detriment, in an effort to attempt to collect additional rent during the shut down of Westchester Fitness's business due to a world-wide pandemic and while knowing full well that the Landlord never intended to accept a replacement tenant of a non-branded fitness facility.

297.     In addition, in light of the frustration of purpose and impossibility of performance caused by the COVID-19 Pandemic, and related government shut-down orders and restrictions placed on the operation of fitness centers in New York, Westchester Fitness elected to rescind the Lease as asserted herein.

## VIII.     Frustration of Purpose, Impossibility of Performance and Westchester's Contractual Right to Terminate the Lease

298.     Westchester Fitness and the Landlord entered the Lease with the principle and basic expectation that Westchester Fitness could operate the Premises as a fitness center location as detailed above.

299.     The operation of the Premises as a fitness center was equally important and fundamental to both Westchester Fitness and the Landlord.

300.     In fact, Landlord required Westchester Fitness to assent to Section I. D. of the Original Lease and Section 5 of the Lease Rider, which mandated that Westchester Fitness operate as a Health Club and related services and accessories and that any deviation therefrom would constitute a default under the terms of the Lease.  See Original Lease at p. 2, §1.D.

301.    Further, the Landlord required Westchester Fitness to "occupy the Premises upon commencement of the Term and thereafter [to] … continuously conduct in the Premises the business in accordance with the Permitted Use."  Further, Westchester Fitness was to "cause [its] … business to be conducted and operated in good faith and in such manner [to] … assure the transaction of the maximum of business in and at the Premises.  And, Westchester Fitness was required to covenant and agree to remain open for business at least during the hours of no less than 9:00 am to 5:00 pm Monday through Friday and such additional hours as determined by Westchester Fitness to maximize the business conducted at the Premises. See Original Lease at p. 7, §17, p. 3, §1.J.

302.    Any failure by Westchester Fitness to abide by the above provisions, constituted an event of default under the Lease.  See Original Lease at p. 18, §40A.

303.    Likewise, Westchester Fitness required that it have the exclusive right to use the Premises as follows:

> EXCLUSIVE USE:  Fitness/strength training, fitness equipment sales, aerobics, cardio classes, circuit training facilities of any kind, personal training, physical therapy and nutritional counseling. Landlord shall not permit any other tenant at the Shopping Center to provide any of the foregoing services.

See Lease Rider at p. 2, §6.

304.    Thus, the express terms of the Lease demonstrate that both parties recognized that the Lease's principle purpose was the operation of a fitness facility, which would generate income for Westchester Fitness in the form of membership sales and ancillary services.

305.    Without Westchester Fitness's ability to operate a fitness center at the Premises, neither party would have entered the Lease.

306.    Unfortunately, as a result of the governmental lockdown restrictions resulting from the COVID-19 Pandemic, Westchester Fitness was expressly precluded by law from operating its fitness center at the Premises, and thus the very purpose of the Lease has been completely frustrated insofar as, *inter alia*, Westchester Fitness has been deprived of its use of the Premises for the full term that Westchester Fitness was promised under the Lease.  Indeed, it was a fundamental and material expectation that Westchester Fitness would have access to the Premises for the full term of the Lease (not just some portion thereof).

307.    Moreover, even when fitness centers were permitted to reopen on September 2, 2020, there were severe restrictions placed on their operations and facilities were required to operate at 33 percent capacity and follow rigorous health and safety protocols as detailed in the Press Release and discussed above.  These restrictions have severely hampered the ability of fitness centers (including Westchester Fitness) to operate in accordance with the parties expectations under the Lease including, without limitation, the ability to operate in accordance the use and occupancy provisions under the Lease.

308.    It is of paramount importance that the parties specifically agreed that "there were be no violation of the terms of the lease or damages or penalty if the business is unable to operate due to situations that are beyond the Tenants control (i.e.) action instituted by the local health department, as long as the Tenant is diligently acting to correct the condition."  See Original Lease at p. 8, §17.C.  Thus, the Landlord clearly is not entitled to any damages including, without limitation, any rent or any claims under the Lease given Westchester Fitness's inability to operate due to the COVID-19 shut down and ongoing stringent health and safety restrictions imposed by the government, and the parties clearly contemplated a government related shut down when they executed the Lease.

309. COVID-19 has paralyzed the entire world, having killed more than 200,000 Americans and infected millions more. The disease has spread exponentially, shutting down fitness centers, retail stores, schools, jobs, professional sports seasons, and life as we know it. The State of New York and, in particular, the New York City Metropolitan Area and its suburbs have been the hardest region hit in America.

310. On March 7, 2020, Governor Andrew M. Cuomo issued Executive Order No. 202. That order, issued in response to the rapidly escalating COVID-19 public health emergency, stated that "a disaster [was] impending in New York State, for which the affected local governments [would be] unable to respond adequately" and therefore the declaration of "a State disaster emergency for the entire State of New York" was necessary (Executive Order [A.Cuomo] No.202).

311. At that time in early March, the number of confirmed COVID-19 cases in New York State was less than 100 (Jesse McKinley and Edgar Sandoval, Coronavirus in NY: Cuomo Declares State of Emergency, NY Times, Mar. 7, 2020, https://nyti.ms/2XkHaZW); a month later, that number exceeded 138,000 (NY Virus Deaths Hit New High, but Hospitalizations Slow, NY Times, Apr. 7, 2020, https://nyti.ms/3aOzvXz).

312. In the ensuing days and weeks, the Governor, in a series of executive orders, aimed to "flatten the curve" and slow the spread of COVID-19 by limiting gatherings of people (see, e.g., Executive Order 202.1 [ordering the 30-day postponement or cancelation of "[a]ny large gathering or event for which attendance is anticipated to be in excess of five hundred people"]; Executive Order 202.3 [modifying the large gathering order in Executive Order 202.1 to gatherings where "more than fifty persons are expected in attendance"]; Executive

Order 202.10 [cancelling or postponing all "(n)on-essential gatherings of individuals of any size for any reason"] ).

313.    In particular, on March 16, 2020, as the crisis worsened, Executive Order 202.3, required any gym, fitness centers or classes to cease operation effective 8 pm that day.  As such, on March 16, 2020, Westchester Fitness suspended all operations at the Premises to comply with applicable governmental orders and guidelines and to protect the health and safety of its employees, members, and the surrounding community.

314.    Thereafter, on March 18, 2020, Governor Cuomo issued Executive Order 202.6, requiring non-essential businesses to reduce their in-person work force by 50%.  Westchester Fitness's operations at the Premises were not only deemed "non-essential," but also as a fitness center any operation of the facility was strictly prohibited pursuant to Executive Order 202.3.  By this time, business and commerce in New York was already at a virtual standstill.

315.    These efforts culminated in the issuance of Executive Order 202.8, on March 20, 2020, which ordered all nonessential businesses and nonprofit organizations to ***"reduce [their] in-person workforce at any work locations by 100% no later than March 22[, 2020] at 8 p.m."*** (Executive Order 202.8) (emphasis added).

316.    Pursuant to these extraordinary and unforeseeable executive acts and decrees, Westchester Fitness was *required* to close all of its operations at the Premises and unfortunately was required to remain shuttered by government order until in or about September 2, 2020 or possibly later pursuant to the Governor's Press Release  - a period of nearly six months.

317.    The COVID-19 Pandemic and Executive Order 202.3 have completely frustrated the very purpose of the Lease, and made it impossible for the parties to perform.

318. Because of the COVID-19 Pandemic, Westchester Fitness cannot operate its facility at the Premises consistent with the parties' fundamental understanding, purpose, and expectation at the time the Lease was entered.

319. Westchester Fitness' inability to operate its store has completely frustrated the purpose of the Lease and rendered performance impossible.

320. In fact, as set forth above, the Landlord acknowledged in the Original Lease that Westchester Fitness's inability to operate due to reasons beyond its control that it would not be a violation of the Lease and there would be no claim for damages by the Landlord or any penalty to the business. See Original Lease at p. 8, § 17C.

321. Further, the lease provides for a full abatement of the rent if the Premises was damaged by Casualty and is rendered untenantable as detailed above. See Original Lease at p. 16, § 33(A); Lease Rider at p. 13, § 25. The Premises were rendered untenantable by virtue of the Governor's Executive Orders prohibiting the operation of the fitness facility and the ongoing restrictions that continue to limit the use, occupancy, and operations of the facility with no end in sight. Accordingly, pursuant to the provisions of the Lease, Westchester Fitness is entitled to, and has, terminated the Lease and the Landlord's continued efforts to seek rent and other fees under the Lease constitute a breach of the Lease.

322. The COVID-19 Pandemic and related government shutdown orders – altering every aspect of business and life in New York, and particularly hard hitting on the brick and mortar fitness industry, were neither foreseen nor foreseeable by any party to the Lease.

323. Nevertheless, it is clear from the Lease that the Landlord and Westchester Fitness understood that the operation of a fitness center at the Premises was *the primary purpose* of the Lease, and the inability to operate as a fitness center free from the restrictions

imposed by the government on the use, occupancy and operations would not constitute a breach of the Lease, would preclude the Landlord from asserting any claims for damages or any other penalties on Westchester Fitness and would entitle Westchester Fitness to an abatement of rent, to terminate the Lease, and a rescission of the Lease.

324.    Accordingly, as a result of the COVID-19 Pandemic and Executive Orders, the Lease is terminated and also rescinded by the legal doctrines of frustration of performance and impossibility of performance, and any efforts by the Landlord to collect rent or any other charges under the Lease constitute a breach of the Lease as well as the Landlord Agreement given that Westchester Fitness provided the Landlord with a tenant ready, willing and able to assume the Lease consistent with the Landlord's guidelines.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Against Retrofitness and Sprechman for Violation of New York General Business Law)**

325.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

326.    Westchester Fitness was fraudulently induced to enter into the Franchise Agreement under false pretenses because despite representations to the contrary in the July 2008 Disclosure, and the Franchise Agreement, at the time of the execution of the Franchise Agreement, upon information and belief, Retrofitness and Sprechman never had any intention to honor the Franchise Agreement or to comply with the requirements of the July 2008 Disclosure or applicable law.

327.    Instead, Retrofitness and Sprechman sought to have Westchester Fitness, the Wallmans, and the Investors spend in excess of one million eight hundred thousand dollars ($1,800,000.00) for the start-up and construction costs of their business.  Then, upon renewal,

and after collecting lucrative royalties, franchise fees and kick-backs over ten years while Westchester Fitness invested countless hours in running and building its business, attempted to strong arm Westchester Fitness, the Wallmans, and the Investors. In particular, Retrofitness and Sprechman demanded as a condition to renewal of the Franchise Agreement, that Westchester Fitness, the Wallmans and the Investors execute the 2019 Franchise Documents (for which they were not contractually obligated to execute as a condition for renewal) that significantly benefit Retrofitness and place untenable obligations upon Westchester Fitness, the Wallmans, and the Investors contrary to applicable law and Retrofitness's contractual obligations.

328. In the event that Westchester Fitness, the Wallmans and the Investors refused to concede to Retrofitness and Sprechman's unreasonable demands, Retrofitness and Sprechman, upon information and belief, planned to use their unequal bargaining power and leverage as the franchisor to unlawfully take Westchester Fitness's business for nominal (if any) consideration.

329. Upon information and belief, as fully detailed above, Retrofitness and Sprechman, intentionally and knowingly, made false and material representations. These representations include, but are not limited to, the following: (i) the New York Amendment would be included in the Franchise Agreement as represented in, and required by, the July 2008 Disclosure and would be incorporated in any renewal agreement; (ii) the terms for renewal of the Franchise Agreement were set forth in the Franchise Agreement and the July 2008 Disclosure and would be incorporated in any renewal agreement; (iii) only Westchester Fitness and the Wallmans would execute any renewal of the Franchise Agreement and Guaranty, respectively, as required in the Franchise Agreement; (iv) the releases required in the New York Amendment and the Mandatory Disclosure Documents would be reciprocal general releases with certain carve outs for the legal rights of Westchester Fitness, the Wallmans and the Investors as required under the

New York General Business Law; (v) the Lease was approved and would not be subject to any further amendment as a condition for renewal of the Franchise Agreement; (vi) the version of the 2019 Franchise Agreement provided by Retrofitness and Sprechman to Westchester Fitness was the same version as set forth in the 7/30/19 Disclosure; and (vii) Retrofitness would work with Westchester Fitness in good faith and provide a draft of the 2019 Franchise Documents in a week from the August 2, 2019 meeting.

330.   Upon information and belief, Retrofitness and Sprechman, through their unlawful and fraudulent scheme and in blatant disregard of New York law, intentionally failed to include the terms of the New York Amendment, which served to benefit and protect Westchester Fitness in accordance with New York statutory law, in not one, but three franchise agreements provided to Westchester Fitness for execution.  Two of those franchise agreements, namely the Franchise Agreement and the 8/18/08 Franchise Agreement, were in fact executed.   It is apparent from Retrofitness and Sprechman's repeated violations of New York law even after they were apprised of their violations, that this unlawful pattern and practice was willful and intentional.

331.   Further, upon information and belief, Retrofitness and Sprechman knew their statements were false, and, as a direct and proximate cause of these intentional misrepresentations and omissions, Retrofitness and Sprechman knew that Plaintiff and the Wallmans would be induced to execute the Franchise Agreement and guarantee thereof, respectively, and to spend significant funds to invest in the start-up and construction of a Retrofitness franchise.

332.   Upon information and belief, Retro Defendants, intentionally and knowingly, made false and material representations in the Franchise Agreement and 2008 Disclosure Statement. Retro Defendants neither had any intention to honor the Franchise Agreement, nor to

adhere to the representations set forth in the 2008 Disclosure Statement, or to comply with their legal obligations under New York law as detailed herein.

333. Upon information and belief, Retrofitness and Sprechman intended to induce Plaintiff to act or refrain from acting upon their false statements, and Plaintiff justifiably relied upon such false statements.

334. Westchester Fitness, the Wallman's, and the Investors of the business, did not know, and could not have known, of the unlawful and fraudulent conduct committed by Retrofitness and Sprechman until they revealed their true intent over the last few months when Westchester Fitness attempted to renew the Franchise Agreement.

335. Plaintiff suffered damages as a direct and proximate consequence of the false statements made, and fraud committed, by Retrofitness and Sprechman.

336. As a result of false statements made, and alleged fraud committed, by Retrofitness and Sprechman, Retro Defendants obtained from Plaintiff, *inter alia*: (i) the investment of over one million eight hundred thousand ($1,800,000) in a Retrofitness franchise; (ii) approximately one million dollars ($1,000,000) in royalties and franchise fees to date plus unknown amounts from the kick-backs Retrofitness received from the mandatory vendors and suppliers with whom Westchester was required to do business and which kick-backs served to increase the cost of such products and services passed through to Westchester Fitness; and (iii) the execution of the Franchise Agreement, which would not have been authorized by Plaintiff if the false statements had not been made, or if material facts that were omitted and concealed, were actually disclosed.

337. The New York General Business Law requires franchisors to register with the department of law prior to offering or selling a franchise in New York and obtaining the approval

of their "offering prospectus," which in the instant case were the Mandatory Disclosures. *See* N.Y. Gen. Bus. Law, Article 33, § 683, Section 1.

338. The Mandatory Disclosures must include a detailed list of information as set forth in Section 683 of the New York General Business Law. Among the information required are: (i) "[a] statement of the conditions under which the franchise agreement may be terminated or renewal refused or repurchased at the option of the franchisor"; and (ii) "[a] representation that the registered prospectus does not knowingly omit any material fact or contain any untrue statement of material fact." *See* N.Y. Gen. Bus. Law, Article 33, § 683, Sections 2 (j) and (s).

339. Further, the General Business Law provides that

> [a] franchise which is subject to registration under this article shall not be sold without first providing to the prospective franchisee, a copy of the offering prospectus, together with a copy of all proposed agreements relating to the sale of the franchisee at the earlier of (a) the first personal meeting between the franchisor or its agent and the prospective franchisees, (b) at least ten business days prior to the execution of a binding franchise or other agreement, or (c) at least ten days prior to the receipt of any consideration in connection with the sale or proposed sale of a franchise. For the purposes of this chapter, the words: (i) 'first personal meeting' shall mean the first face to face meeting between a franchisor or franchisor's agent or any representative or employee thereof and a prospective franchisee which is held for the purpose of discussing the sale or possible sale of a franchise.

*See* N.Y. Gen. Bus. Law, Article 33, § 683, Section 8.

340. Pursuant to General Business Law Section 687:

> 4. It is unlawful for any person to make any untrue statement of a material fact in any application, notice, statement, prospectus or report filed with the department under this article, or willfully to omit to state in any such application, notice, statement, prospectus or report any material fact which is required to be stated therein, or to fail to notify the department of any material change as required by this article.

5. It is unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly:

    (d) Employ any device, scheme, or artifice to defraud.

    (e) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading….

    (f) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

3. It is unlawful for any person to violate any provision of this article, or any rule of the department promulgated hereunder, or any condition to the effectiveness of the registration of an offering prospectus or of an exemption from the registration provisions of this article.

4. Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void.

5. It is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article.

*See* N.Y. Gen. Bus. Law, Article 33, § 687.

341.    By virtue of Retro Defendants' failure to comply with the terms of the Franchise Agreement and the July 2008 Disclosure -- to wit, the inclusion of the New York Amendment and the terms therein, and compliance with the renewal provisions set forth in the Franchise Agreement -- Retro Defendants have made untrue statements of material fact in violation of Section 687 of the General Business Law.

342.    In addition, in contravention of Section 683 of the New York General Business Law, the conditions under which a renewal of the Franchise Agreement may be refused were

materially false in the July 2008 Disclosure and the Franchise Agreement given Retrofitness's refusal to honor such provisions when renewing the Franchise Agreement. Thus, Retrofitness's claim in the July 2008 Disclosure that the registered prospectus does not knowing omit any material fact or contain any untrue statement of material fact was false also in violation of the New York General Business Law.

343.    Upon information and belief, Retro Defendants' statements, omissions and acts described above also constitute: (i) a scheme to defraud Westchester Fitness, the Wallmans, and the Investors into purchasing a Retrofitness franchise; (ii) untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; (iii) acts, practices, or a course of business which operates or would operate as a fraud or deceit upon any person. Accordingly, Retro Defendants also have violated Section 687 of the General Business Law.

344.    In addition, Retro Defendants' efforts to force Plaintiff, the Wallmans and the Investors to waive their rights under the New York General Business Law to a reciprocal general release, and to require Plaintiff, the Wallmans, and the Investors to waive Retro Defendants' compliance with the New York General Business Law by mandating that they release Retrofitness and its affiliates from any obligations under the New York General Business Law as a condition to renewing the Franchise Agreement, is unlawful in accordance with Section 687 of the New York General Business Law.

345.    Moreover, Retro Defendants' failure to provide the New York Amendment as part of the Franchise Agreement and Retro Defendants' persistent refusal to cure their violations under the New York General Business Law even after they were specifically raised by Westchester Fitness renders the Franchise Agreement, and any other documents executed by

Westchester Fitness and/or the Wallmans in connection therewith, void in accordance with Section 687 of the General Business Law.

346.    In addition to criminal remedies for violation of the General Business Law, Section 691 of the General Business Law provides civil remedies for violations, but notes that liability is not limited and may exist by virtue of any other statute or under common law if the article was not in effect. In particular,

> 2.    [a] person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred and eighty-seven of this article is liable to the person purchasing the franchise for damages and, if such violation is willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs….

> 6.    A person who directly or indirectly controls a person liable under this article, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, and an employee of a person so liable, who materially aids in the act of transaction constituting the violation, is also liable jointly and severally with and to the same extent as the controlled person, partnership, corporation or employer.

*See* N.Y. Gen. Bus. Law, Article 33, § 691.

347.    Due to the fraud and intentional misconduct perpetrated by both Retrofitness and Sprechman as alleged above, Retro Defendants are both jointly and severally liable for the damages alleged herein.  Moreover, it is readily apparent from Retrofitness and Sprechman's refusal to comply with their obligations under the Franchise Agreement, the disclosures required under the July 2008 Disclosure, as well as the requirements under the New York General Business Law, that Retrofitness and Sprechman's violations were willful and material. Accordingly, in addition to damages, Westchester Fitness is entitled to rescission of the

Franchise Agreement, recoupment of all construction and equipment costs invested in the business, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs.

348.    Plaintiff is entitled to: (i) a judgment voiding and rescinding the Franchise Agreement,  and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, and recouping from Retrofitness and Sprechman, all monies invested in the franchise (including, without limitation, all construction, equipment and other start-up costs for the business) in addition to the revenue collected by Retrofitness from Westchester Fitness in royalties, franchise fees, kick-backs from Westchester Fitness's purchases, and any other form of compensation; and (ii) an award of damages against Retrofitness and Sprechman, jointly and severally, in an amount to be determined at trial in accordance with the damages afforded under the New York General Business Law, plus attorneys' fees, costs incurred, and interest, and such other relief as the Court deems just and proper.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Against Retrofitness and Sprechman, in the Alternative, for Fraud)

349.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

350.    Westchester Fitness was fraudulently induced to enter into the Franchise Agreement under false pretenses because despite representations to the contrary in the July 2008 Disclosure, and the Franchise Agreement, at the time of the execution of the Franchise Agreement, upon information and belief, Retrofitness and Sprechman never had any intention to honor the Franchise Agreement or to comply with the requirements of the July 2008 Disclosure or applicable law.

351.    Instead, Retrofitness and Sprechman sought to have Westchester Fitness, the Wallmans, and the Investors spend in excess of one million eight hundred thousand dollars ($1,800,000.00) for the start-up and construction costs of their business.  Then, upon renewal, and after collecting lucrative royalties, franchise fees and kick-backs over ten years while Westchester Fitness invested countless hours in running and building its business, attempted to strong arm Westchester Fitness, the Wallmans, and the Investors.  In particular, Retrofitness and Sprechman demanded as a condition to renewal of the Franchise Agreement, that Westchester Fitness, the Wallmans and the Investors execute the 2019 Franchise Documents (for which they were not contractually obligated to execute as a condition for renewal) that significantly benefit Retrofitness and place untenable obligations upon Westchester Fitness, the Wallmans, and the Investors contrary to applicable law and Retrofitness's contractual obligations.

352.    In the event that Westchester Fitness, the Wallman's and the Investors refused to concede to Retrofitness and Sprechman's unreasonable demands, Retrofitness and Sprechman, upon information and belief, planned to use their  unequal bargaining power and leverage as the franchisor to unlawfully take Westchester Fitness' business for nominal (if any) consideration.

353.    Upon information and belief, as fully detailed above, Retrofitness and Sprechman, intentionally and knowingly, made false and material representations.  These representations include, but are not limited to, the following:  (i) the New York Amendment would be included in the Franchise Agreement as represented in, and required by, the July 2008 Disclosure and would be incorporated in any renewal agreement; (ii) the terms for renewal of the Franchise Agreement were set forth in the Franchise Agreement and the July 2008 Disclosure and would be incorporated in any renewal agreement;  (iii) only Westchester Fitness and the Wallmans would execute any renewal of the Franchise Agreement and Guaranty, respectively, as required

in the Franchise Agreement; (iv) the releases required in the New York Amendment and the Mandatory Disclosure Documents would be reciprocal general releases with certain carve outs for the legal rights of Westchester Fitness, the Wallmans and the Investors as required under the New York General Business Law; (v) the Lease was approved and would not be subject to any further amendment as a condition for renewal of the Franchise Agreement; (vi) the version of the 2019 Franchise Agreement provided by Retrofitness and Sprechman to Westchester Fitness was the same version as set forth in the 7/30/19 Disclosure; and (vii) Retrofitness would work with Westchester Fitness in good faith and provide a draft of the 2019 Franchise Documents in a week from the August 2, 2019 meeting.

354. Upon information and belief, Retrofitness and Sprechman, through their unlawful and fraudulent scheme and in blatant disregard of New York law, intentionally failed to include the terms of the New York Amendment, which served to benefit and protect Westchester Fitness in accordance with New York statutory law, in not one, but three franchise agreements provided to Westchester Fitness for execution. Two of those franchise agreements, namely the Franchise Agreement and the 8/18/08 Franchise Agreement, were in fact executed. It is apparent from Retrofitness and Sprechman's repeated violations of New York law even after they were apprised of their violations, that this unlawful pattern and practice was willful and intentional.

355. Further, upon information and belief, Retrofitness and Sprechman knew their statements were false, and, as a direct and proximate cause of these intentional misrepresentations and omissions, Retrofitness and Sprechman knew that Plaintiff and the Wallmans would be induced to execute the Franchise Agreement and the guarantee thereof, respectively, and to spend significant funds to invest in the start-up and construction of a Retrofitness franchise.

356.     Upon information and belief, Retro Defendants, intentionally and knowingly, made false and material representations in the Franchise Agreement and 2008 Disclosure Statement. Retro Defendants neither had any intention to honor the Franchise Agreement, nor to adhere to the representations set forth in the 2008 Disclosure Statement, or to comply with their legal obligations under New York law as detailed herein.

357.     Upon information and belief, Retrofitness and Sprechman intended to induce Plaintiff to act or refrain from acting upon their false statements, and Plaintiff justifiably relied upon such false statements.

358.     Westchester Fitness, the Wallman's, and the Investors, did not know, and could not have known, of the unlawful and fraudulent conduct committed by Retrofitness and Sprechman until they revealed their true intent over the last few months when Westchester Fitness attempted to renew the Franchise Agreement.

359.     Plaintiff suffered damages as a direct and proximate consequence of the false statements made, and fraud committed, by Retrofitness and Sprechman.

360.     As a result of false statements made, and alleged fraud committed, by Retrofitness and Sprechman, Retro Defendants obtained from Plaintiff, *inter alia*: (i) the investment of over one million eight hundred thousand ($1,800,000) in a Retrofitness franchise; (ii) approximately one million dollars ($1,000,000) in royalties and franchise fees to date plus unknown amounts from the kick-backs Retrofitness received from the mandatory vendors and suppliers with whom Westchester was required to do business and which kick-backs served to increase the cost of such products and services passed through to Westchester Fitness; and (iii) the execution of the Franchise Agreement, which would not have been authorized by Plaintiff if the false statements had not been made, or if material facts that were omitted and concealed, were actually disclosed.

361.    Retro Defendants' statements and acts described above constitute actual fraud and fraudulent inducement under New York law.

362.    Plaintiff is entitled to an award of damages against Retrofitness and Sprechman, jointly and severally, in an amount to be determined at trial, but no less than the amount of Two Million Dollars ($2,000,000), plus attorneys' fees, costs incurred, punitive damages, and such other and further relief as the Court deems just and proper.

### AS AND FOR A THIRD CLAIM FOR RELIEF
**(Against Retrofitness, in the Alternative, for Breach of Contract)**

363.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

364.    This cause of action is pled in the alternative to the other claims set forth herein in the event that the Court determines that the Franchise Agreement is not void under the New York General Business Law.

365.    The Franchise Agreement was and remains a valid, binding and written expression of the parties' agreement to be bound under the terms set forth therein.

366.    Westchester Fitness duly performed each and every obligation as required under the terms of the Franchise Agreement.

367.    Retrofitness has failed to perform its material obligations under the Franchise Agreement in breach thereof as detailed herein.    Retrofitness's breach of the Franchise Agreement remains uncured.

368.    In sum, Section 4.6.2 of the Franchise Agreement sets forth various conditions for renewal of the Franchise Agreement. The conditions for renewal were to supersede any renewal requirements in the then-current franchise agreement.

369.     Section 4.6.2 of the Franchise Agreement provides, in pertinent part:

[Westchester Fitness] … and any Related Parties that have signed this Agreement shall have signed a copy of the then-current Franchise Agreement (except with respect to the renewal provisions thereof, which shall not supersede this Section 4.6.2) not less than thirty (30) days before the expiration of this Agreement, or thirty (30) day after [Westchester Fitness] .... receives a signature ready copy of the then-current Franchise Agreement from Retrofitness, whichever is later.

370.     Related Parties are defined in Section 3.11 of the Franchise Agreement, in relevant part, as

persons and companies affiliated with … [Westchester Fitness], including but not limited to, owners (as defined herein) general partners, limited partners, shareholders, or members, owning a Substantial Interest in (i) … [Westchester Fitness]; … and (iv) officers, directors, members or agents of …[Westchester Fitness]. As used in this paragraph, the phrase "Substantial Interest" means the right to twenty percent (20%) or more of the capital or earnings of … a limited liability company….

371.     Other than the Wallmans, none of the members of Westchester Fitness have an interest greater than 20% or more in Westchester Fitness.  Accordingly, consistent with the requirement that only the Wallmans guarantee the Franchise Agreement, none of the other members of Westchester Fitness constitute Related Parties and thus were not contractually required to execute the Franchise Agreement or a guarantee thereof as a condition for renewal, as stated above.

372.     Moreover, the Renewal Provisions expressly state that only "Related Parties" *that signed the Franchise Agreement* would be required to execute the then-current Franchise Agreement.  Thus, in accordance therewith, if Westchester Fitness determined to renew the Franchise Agreement, then only Westchester Fitness was contractually required to execute a

renewal of the Franchise Agreement given that the Investors and the Wallmans did not execute the Franchise Agreement, but, rather the Wallmans merely guaranteed the Franchise Agreement.

373.    Retrofitness intentionally and willfully breached the Franchise Agreement as it demanded as a condition for renewal that all members of Westchester Fitness execute the 2019 Franchise Agreement.

374.    The conditions for renewal in the Franchise Agreement do not require that the Lease Addendum be executed.

375.    Retrofitness intentionally and willfully breached the Franchise Agreement by demanding that the Lease Addendum be executed as a condition for renewal.

376.    The conditions for renewal in the Franchise Agreement were to be incorporated in the 2019 Franchise Agreement.

377.    Retrofitness intentionally and willfully breached the Franchise Agreement by refusing to incorporate the conditions for renewal set forth therein in the 2019 Franchise Agreement.

378.    The conditions for renewal in the Franchise Agreement require that Retrofitness shall sign a new franchise agreement thirty (30) days after Westchester Fitness receives a signature ready copy of the then-current franchise agreement from Retrofitness.

379.    Retrofitness intentionally and willfully breached the Franchise Agreement by demanding that Retrofitness execute the 2019 Franchise Agreement within two days of it being presented to Westchester Fitness and after having deceitfully and fraudulently switched the version of the franchise agreement from the version disclosed in the 7/30/19 Disclosure pursuant to the mandatory disclosures under the New York General Business law.

380.     The contract terms set forth herein are material conditions of the Franchise Agreement and Retrofitness's full performance of those express terms was a necessary covenant to enter in the now terminated Franchise Agreement.

381.     Section 11.11 of the Franchise Agreement provides that:

> If legal action … is necessary to enforce the terms and conditions of this Agreement or for violation of this Agreement, the prevailing party will be entitled to recover reasonable compensation for the preparation, investigation and court or arbitral costs or both and reasonable attorneys' fees, as fixed by a court of competent jurisdiction or by the arbitrator.

382.     As a result of Retrofitness's default and this resulting litigation, Westchester Fitness has incurred and continues to incur expenses including attorneys' fees, which cannot be finally determined at this date but which will be capable of determination at such time as judgment may be entered herein.

383.     By reason of the foregoing, Retrofitness is liable to Westchester Fitness in an amount to be determined at trial, but no less than the amount of Two Million Dollars ($2,000,000), plus attorneys' fees, costs and disbursements incurred in such amount as may be determined, interest at the statutory rate from the date of Retrofitness's breach of the Franchise Agreement through the entry of judgment herein, and such other relief as the Court deems just and proper.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

**(Against Retrofitness, in the Alternative, for Breach of
the Implied Covenant of Good Faith and Fair Dealing)**

384.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

385. Implied in the Franchise Agreement entered into between Westchester Fitness and Retrofitness was a duty of good faith and fair dealing between the parties to that contract.

386. Westchester Fitness acted at all times in good faith and dealt fairly with Retrofitness with regard to their contractual relationship.

387. Retrofitness repeatedly breached the implied duty of good faith and fair dealing that it owed to Westchester Fitness by, *inter alia*: (i) committing the fraud and unlawful conduct alleged above to fraudulently induce Westchester Fitness to execute the Franchise Agreement and the 2019 Franchise Documents; (ii) failing to negotiate in good faith, and in accordance with its obligations under the Renewal Provisions set forth in the Franchise Agreement and the Disclosure, and consistent with the requirements of the New York General Business Law; (iii) unreasonably demanding that Westchester Fitness and its members execute onerous and unlawful documents as a condition for renewal of the Franchise Agreement although not contractually obligated to do so; (iv) unreasonably demanding that Westchester Fitness and its members waive their rights under the New York General Business Law to provide Retrofitness with unlawful benefits; and (v) strong-arming Westchester Fitness and its members by virtue of its position of power as the franchisor in an effort to force Westchester Fitness and its members to execute onerous and unlawful franchise renewal documents to the benefit of Retrofitness.

388. In doing so, Retrofitness acted indifferently, arbitrarily, capriciously and in a manner inconsistent with Westchester Fitness's expectations of its business relationship with Retrofitness.

389. By virtue of Retrofitness's breach of its implied duty of good faith and fair dealing to Westchester Fitness, Westchester Fitness has been damaged in an amount to be

determined upon the trial of this action, but no less than Two Million Dollars ($2,000,000), and such other and further relief as this Court deems just and proper..

**AS AND FOR A FIFTH CLAIM FOR RELIEF**

**(Against Retrofitness, in the Alternative, for Unjust Enrichment)**

390.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

391.    As a direct result of the actions described in the preceding paragraphs that were committed by Retro Defendants, Westchester Fitness has been impoverished.

392.    Retrofitness has been unjustly enriched in the sum of at least $2,000,000, as a result of Retro Defendants' wrongful and fraudulent conduct detailed above.

393.    Retrofitness's retention of the benefits it derived from its unjust actions, which were to the detriment of Westchester Fitness and its members, violates the fundamental principles of equity and good conscience.

394.    By reason of the foregoing, Retrofitness is liable to Westchester Fitness in an amount to be determined at trial, but no less than Two Million Dollars ($2,000,000), and such other and further relief as this Court deems jus and proper.

**AS AND FOR A SIXTH CLAIM FOR RELIEF**

**(Against Retrofitness, in the Alternative, for Declaratory Judgment)**

395.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

396.    Westchester Fitness duly performed each and every obligation as required under the terms of the Franchise Agreement.

397. Retrofitness has failed to perform its material obligations under the Franchise Agreement in breach thereof as detailed herein. Retrofitness's breach of the Franchise Agreement remains uncured.

398. Retrofitness also has violated applicable law by reason of its conduct as set forth above.

399. By virtue of the foregoing, Westchester Fitness seeks declaratory relief that the Franchise Agreement, and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are void and in violation of New York law.

400. An actual and justiciable controversy exists between Westchester Fitness and Retrofitness and a judicial declaration is necessary and appropriate at this time to determine the respective rights and obligations of the parties.

401. By reason of the forgoing, Westchester Fitness is entitled to a judicial determination that: (i) the Franchise Agreement, and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are void and of no force and effect; and (ii) Westchester Fitness is entitled to all monies invested in the franchise (including, without limitation, all construction, equipment and other start-up costs for the business) in addition to the revenue collected by Retrofitness in royalties, franchise fees, kick-backs and any other form of compensation collected by Retrofitness on account of Westchester Fitness's business.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (Against Retro Defendants, in the Alternative, for Fraud)

402. Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

403. As detailed above, the Retro Defendants and Westchester Fitness were fraudulently induced by the Retro Defendants into believing that the parties had reached an agreement on the First Settlement Agreement and that the Retro Defendants were negotiating in good faith to reach an agreement under the Second Settlement Agreement under false pretenses. Despite representations to the contrary by the Retro Defendants as detailed herein, upon information and belief, the Retro Defendants never had any intention to honor the terms of the First Settlement Agreement or to agree upon the Second Settlement Agreement.

404. Instead, upon information and belief, Retrofitness and Sprechman sought to have Westchester Fitness rely upon the fact that they had reached an agreement on the First Settlement Agreement and that they were negotiating in good faith to consummate the Second Settlement Agreement. Upon information and belief, such conduct was intended to cause Westchester Fitness to incur additional liabilities to its detriment as detailed herein, and to enable the Retro Defendants to run out the clock during the COVID-19 Pandemic to preclude Westchester Fitness from selling its business and maximizing its ability to mitigate its damages as a result of the Retro Defendants wrongful conduct addressed at length above.

405. Upon information and belief, as fully detailed above, the Retro Defendants, intentionally and knowingly, made false and material representations and omissions, through their counsel. These representations and conduct include, but are not limited to, the following: (i) the Retro Defendants, Westchester Fitness and Ms. Wallman had reached an agreement on the First Settlement Agreement and intended to purchase Westchester Fitness's business and either assume the lease no later than April 1, 2020 or execute a new lease by that date; and (ii) the Retro Defendants were negotiating in good faith to reach an agreement as to the Second

Settlement Agreement and, in fact, had agreed to all material terms before retrenching on their position once the Governor of New York lifted the shut down of fitness facilities in New York.

406. Upon information and belief, the Retro Defendants, through their unlawful and fraudulent scheme and in blatant disregard of New York law, intentionally misled Plaintiff as further detailed above.

407. Further, upon information and belief, as detailed herein, the Retro Defendants knew their statements were false, and, as a direct and proximate cause of these intentional and knowing misrepresentations and omissions, the Retro Defendants knew that Plaintiff would be induced to rely upon such statement to its detriment.

408. Upon information and belief, as detailed herein, the Retro Defendants intended to induce Plaintiff to act or refrain from acting upon their false statements, and Plaintiff justifiably relied upon such false statements.

409. Plaintiff, did not know, and could not have known, of the alleged unlawful and fraudulent conduct committed by the Retro Defendants until they revealed their true intent in June 2020 when the Retro Defendants reneged on the First Settlement Agreement and in or about August/September 2020 when the Retro Defendants refused to consummate the Second Settlement Agreement as detailed above.

410. Plaintiff suffered damages as a direct and proximate consequence of the alleged false statements made, and alleged fraud committed, by the Retro Defendants.

411. As a result of alleged false statements made, and alleged fraud committed, by Retrofitness and Sprechman, the Retro Defendants were able to force Plaintiff to shut down its business without being able to fully mitigate its damages due to the fraudulent and other misconduct alleged herein.

412. Retro Defendants' statements and acts described above constitute actual fraud and fraudulent inducement under New York law.

413. Plaintiff is entitled to an award of damages against Retrofitness and Sprechman, jointly and severally, in an amount to be determined at trial, but no less than, the amount of any claims alleged by the Landlord Defendants against Plaintiff for the period of February 7, 2020 forward, plus attorneys' fees, costs incurred, punitive damages, and such other and further relief as the Court deems just and proper.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### (Against the Retro Defendants, in the Alternative, for Breach of Contract)

414. Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

415. The First Settlement Agreement was and remains a valid, binding and written expression of the parties' agreement to be bound under the terms set forth therein.

416. Plaintiff duly performed each and every obligation as required under the terms of the First Settlement Agreement.

417. The Retro Defendants intentionally and willfully failed to perform its obligations under the First Settlement Agreement in breach thereof as detailed herein.

418. The Retro Defendants' breach of the First Settlement Agreement remains uncured.

419. As a result of Retrofitness's default and this resulting litigation, Plaintiff has incurred and continues to incur expenses including attorneys' fees, which cannot be finally determined at this date but which will be capable of determination at such time as judgment may be entered herein.

420.     By reason of the foregoing, Retrofitness is liable to Plaintiff in an amount to be determined at trial, including, without limitation, the amount of any claims alleged by the Landlord Defendants against Plaintiff for the period of February 7, 2020 forward, plus attorneys' fees, costs and disbursements incurred in such amount as may be determined, interest at the statutory rate from the date of Retrofitness's breach of the First Settlement Agreement through the entry of judgment herein, and such other relief as the Court deems just and proper.

## AS AND FOR A NINTH CLAIM FOR RELIEF

**(Against Retro Defendants, in the Alternative, for Breach of
the Implied Covenant of Good Faith and Fair Dealing)**

421.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

422.     Implied in the First Settlement Agreement and the Second Settlement Agreement agreed upon by Plaintiff and Retro Defendants was a duty of good faith and fair dealing between the parties to those contracts.

423.     As detailed herein, Plaintiff acted at all times in good faith and dealt fairly with the Retro Defendants with regard to their contractual relationship.

424.     The Retro Defendants repeatedly breached the implied duty of good faith and fair dealing that it owed to Plaintiff by, *inter alia*:  (i) committing the fraud and unlawful conduct alleged above to fraudulently induce Westchester Fitness to agree upon the First Settlement Agreement and the Second Settlement Agreement while never intending to honor its obligations thereunder and preventing Plaintiff from mitigating its damages as result of the Retro Defendants' wrongful conduct; (ii) failing to negotiate in good faith, and in accordance with its obligations under the First Settlement Agreement and the Second Settlement Agreement, and consistent with the requirements of New York law; (iii) unreasonably demanding that Plaintiff

execute onerous and one-sided documents in connection with the First Settlement Agreement and Second Settlement Agreement; (iv) unreasonably demanding that Plaintiff waive their rights to provide Retrofitness with unreasonable benefits with nominal benefits provided in return; (v) strong-arming Plaintiff by virtue of its position of power as the franchisor in an effort to force Plaintiff to concede to its unreasonable demands; (vi) strong-arming Plaintiff through its ill-conceived New Jersey Action and delay tactics to force the Plaintiff into the untenable position of being unable to mitigate its damages as a result the Retro Defendants' wrongful conduct; and (vii) taking inconsistent legal positions in the New Jersey Class Action and the Second Settlement Agreement with respect to the ownership rights of Westchester Fitness's membership agreements and in an effort to obtain wrongful ownership over Westchester Fitness's assets.

425.    In doing so, Retro Defendants acted indifferently, arbitrarily, capriciously and in a manner inconsistent with Plaintiff's expectations of its business relationship with Retrofitness.

426.    By virtue of Retrofitness's breach of its implied duty of good faith and fair dealing to Plaintiff, Westchester Fitness has been damaged in an amount to be determined upon the trial of this action, including, without limitation, the amount of any claims alleged by the Landlord Defendants against Plaintiff for the period of February 7, 2020 forward.

## AS AND FOR A TENTH CLAIM FOR RELIEF
### (Against Retrofitness, in the Alternative, for Unjust Enrichment)

427.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

428.    As a direct result of the actions described in the preceding paragraphs with respect to the wrongful conduct committed by the Retro Defendants after commencement of this Action, , Plaintiff has been impoverished.

429.     Retrofitness has been unjustly enriched in an amount to be proven at trial, as a result of the Retro Defendants' wrongful and fraudulent conduct detailed above.

430.     Retrofitness's retention of the benefits it derived from its unjust actions, which were to the detriment of Plaintiff its members, violates the fundamental principles of equity and good conscience.

431.     By reason of the foregoing, Retrofitness is liable to Plaintiff and its members in an amount to be determined at trial, but no less than the amount of any claims alleged by the Landlord Defendants against Plaintiff for the period of February 7, 2020 forward.

## AS AND FOR AN ELEVENTH CLAIM FOR RELIEF

**(Against Retrofitness and Sprechman for Tortious Interference with Business Relations)**

432.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

433.     Westchester Fitness has and had, at all relevant times, business relationships with its members, ABC Financial, and First Credit with which it has contracted.

434.     The Retro Defendants knew of Westchester Fitness's business relationships and intentionally interfered with, and continue to interfere with and disrupt Westchester Fitness's business relationships with its members, ABC Financial and First Credit as detailed herein.

435.     The Retro Defendants acts of intentional and wrongful interference and disruption have actually and proximately caused a disruption of the economic and existing business relationships Westchester Fitness has with its members, ABC Financial and First Credit.

436.     As a direct and proximate cause of the Retro Defendants improper and unlawful interference with Plaintiff's existing business relationships, Plaintiff has been damaged in an amount to be proven at trial, plus attorneys' fees, costs and disbursements incurred in such

151

amount as may be determined, and interest in an amount to be determined by the Court, and such other relief as the Court deems just and proper.

**AS AND FOR A TWELFTH CLAIM FOR RELIEF**

**(Against Retrofitness for a Permanent Injunction)**

437.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

438.    Retrofitness, through its unlawful and fraudulent conduct set forth above, is attempting to prevent Westchester Fitness and Ms. Wallman from mitigating their damages caused by Retrofitness.

439.    Indeed, Retrofitness is seeking to prevent Westchester Fitness and Ms. Wallman from taking any steps to preclude Retrofitness from enforcing its alleged rights under its unlawful Franchise Agreement and to take ownership and control over Westchester Fitness's Premises, equipment and business.

440.    Due to the significant damage Retrofitness caused Westchester Fitness, the Wallmans and the Investors as well as the substantial exposure under a multi-million dollar Lease, Plaintiff and Ms. Wallman must mitigate the damages.

441.    Retrofitness has no adequate remedy at law for Retrofitness and Sprechman's refusal to allow Westchester Fitness and Ms. Wallman to mitigate the damages.

442.    Plaintiff is likely to succeed on the merits of this complaint due to the apparent fraud and misconduct committed by Retro Defendants, which is extensively documented.

443.    Absent an injunction Westchester Fitness will suffer irreparable harm.

444.    Accordingly, Westchester Fitness is entitled to an order permanently enjoining and restraining Retro Defendants and all those acting in concert with them and on their behalf

(the "Retrofitness Parties"), from attempting to enforce the unlawful Franchise Agreement and precluding Westchester Fitness, the Wallmans, and the Investors from mitigating their damages caused by Retrofitness through any means possible including, without limitation, liquidating the business assets, and/or operating or selling the business as a non-Retrofitness franchise without the Retrofitness Parties, directly or indirectly, disrupting or interfering with Westchester Fitness's business, membership agreements, billings, members, billing provider, vendors and/or service providers.]

## AS AND FOR A THIRTEENTH CLAIM FOR RELIEF

**(Against Landlord Defendants, in the Alternative, for Declaratory Judgment)**

445. Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

446. Plaintiff duly performed each and every obligation as required under the terms of the Lease and the Landlord Agreement.

447. The Landlord Defendants failed to perform its material obligations under the Lease as it, *inter alia*, continued to charge Plaintiff rent and other charges under the Lease even though there is an express provision in the Lease that precludes such.

448. Specifically, the Landlord Defendants specifically agreed that "there were be no violation of the terms of the lease or damages or penalty if the business is unable to operate due to situations that are beyond the Tenants control (i.e.) action instituted by the local health department, as long as the Tenant is diligently acting to correct the condition." See Original Lease at p. 8, §17.C. Thus, the Landlord Defendants clearly are not entitled to any damages including, without limitation, any rent or any claims under the Lease given Westchester Fitness's inability to operate due to the COVID-19 shut down and ongoing stringent health and safety

restrictions imposed by the government, and the parties clearly contemplated a government related shut down when they executed the Lease.

449.     Moreover, under the Casualty provisions of the Lease, the Landlord Defendants are not entitled to charge rent or related charges and must abate the full amount of any rent due and owing due to the Casualty caused by the ongoing pandemic, which caused the Premises to be shut down and untenable for nearly 6 months and continue to cause the Premises to be untenantable due to ongoing severe restrictions on occupancy, use and operations.

450.     Further, the Lease requires the Landlord to afford Plaintiff the peaceful and quiet use and possession of the Premises.  Clearly, Westchester Fitness has been unable to use the Premises for the purposes for which it leased the Premises and under the same occupancy and operations guidelines as discussed above and thus has not been provided by the Landlord with the use of the Premises as contemplated under the Lease.

451.     The Landlord Defendants also failed to provide a Premises that may be used for the permitted use and occupancy as provide in the Lease as previously detailed.

452.     The Landlord Defendants also failed to perform its material obligations under the Landlord Agreement in breach thereof by refusing to honor its agreement to accept a replacement tenant that was proffered by the Plaintiff in good faith and in accordance with the acceptable guidelines outlined by the Landlord Defendants in exchange for an abatement of all rent and related obligations as detailed herein.

453.     The Landlord Defendants breach of the Lease Agreement and Landlord Agreement remains uncured.

454.     The Landlord Defendants also have violated applicable law by reason of its conduct as set forth above.

455. By virtue of the foregoing, Plaintiff seeks declaratory relief that the Lease (including all guarantees thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are void.

456. By virtue of the foregoing, Plaintiff seeks declaratory relief that the Landlord Agreement is fully enforceable and that any and all rent or other charges alleged to be owed under the Lease (including all guarantees thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are fully abated and no amounts are due and owing thereunder.

457. An actual and justiciable controversy exists between Plaintiff and the Landlord Defendants and a judicial declaration is necessary and appropriate at this time to determine the respective rights and obligations of the Landlord Defendants and Plaintiff.

458. By reason of the forgoing, Plaintiff is entitled to a judicial determination that: (i) the Lease (and any guarantees executed thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are void and of no force and effect; and (ii) Landlord Agreement is fully enforceable and that any and all rent or other charges alleged to be owed under the Lease (including all guarantees thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are fully abated and no amounts are due and owing thereunder.

## AS AND FOR A FOURTEENTH CLAIM FOR RELIEF

**(Against Landlord Defendants, in the Alternative for Rescission Based on Frustration of Purpose)**

459. Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

460.     An actual and justiciable controversy exists between Plaintiff and the Landlord Defendants and a judicial declaration is necessary and appropriate at this time to determine the respective rights and obligations of the Landlord Defendants and Plaintiff under the Lease.

461.     Specifically, the Landlord Defendants seek to enforce the Lease despite the fact that the Lease is rescinded under the doctrine of frustration of purpose.

462.     Under New York law, frustration of purpose applies to a situation where an unforeseen event has occurred which, in the context of the entire transaction, destroys the underlying reasons for performing such contract, thus operating to discharge a party's duties of performance.

463.     As a result of COVID-19 and/or Governor Cuomo's Executive Orders, Plaintiff was prohibited from operating its business at the Premises and was prohibited from undertaking all other permitted uses set forth in the Lease for nearly 6 months.

464.     Plaintiff's inability to operate its business because of a pandemic and/or the related government shutdown order was completely outside of Plaintiff's control and was neither foreseen nor foreseeable at the time the Lease was entered.  Although fitness centers have been allowed to reopen it is at the marginal capacity of 35% with stringent health and safety requirements, restrictions on use, occupancy and operations for the foreseeable future – all of which are to the substantial detriment of Plaintiff and not consistent with the general understanding of the parties when the Lease was executed.  It will, thus, be years before consumer fitness behavior in the brick and mortar fitness club industry will recover to pre-COVID-19 levels.  This, too, was unforeseeable.

465.     Plaintiff has a legally protectable interest in this controversy.

466.     Specifically, Plaintiff has a pecuniary interest in a declaration that they have no obligation to continue to pay rent to Defendant commencing on March 17, 2020 (the first date that operations at the Premises were shuttered).

467.     Therefore, Plaintiff seeks a declaratory judgment of its rights under the doctrine of frustration of purpose.

468.     Specifically, Plaintiff seeks a declaration from this Court that the Lease (including all guarantees thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are rescinded as a result of the COVID-19 Pandemic and/or the Executive Orders, which prohibited Plaintiff from operating its business at the Premises.

469.     This controversy is ripe for adjudication and a judicial declaration is necessary to end the present controversy.

## AS AND FOR A FIFTEENTH CLAIM FOR RELIEF
**(Against Landlord Defendants, in the Alternative, for Rescission Based on Impossibility of Performance)**

470.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

471.     An actual and justiciable controversy exists between Plaintiff and the Landlord Defendants and a judicial declaration is necessary and appropriate at this time to determine the respective rights and obligations of the Landlord Defendants and Plaintiff under the Lease.

472.     The Lease requires Defendant to tender the Premises for use as a health club with related services and accessories.

473.    The doctrine of impossibility of performance provides that performance of a contract will be excused if such performance is rendered impossible by, *inter alia*, intervening governmental activities.

474.    COVID-19 and/or the Executive Orders have rendered performance by both Plaintiff and the Landlord Defendants impossible. Indeed, since mid-March and continuing for nearly 6 months, governmental regulations have outlawed the operation of a fitness facility at the Premises.  Thus, performance under the Lease has been rendered impossible.

475.    The impossibility occasioned by COVID-19 and/or the Executive Orders - as well as the "phased" reopening at marginal capacity only with severe restrictions on use, occupancy and operations - was unforeseen and unforeseeable at the time the Lease was entered into, and cannot be attributed to Plaintiff or the Landlord Defendants.

476.    Therefore, Plaintiff seeks a declaratory judgment of its rights under the doctrine of impossibility.

477.    Specifically, Plaintiff seeks a declaration from this Court that the Lease (including all guarantees thereof), and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are rescinded as a result of the COVID-19 Pandemic and/or the Executive Orders, which have rendered performance by Plaintiff and the Landlord Defendants impossible.

478.    This controversy is ripe for adjudication and a judicial declaration is necessary to end the present controversy.

## AS AND FOR A SIXTEENTH CALIM FOR RELIEF

### (Against Landlord Defendants, in the Alternative, for Reformation of Lease)

479.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

480.    Plaintiff's ability to operate a fitness center at the Premises was the Landlord Defendants and Plaintiff's mutual purpose in entering the Lease, as all parties understood at the time of contracting, and but for its right to operate such a business, Plaintiff would not have entered the Lease.

481.    When Plaintiff was forced to cease all operations at the Premises, the purpose of the Lease was frustrated and impossible to effectuate due to no fault of Plaintiff.  Plaintiff's obligations under the Lease became impossible and impracticable to perform, and Plaintiff was deprived of the consideration it received in exchange for entering the Lease.

482.    Plaintiff's inability to operate its business for a protracted period because of a pandemic and/or the related government shutdown order was completely outside of Plaintiff's control and was neither foreseen nor foreseeable at the time the Lease was entered.

483.    Plaintiff and the Landlord Defendants would not have entered the Lease had they known that Plaintiff would be unable to operate a fitness center at the Premises for the full term of the Lease, and Plaintiff's ability to use the Premises as a fitness center was the sole consideration Plaintiff received under the Lease.

484.    It was the Plaintiff and the Landlord Defendants' intent that Plaintiff would not pay rent or other consideration for the Premises if such use was rendered impossible or impracticable.  Had the Plaintiff and the Landlord Defendants' been able to anticipate the

events of the COVID-19 crisis at the time of contracting, the Parties would have provided language expressly stating their true intent.

485.     An actual controversy exists between the Parties concerning their respective rights under the Lease, and Plaintiff has no adequate remedy at law.

486.     In the alternative to Plaintiff's claims relating to the rescission of the Lease, Plaintiff is entitled to judicial reformation of the Lease to reflect the Parties' true intent that Plaintiff would have no obligation to pay rent once it was deprived of the use of the Premises and that the Lease would terminate automatically when Plaintiff was deprived of its use of the Premises as originally contemplated by the Lease.

## AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF

### (Against Landlord Defendants, in the Alternative, for Breach of Contract – Lease Agreement)

487.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

488.     Prior to the Lease's termination and/or rescission, the Lease constituted a binding enforceable contract.

489.     Landlord Defendants breached the contract by, among other things, demanding that Plaintiff pay rent, other expenses and excess charges that were not owed under the Lease; and continuing to charge such fees during the period that Plaintiff has been deprived of its use of the Premises in contravention of the express terms of the Lease as previously stated.

490.     Plaintiff performed all of its obligations under the Lease except those that were waived, excused or rendered impossible and/or impractical.

491.     Plaintiff was damaged due to the Landlord Defendants' breach.

492.    By reason of the foregoing, the Landlord Defendants are liable to Plaintiff in an amount to be determined at trial, plus attorneys' fees, costs and disbursements incurred in such amount as may be determined, interest at the statutory rate from the date of the Landlord Defendants' breach of the Lease through the entry of judgment herein, and such other relief as the Court deems just and proper.

## AS AND FOR A EIGHTEENTH CLAIM FOR RELIEF
**(Against Landlord Defendants, in the Alternative, for Breach of Contract – Landlord Agreement)**

493.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

494.    The Landlord Agreement constitutes a binding and enforceable contract.

495.    The Landlord Defendants breached the contract by, among other things, failing to abate the rent and all related charges given that Plaintiff proffered a ready, willing, able and qualified tenant to assume the Lease within the guidelines agreed to by the Landlord Defendants as further detailed herein.

496.    Plaintiff performed all of its obligations under the Landlord Agreement.

497.    Plaintiff was damaged due to the Landlord Defendants' breach.

498.    By reason of the foregoing, the Landlord Defendants are liable to Plaintiff in an amount to be determined at trial, plus attorneys' fees, costs and disbursements incurred in such amount as may be determined, interest at the statutory rate from the date of the Landlord Defendants' breach of the Landlord Agreement through the entry of judgment herein, and such other relief as the Court deems just and proper

## AS AND FOR A NINETEENTH CLAIM FOR RELIEF

### (Against Landlord Defendants, in the Alternative, for Fraud)

499.     Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

500.     As previously detailed, Plaintiff was fraudulently induced to entering into the Landlord Agreement under false pretenses because despite representations to the contrary, at the time the Landlord Parties and Plaintiff agreed to the Landlord Agreement, upon information and belief, the Landlord Parties never had any intention to honor the Landlord Agreement or to comply with its terms.

501.     In particular, Plaintiff was fraudulently induced to remain at the Premises, to its detriment, in an effort to continue to obtain a tenant for the Landlord Defendants in exchange for the Landlord Defendants agreeing to abate all rent and other alleged amounts due and owing under the Lease in accordance with the Landlord Agreement.

502.     Upon information and belief, the Landlord Defendants, however, never intended to accept a replacement tenant of a non-branded fitness center or to honor the terms of the Landlord Agreement.

503.     Rather, the Landlord Defendants induced Plaintiff to continue to seek a replacement tenant and to continue its occupancy of the Premises to, upon information and belief, enable the Landlord Defendants to attempt to collect additional rent and other charges during, *inter alia*, the shut down of Westchester Fitness's business (and all other non-essential businesses) due to a world-wide pandemic and while knowing full well that the Landlord Defendants never intended to accept a replacement tenant of a non-branded fitness center.

504.     Upon information and belief, as fully detailed above, the Landlord Defendants, intentionally and knowingly, made false and material representations.  .

505.     Further, upon information and belief, the Landlord Defendants knew their statements were false, and, as a direct and proximate cause of these intentional misrepresentations and omissions, the Landlord Defendants knew that Plaintiff would be induced to agree to the Landlord Agreement, and to spend significant, time and effort attempting to provide a replacement tenant while continuing to occupy the Premises so as to increase the ability to locate a new fitness center tenant.

506.     Indeed, Mr. Hirsch was told by Ms. Wallman multiple times during the aforementioned discussions in February, April, June, at a minimum, that it would be necessary to continue to occupy the Premises while continuing to locate another fitness tenant so as to maximize the ability to obtain a new fitness center tenant.

507.     Upon information and belief, the Landlord Defendants intended to induce Plaintiff to act or refrain from acting upon its false statements, and Plaintiff justifiably relied upon such false statements.

508.     Plaintiff, did not know, and could not have known, of the alleged fraudulent conduct committed by the Landlord Defendants until it revealed its true intent late July and early August 2020 when presented with a ready, willing, able and qualified tenant to assume the Lease and the Landlord Defendants refused to negotiate in good faith to agree upon a lease assumption, admitting to the prospective tenant that they already had a lease and thus had no need to negotiate a new lease and that they were not interested in having a debranded fitness center as a tenant.

509. Plaintiff suffered damages as a direct and proximate consequence of the alleged false statements made, and alleged fraud committed, by the Landlord Defendants.

510. As a result of false statements made, and alleged fraud committed, by the Landlord Defendants, the Landlord Defendants continued to charge Plaintiff rent and other excessive and unauthorized charges under the Lease to which it was not entitled as detailed above.

511. The Landlord Defendants statements and acts described above constitute actual fraud and fraudulent inducement under New York law.

512. Plaintiff is entitled to an award of damages against the Landlord Defendants, jointly and severally, in an amount to be determined at trial, plus attorneys' fees, costs incurred, punitive damages, and such other and further relief as the Court deems just and proper.

## AS AND FOR A TWENTIETH CLAIM FOR RELIEF

### (Against Landlord Defendants, in the Alternative, for Breach of the Implied Covenant of Good Faith and Fair Dealing)

513. Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

514. Implied in the Lease and Landlord Agreement entered into between Plaintiff and the Landlord Defendants was a duty of good faith and fair dealing between the parties to that contract.

515. Plaintiff acted at all times in good faith and dealt fairly with the Landlord Defendants with regard to their contractual relationship.

516. The Landlord Defendants repeatedly breached the implied duty of good faith and fair dealing that it owed to Plaintiff by, *inter alia*: (i) committing the fraud and misconduct

alleged above to fraudulently induce Plaintiff to remain at the Premises, to its detriment, in an effort to attempt to collect additional unwarranted rent and other excessive charges during the shut down of Westchester Fitness's business due to a world-wide pandemic and while knowing full well that the Landlord never intended to accept a replacement tenant of a non-branded fitness facility; (ii) failing to negotiate in good faith, and in accordance with its obligations under the Lease Agreement and Landlord Agreement, and consistent with the requirements of the New York law; and (iii) failing to negotiate in good faith with the Plaintiff and the prospective tenant that Plaintiff provided to the Landlord Defendants as a replacement tenant in accordance with the requirements of the Landlord Agreement agreed upon by Plaintiff and the Landlord Defendants.

517.    In doing so, the Landlord Defendants acted indifferently, arbitrarily, capriciously and in a manner inconsistent with Plaintiff's expectations of its business relationship with the Landlord Defendants.

518.    By virtue of the Landlord Defendants' breach of its implied duty of good faith and fair dealing to Plaintiff, Plaintiff Fitness has been damaged in an amount to be determined upon the trial of this action.

## AS AND FOR A TWENTY-FIRST CLAIM FOR RELIEF

### (Against Landlord Defendants, in the Alternative, for Unjust Enrichment)

519.    Plaintiff repeats and realleges the above allegations and incorporates the same herein as though more fully stated at length.

520.    Plaintiff's ability to operate a fitness center at the Premises was the parties' mutual purpose in entering the Lease, as both parties understood at the time of contract.

521.    But for its right to operate a fitness center, Plaintiff would not have entered the Lease.

522. When Plaintiff was forced to cease all operations at the Premises, the purpose of the Lease was frustrated and impossible to effectuate due to no fault of Plaintiff. At that point, Plaintiff's obligations under the Lease became impossible and impracticable to perform, and Plaintiff was deprived of the consideration it received in exchange for entering the Lease.

523. This sudden mandatory cessation of operations at the Premises was unforeseeable and not contemplated by the Plaintiff and the Landlord Defendants at the time the Lease was entered.

524. Plaintiff and the Landlord Defendants would not have entered the Lease had they known that Plaintiff would have been unable to operate a fitness center at the Premises, and Plaintiff's ability to use the Premises as a fitness center was the sole consideration it received under the Lease.

525. The Landlord Defendants would be unjustly enriched if they were entitled to receive rent and other charges under the Lease during the period of time Plaintiff was unable to operate the fitness center at the Premises.

526. The Landlord Defendants would be unjustly enriched if they were entitled to receive rent and other charges under the Lease given that the Landlord Parties agreed to abate such fees under the terms of the Landlord Agreement, which the Landlord Defendants breached while the Plaintiff performed all obligations thereunder.

527. Plaintiff will be unjustly enriched if it was entitled to the aforementioned payments to the Plaintiff's detriment.

528. Moreover, as a direct result of the actions described in the preceding paragraphs that were committed by the Landlord Defendants, Plaintiff has been impoverished.

529. The Landlord Defendants have been unjustly enriched in an amount to be proven at trial, as a result of the Landlord Defendants' wrongful and fraudulent conduct detailed above.

530. The Landlord Defendants retention of the benefits it derived from its unjust actions, which were to the detriment of Plaintiff, violates the fundamental principles of equity and good conscience.

531. By reason of the foregoing, Retrofitness is liable to Plaintiff in an amount to be determined at trial.

**WHEREFORE**, Westchester Fitness demands judgment:

a) on the FIRST CLAIM FOR RELIEF against Retrofitness and Sprechman, jointly and severally, (i) voiding and rescinding the Franchise Agreement, and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, and recouping all monies invested in the franchise (including, without limitation, all construction, equipment and other start-up costs for the business) in addition to the revenue collected by Retrofitness from Westchester Fitness in royalties, franchise fees, kick-backs, and any other form of compensation; and (ii) in an amount to be determined at trial in accordance with the damages afforded under Section 691 of the General Business Law, plus attorneys' fees, costs incurred, and interest, and such other relief as the Court deems just and proper;

b) on the SECOND CLAIM FOR RELIEF against Retrofitness and Sprechman, jointly and severally, in an amount to be determined at trial, but no less than the amount of Two Million Dollars ($2,000,000), plus attorneys' fees, costs incurred, punitive damages, and such other relief as the Court deems just and proper;

c)      on the THIRD CLAIM FOR RELIEF against Retrofitness in an amount to be determined at trial, but no less than the amount of Two Million Dollars ($2,000,000), plus attorneys' fees, costs and disbursements incurred in such amount as may be determined, interest at the statutory rate from the date of Retrofitness's breach of the Franchise Agreement through the entry of judgment herein, and such other relief as the Court deems just and proper;

d)      on the FOURTH CLAIM FOR RELIEF against Retrofitness in an amount to be determined upon the trial of this action, but no less than Two Million Dollars ($2,000,000);

e)      on the FIFTH CLAIM FOR RELIEF against Retrofitness in an amount to be determined at trial, but no less than $2,000,000;

f)      on the SIXTH CLAIM FOR RELIEF against Retrofitness determining that:  (i) the Franchise Agreement, and any other documents executed by Westchester Fitness and/or the Wallmans in connection therewith, are void and of no force and effect; and (ii) Westchester Fitness is entitled to all monies invested in the franchise (including, without limitation, all construction, equipment and other start-up costs for the business) in addition to the revenue collected by Retrofitness in royalties, franchise fees, kick-backs and any other form of compensation collected by Retrofitness on account of Westchester Fitness's business;

g)      on the SEVENTH CLAIM FOR RELIEF an award of damages against Retrofitness and Sprechman, jointly and severally, in an amount to be determined at trial, but no less than, the amount of any claims alleged by the Landlord Defendants against Plaintiff for the period of February 7, 2020 forward, plus

attorneys' fees, costs incurred, punitive damages, and such other and further relief as the Court deems just and proper.

h)      on all other CLAIMS FOR RELIEF as set forth in each individual claim;

i)      for attorneys' fees, costs and disbursements pursuant to the Franchise Agreement, the New York General Business Law, and as further detailed herein; and

j)      for such other and further relief as this Court deems just and proper.

Dated: Centerport, New York
October 13, 2020

By:    /s/ Holly S. Falkowitz          
       Holly S. Falkowitz
14 Forest Drive
Centerport, New York 11721
Tel: (646) 641-4469
*Attorney for Plaintiff Westchester Fitness, LLC, Holly and Jason Wallman*